DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON (CABN 217022)
LOLITA DE PALMA (WABN 57380)
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C. 20044-0683
(202) 307-6422 (AM)
(202) 305-3664 (LDP)
(202) 307-0054 (f)
Amy.T.Matchison@usdoj.gov
Lolita.DePalma@usdoj.gov
Western.Taxcivil@usdoj.gov
*Counsel for Plaintiff the United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 4:22-cv-07371-DMR |
| | ) | |
| Plaintiff, | ) | **UNITED STATES' MOTION FOR** |
| | ) | **SUMMARY JUDGMENT AGAINST** |
| v. | ) | **DEFENDANT TUNCAY SAYDAM** |
| | ) | |
| TUNCAY SAYDAM, | ) | Hearing Date: July 11, 2024 |
| | ) | Hearing Time: 1:00 PM |
| Defendant. | ) | Judge: Chief Magistrate Judge Donna M. |
| | ) | Ryu |

NOTICE IS GIVEN that on July 11, 2024 at 1:00 PM, the United States will and hereby does move the Court to grant summary judgment to the United States under Federal Rule of Civil Procedure 56.

The United States requests that the Court enter judgment that defendant Tuncay Saydam is liable for the outstanding unpaid civil penalty assessments against him for 2013 through 2017 for his willful failure to comply with his statutory obligation to report his foreign bank accounts for those years.

# TABLE OF CONTENTS

Table of Contents ............................................................................................................. ii

Table of Authorities ........................................................................................................ iii

Introduction ...................................................................................................................... 1

Statement of Undisputed Material Facts ......................................................................... 1

    I.    Congress Passes the Bank Secrecy Act to Curb the Use of Foreign Bank Accounts to Evade the Law .................................................................................................................... 1

    II.    Accomplished Engineering Professor Tuncay Saydam Moves from Turkey to the United States and Becomes a Citizen. ................................................................................ 2

    III.    Tuncay Stores His "Life Savings" in Swiss Bank Accounts. ......................................... 4

    IV.    After ZKB Closes Tuncay's Accounts Due to Tightening United States Regulations, Tuncay Transfers the Balance of the Accounts to Turkey......................................................... 5

    V.    From 2013 Through 2017, Tuncay Maintains Accounts at Multiple Turkish Banks While Repeatedly Denying Their Existence to the IRS............................................................. 7

    VI.    Tuncay Is Not Forthcoming with the IRS During His FBAR Examination. ................ 11

Argument ........................................................................................................................ 12

    I.    This Court Has Jurisdiction to Grant Summary Judgment on the Timely Willful FBAR Penalty Assessments Against Tuncay for 2013 through 2017................................................ 13

    II.    Tuncay Is Liable for Willful FBAR Penalties for His Failure to File Timely FBARs for 2013 Through 2017. ........................................................................................................... 14

    III.    This Court Should Enter Judgment Against Tuncay on the Willful FBAR Penalties. .. 22

Conclusion ...................................................................................................................... 23

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

ii

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011)..............................................................................................15, 21

*Jones v. United States*,
    No. SACV 19-00173, 2020 WL 4390390 (C.D. Cal. May 11, 2020) ...............................14, 16

*Norman v. United States*,
    942 F.3d 1111 (Fed. Cir. 2019).......................................................................................15, 18

*Planned Parenthood of Columbia/Willamette Inc. v. Amer. Coal. of Life
    Activities*,
    518 F.3d 1013 (9th Cir. 2008) .................................................................................................22

*Safeco Ins. v. Burr*,
    551 U.S. 47 (2007)................................................................................................................15, 16

*United States v. Bohanec*,
    263 F. Supp. 3d 881 (C.D. Cal. 2016) .................................................................................15, 21

*United States v. Burga*,
    --- F. Supp. 3d ----, 2023 WL 8190173 (N.D. Cal. 2023).....................................14, 15, 19, 20

*United States v. Collins*,
    36 F.4th 487 (3rd Cir. 2022) .......................................................................................................15

*United States v. Gentges*,
    531 F. Supp. 3d 731 (S.D.N.Y. 2021).........................................................................................15

*United States v. Goldsmith*,
    541 F. Supp. 3d 1058 (S.D. Cal. 2021).............................................................................. *passim*

*United States v. Horowitz*,
    978 F.3d 80 (4th Cir. 2020) ............................................................................................... *passim*

*United States v. Hughes*,
    No. 18-cv-05931-JCS, 2021 WL 4768683 (N.D. Cal. Oct. 13, 2021) .......................14, 15, 22

*United States v. Kerr*,
    No. CV-19-05432, 2023 WL 2308415 (D. Ariz. Mar. 1, 2023)...............................................22

*United States v. Kimble*,
    991 F.3d 1238 (Fed. Cir. 2021)......................................................................15, 16, 18, 19

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

*United States v. McBride*,
  908 F. Supp. 2d 1186 (D. Utah Nov. 8, 2012) ........................................................21

*United States v. Ott*,
  441 F. Supp. 3d 521 (E.D. Mich. 2020) ................................................................19

*United States v. Reyes*,
  No. 21-CV-5578, 2024 WL 2293750 (E.D.N.Y. May 21, 2024) ...........................22

*United States v. Rum*,
  995 F.3d 882 (11th Cir. 2021) ..........................................................15, 17, 18, 19

*United States v. Texas*,
  507 U.S. 529 (1993) ..............................................................................................22

**Statutes and Regulations**

31 C.F.R. § 5.5 .........................................................................................................22

31 C.F.R. § 1010.306 ...............................................................................................13

31 C.F.R. § 1010.350 .............................................................................................2, 14

28 U.S.C. § 1355 ......................................................................................................14

28 U.S.C. § 1961 ...............................................................................................22, 23

31 U.S.C. § 3717 .........................................................................................12, 22, 23

31 U.S.C. § 5314 .........................................................................................2, 12, 13

31 U.S.C. § 5321 .............................................................................................. *passim*

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

iv

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664

## INTRODUCTION

Tuncay Saydam has lived an impressive life. He was the "full professor and founder of the first computer science department in his native Turkey at 36, dean of faculty at 37" and then joined "a university faculty in the U.S. where he emigrated and became a citizen." Ex. 1, Jan. 20, 2021 Email. He has "taught and d[one] research and some of the best schools in Istanbul, U.S., Europa, and Japan." *Id.* And he has written "7 books, 61 research articles and 15 bound consulting reports." *Id.*

Yet Tuncay[1] chose to conceal the fruits of his many decades of academic labor from the United States. He stored his life savings in Swiss bank accounts and did not comply with United States laws requiring him to annually report these accounts on a Report of Foreign Bank and Financial Accounts ("FBAR"). And when his Swiss bank informed him in 2012 that it was closing his accounts due to tightening United States regulations and recommended that he consult with a qualified tax advisor about his disclosure obligations, he moved the funds to a bank in Turkey without consulting a tax advisor or filing the requisite FBARs. Indeed, from 2013 through 2017, Tuncay kept hundreds of thousands of dollars in unreported bank accounts in Turkey while declaring on his tax returns that he had no financial interest in any foreign accounts. And when the IRS finally confronted him about his unreported Turkish bank accounts, Tuncay tried to conceal the fact that the funds in the accounts had originated from a Swiss bank account.

As a learned scholar who has taught and written in English at the university-level, Tuncay's decision not to comply with the FBAR reporting requirements despite receiving multiple notices of these requirements cannot be anything but willful. Tuncay is thus liable for willful FBAR penalties for 2013 through 2017.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I. Congress Passes the Bank Secrecy Act to Curb the Use of Foreign Bank Accounts to Evade the Law.

---

[1] Tuncay Saydam will be referred to as "Tuncay" in this motion to distinguish him from his wife Oya Saydam.

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

In 1970, Congress enacted the Bank Secrecy Act to counteract the "serious and widespread use of foreign financial facilities located in secrecy jurisdictions for the purpose of violating American law." H.R. Rep. No. 91-975 (1970). In particular, the Bank Secrecy Act targeted the use of foreign bank accounts "by Americans to evade income taxes" and to "conceal assets illegally." *Id.* Indeed, the House report noted that "Swiss account[s]" in particular "offer[] a convenient means of evading U.S. taxes." *Id.* The Bank Secrecy Act thus directed the Secretary of Treasury to promulgate regulations requiring United States persons to report their relationships with foreign financial agencies to the IRS. 31 U.S.C. § 5314.

The regulations the Secretary of Treasury promulgated under the Bank Secrecy Act require all United States persons with a financial interest in or signature authority over foreign accounts with a total balance exceeding $10,000 to file an annual FBAR with the IRS identifying these accounts. 31 U.S.C. § 5314; 31 C.F.R. §§ 1010.306(c), 1010.350(a). Since tax year 1976, Schedule B of Form 1040 has asked United States taxpayers whether they have any interest or signature authority over a foreign financial account and directed them to the appropriate FBAR form for that year to put taxpayers on notice of the FBAR filing requirement. Ex. 2, 1976 Form 1040 Schedules A & B.

## II. Accomplished Engineering Professor Tuncay Saydam Moves from Turkey to the United States and Becomes a Citizen.

Despite growing up in Turkey in the 1930s and 40s, Tuncay Saydam began learning English at the age of 10. Tuncay Depo. at 13:7−15, 15:9−19. By the time he was pursuing his undergraduate degree in engineering at Istanbul Technical University, he was fluent. *Id.* at 13:18−14:2, 15:20−25. Indeed, Tuncay was so fluent in English that he completed graduate degrees in engineering and computer science at the University of Texas at Austin. *Id.* at 14:5−10. After he returned from the United States, Tuncay joined Istanbul Technical University's faculty, first as an assistant professor, and then as a full professor. *Id.* at 16:5−12.

After teaching at Istanbul Technical University, Tuncay became a dean at Bosphorus University—a university in Istanbul that teaches in English. Tuncay Depo. at 16:13−19. While at

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

2

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

Bosphorus University, Tuncay spent a year teaching and writing a book in English at the University of Delaware as a visiting professor. *Id.* at 37:9−19. The University of Delaware was so impressed by Tuncay's teaching and scholarship that the university invited Tuncay to join the computer science faculty as a full professor with tenure. *Id.* at 16:19−17:3, 20:5−9. He accepted this invitation and moved his family to Newark, Delaware in 1980. *Id.* at 16:19−17:6, 20:2−4.

In either 1988 or 1989, Tuncay became an American citizen; this event was "life-changing." *Id.* at 19:15−20:1. While Tuncay continued to hold his Turkish citizenship, he did not go to Turkey more than once or twice a year after 1990. *Id.* at 23:18−24:8. Nevertheless, Tuncay maintained bank accounts in Turkey with Akbank T.A.Ş. ("Akbank"), which he set up himself. *Id.* at 78:18−20, 82:6−13, 85:13−21.

In 1988, Tuncay spent a seven-month sabbatical from the University of Delaware teaching at Eidgenössische Technische Hochschule Zürich ("ETH Zurich") in Zurich, Switzerland. *Id.* at 20:10−17, 32:2−6, 33:3−34:2; Ex. 3, Dr. Bernard Plattner letter, USA000265, USA000268−69. While Tuncay was teaching in Switzerland, he developed contacts with Swiss telecommunications companies and later did some consulting work for them into the mid-1990s. Tuncay Depo. at 27:5−22, 28:4−21, 32:2−11, 35:9−17. At some point in the early to mid-1990s, Tuncay returned to Switzerland for a second sabbatical to teach for a term at École Polytechnique Fédérale de Lausanne ("EPFL") in Lausanne, Switzerland. *Id.* at 20:18−25. Tuncay also later taught in Japan for six months. *Id.* at 21:1−6. Tuncay also got his MBA through a three-and-a-half-month intensive course for professors at the London Business School, where he was taught by both London Business School and Harvard professors. *Id.* at 14:14−15:2.

In 2005, Tuncay retired from the University of Delaware after teaching there for 25 years. *Id.* at 17:7−9, 23:10−15. But even after Tuncay retired, he continued to give lectures at universities around the world. *Id.* at 22:25−23:15. During his academic career, Tuncay wrote over fifty technical articles—almost all of which were in English. *Id.* at 21:7−22:4, 38:5−7; Ex. 4, Research Article, USA000274. He also wrote at least six or seven books on science, at least one of which was in English. Tuncay Depo. at 21:12−24.

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

3

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

### III. Tuncay Stores His "Life Savings" in Swiss Bank Accounts.

Tuncay was no longer teaching or consulting in Switzerland in the 2000s; his only visits to the country were for banking purposes. *Id.* at 25:18−26:19. Tuncay had opened accounts in Switzerland to store his university salaries and his consulting fees—his "life savings." *Id.* at 39:17−40:11, 66:22−67:9. By 2009, Tuncay had three bank accounts with Zürcher Kantonalbank ("ZKB") in Zurich, Switzerland: a securities deposit account, a foreign currency account, and a private account. Ex. 5, ZKB Acct. Opening Letters; Ex. 6, ZKB Acct. Opening Docs., USA000124 (signed May 13, 2009); Tuncay Depo. at 39:17−40:8. Tuncay provided ZKB with a copy of his Turkish passport—not his American passport—when he opened the accounts. Ex. 6, USA000120−21; Tuncay Depo. at 42:8−42:12, 43:11−18, 43:24−44:10. On the general signature agreements for the ZKB accounts, Tuncay's nationality is listed as Turkish, and the address provided is the address for a house in Turkey Tuncay's wife Oya inherited from her mother ("Oya's mother's house"). Ex. 6, USA000118−19; Tuncay Depo. at 40:18−41:16, 42:16−43:10; Oya Depo. at 20:1−21:16. This house was Oya's separate property; Tuncay and Oya also jointly owned an apartment and a summer house in Turkey. Tuncay Depo. at 24:19−25:14, 42:22−43:10; Oya Depo. at 15:21−16:4.

In 2009—the same year that Switzerland's largest bank UBS admitted to conspiring with Americans to hide foreign income from the IRS—Tuncay signed a U.S. Withholding Tax Questionnaire for Natural Persons for his ZKB accounts. Ex. 6, USA000124−25; Ex. 7, N.Y. Times Article; Tuncay Depo. at 47:9−48:3. This questionnaire stated that its purpose was "to correctly determine the status and qualification of the safe custody account holder for the purpose of U.S. Withholding Tax as a non U.S. person or U.S. person." Ex. 6, USA000124. On this signed questionnaire, Tuncay's nationality was listed as "Turkey," and his address as Oya's mother's house. *Id.* On this questionnaire, "NO" was falsely selected in response to these two questions: (1) "Have you lived during the current year and the preceding two years for a total of more than 183 days in the USA?" and (2) "Are you a U.S. taxpayer for any other reason?" *Id.* In

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

4

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

2009, Tuncay was living in the United States and paying U.S. taxes. Tuncay Depo. at 50:16−17. "NO" was also untruthfully selected at some point in response to the question "Are you a U.S. citizen or do you have dual nationality including U.S. citizenship?" Ex. 6, USA000124. This "NO" was then scribbled out and at some point "YES" was selected. *Id.* On May 13, 2009, Tuncay signed the box on this questionnaire to "relinquish any investments in U.S. securities," which would limit reporting requirements to United States authorities. *Id.*; Tuncay Depo at 47:21−48:6. This "declaration of relinquishment" was supposed to only be available to non-U.S. persons. Ex. 6, USA000124.

Tuncay would withdraw money from his ZKB accounts in person in Switzerland and deposit them in his Akbank account in Turkey. Tuncay Depo. at 53:2−14, 55:5−18, 58:18−25, 60:2−61:6; 83:23−84:9. In 2011, Tuncay personally withdrew over $15,000 from his ZKB accounts. Ex. 8, ZKB Foreign Currency Acct., USA000012, USA000029; Ex. 9, ZKB Private Acct., USA000032, USA000047. Tuncay did not file timely FBARs or otherwise report his interest in the ZKB accounts to the IRS. Dkt. 1 ¶18; Dkt. 8 ¶18; Montelongo Decl. ¶¶ 35−35, 77−79; Exs. J, V.

## IV. After ZKB Closes Tuncay's Accounts Due to Tightening United States Regulations, Tuncay Transfers the Balance of the Accounts to Turkey.

On March 22, 2012, ZKB sent a letter to Tuncay to inform him that it was terminating his ZKB accounts due to "the expected tightening of the U.S.-regulations." Ex. 10, Mar. 22, 2012 ZKB Letter, USA000127. At this time, Tuncay had over $500,000 in his ZKB accounts. Tuncay Depo. at 66:22−67:9; Ex. 11, ZKB to DenizBank Transfer, USA000137. In its letter, ZKB advised Tuncay "to choose a financial institution that is either U.S. regulated or has entered into a Qualified Intermediary Agreement with the U.S. authorities" and recommended that Tuncay "consult with a qualified tax advisor to determine if there exist any U.S. tax consequences in connection with the closure of the banking relationship, such as additional U.S. tax return filing or disclosure obligations." Ex. 10, USA000127−28. Tuncay did not receive this letter until he visited Turkey in the summer of 2012 because it was sent to the Turkish address he had given to

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

5

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664

ZKB for Oya's mother's house. *Id.* at USA000127; Tuncay Depo. at 25:25−26:3, 68:2−70:18; Ex. 12, United States' RFAs to Tuncay, RFA No. 2; Ex. 13, Tuncay's RFA Responses, RFA No. 2. Indeed, Tuncay did not even stay at Oya's mother's house that summer; he stayed at his house in Bodrum where he usually stayed when he was in Turkey during the summer. Tuncay Depo. at 78:25−79:18; Ex. 14, Sept. 4, 2012 Letter.

ZKB sent a second letter to Oya's mother's house on August 2, 2012 to inform Tuncay that his accounts would be closed by October 1, 2012. Ex. 15, Aug. 2, 2012 ZKB Termination Letter. This letter again advised Tuncay to choose a bank regulated by the United States and to consult with a qualified tax advisor regarding his disclosure obligations. *Id.* Tuncay eventually received this letter as well. Ex. 12, RFA No. 3; Ex. 13, RFA No. 3.

Even though Tuncay already had an account with M&T Bank in the United States (as well as accounts with Akbank in Turkey) that he could have transferred the ZKB funds into, Tuncay chose to personally open three new Turkish bank accounts with DenizBank A.Ş. ("DenizBank") on August 29, 2012 for the funds in his soon-to-be-terminated ZKB accounts. Tuncay Depo. at 63:20−64:18, 65:23−66:4, 76:10−77:4; Ex. 11, USA000138; Ex. 16, M&T Statement; Ex. 17, Akbank Statements. At the same time, Tuncay entered an agreement with Egeli & Co Portfoy Yönetimi A.Ş. ("Egeli & Co.") to manage his portfolio with DenizBank. Tuncay Depo. at 84:10−85:1; Ex. 18, Egeli & Co. Agreement; Ex. 19, DenizBank Statements. Then, in September 2012, Tuncay personally traveled to Switzerland to supervise the transfer of the balance of his ZKB accounts to his DenizBank accounts. Tuncay Depo. at 25:18−26:3, 58:4−10; 66:10−67:9; Ex. 14. He went to ZKB to transfer the funds in person because the ZKB accounts held his "life savings" and were "very, very important for [him]." Tuncay Depo. at 67:5−9. Indeed, the ZKB funds were "the accumulation of . . . [a] major part of [his and Oya's] wealth, and [he didn't] trust somebody else doing the banking for [him]." *Id.* at 80:2−12.

At Tuncay's request, ZKB transferred the balance of his ZKB accounts—over $525,000—to his U.S. dollar account with DenizBank on September 4, 2012. *Id.* at 74:11−23, 75:13−16, 75:24−77:4; Ex. 11; Ex. 20, DenizBank Letter. Tuncay personally signed off on this

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

1 transfer. Tuncay Depo. at 75:13−16, 75:24−76:6, 77:8−18; Ex. 11, USA000137, USA000139.

2 That same day, Tuncay wrote a letter to ZKB, requesting that ZKB pay him 2,000 Swiss francs

3 in cash to compensate him for "the expenses and the inconvenience" ZKB caused him by

4 terminating his accounts. Ex. 14. Tuncay complained that he had had to travel from his summer

5 house in Bodrum, "search[] for two days in Istanbul to find a suitable bank" for the ZKB funds,

6 and then "fly to Zurich only for this purpose so that the transfer could be securely made." *Id.*;

7 Tuncay Depo. at 66:10−21, 77:22−81:12; Ex. 12, RFA No. 4; Ex. 13, RFA No. 4. ZKB refused

8 to provide compensation. Ex. 21, Sept. 20, 2012 ZKB Letter.

9 **V.  From 2013 Through 2017, Tuncay Maintains Accounts at Multiple Turkish Banks**
   **While Repeatedly Denying Their Existence to the IRS.**

10 In both 2013 and 2014, Tuncay had financial accounts in Turkey with Akbank and

11 DenizBank with a total value of greater than $10,000. Exs. 17, 19; Dkt. 1 ¶¶ 23−24; Dkt. 8 ¶¶

12 23−24. Egeli & Co. managed the DenizBank accounts and would send Tuncay monthly emails

13 with a summary of the balance in his accounts. Tuncay Depo. at 64:24−65:10, 83:13−22;

14 84:10−85:1, 86:2−10, 93:13−15; Ex. 19. And when he visited Turkey twice a year, Tuncay

15 would go to Egeli & Co.'s offices to meet with his financial advisor Tan Egeli and his portfolio

16 manager Elvan Gulcur to discuss Egeli & Co.'s management of his account with DenizBank. *Id.*

17 at 24:4−12, 87:8−89:9, 146:16−147:7, 152:9−153:18, 188:24−189:3; Ex. 18, SAYD-001443.

18 When Tuncay was in Turkey, he would also visit Akbank, which had a location "only 50 yards

19 away across the street" from Tuncay and Oya's apartment in Turkey. Tuncay Depo. at 146:8−15.

20 During these visits, Tuncay would check in on the status of his accounts with Akbank, as well as

21 withdraw and deposit money. *Id.* at 84:2−9, 86:15−87:11, 146:8−15.

22 For 2013 and 2014, Tuncay was required to file an FBAR reporting his Denizbank and

23 Akbank accounts by June 30 of the following year. Dkt. 1 ¶13; Dkt. 8 ¶13. Tuncay did not

24 comply with this requirement. Dkt. 1 ¶27; Dkt. 8 ¶27; Montelongo Decl. ¶¶33, 77−79; Ex. V,

25 FinCEN Search. Linda Dunn, a tax preparer with H&R Block, prepared Tuncay's tax returns for

26 2013 and 2014 in person at Tuncay's local H&R Block office. Dunn Depo. at 46:6−47:5,

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)                    7          **U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

47:17−48:5; 50:22−52:10, 57:5−20; Tuncay Depo. at 159:3−160:1; Ex. P, 2013 IRS Tax Return Info, USA000469; Ex. Q, 2014 Tax Return, USA000474. For each tax year from 2013 through 2017, H&R Block instructed its tax preparers that they must ask each of their clients whether they had a financial interest or signature authority over a financial account located in a foreign country during the tax year Arruda Decl.; Ex. B, 2014 H&R Block Textbook; Ex. C, 2015 H&R Block Textbook; Ex. D, 2016 H&R Block Textbook, Ex. E, 2017 H&R Block Textbook; Rorer Depo. at 33:5−15. If the client said yes to this question, the client was to be advised they may need to file an FBAR. *Id.* Dunn always asked her clients at the start of the in-person meeting whether they had any foreign income or bank accounts. Dunn Depo. at 18:25−19:12, 44:5−9, 45:11−46:5.

While it is unclear whether Tuncay filed a Schedule B for 2013,[2] it is undisputed that Tuncay filed a Schedule B for tax year 2014. Ex. Q, USA000483−85. On Tuncay's filed 2014 Schedule B, "No" was selected in response to the question: "At any time during 2014, did you have a financial interest or signature authority over a financial account (such as a bank account, securities account, or brokerage account) located in a foreign country?" *Id.* at USA000485. "No" was also selected in response to the question: "If 'Yes,' are you required to file FinCen Form 114, Report of Foreign Bank and Financial Accounts (FBAR), to report that financial interest or signature authority? See FinCen Form 114 and its instructions for filing requirements and exceptions to those requirements." *Id.* After he had the opportunity to review his 2014 tax return, Tuncay signed the return, including the Schedule B, under penalty of perjury, representing that he had examined the return and that it was correct to the best of his knowledge. *Id.* at USA000474; Tuncay Depo. at 162:6−19, 164:7−13, 166:25−167:4.

In 2015, Tuncay's relationship with Egeli & Co. broke down because Tuncay was frustrated with their management of his DenizBank accounts. Tuncay Depo. at 96:12−97:2. Tan

---

[2] Neither the IRS, Tuncay, nor H&R Block has a copy of Tuncay's filed 2013 income tax return. The IRS does have the information from the 2013 income tax return on file, which has been attached as Exhibit P. From this information, it is unclear whether Tuncay filed a Schedule B for 2013.

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

1   Egeli had promised Tuncay a "20 percent or something" return on the accounts, but the balance

2   instead "went down" in 2015. Tuncay Depo. at 84:15−21; Exs. 18, 19, 20. Tuncay thus engaged

3   a law firm in September 2015 to pursue a case against Tan Egeli and Egeli & Co to recover his

4   lost savings. Tuncay Depo. at 96:23−97:2, 156:14−25; Ex. 22, Guleryuz Letter, SAYD-003062.

5   That same month, Tuncay opened at least two new Turkish bank accounts with Turkiye İş

6   Bankası A.Ş. ("Isbank"). Ex. 23, Isbank Statements, USA001910, USA002298; Tuncay Depo. at

7   131:15−132:12. About every six months, Isbank would send Tuncay account statements via

8   email to keep him apprised of the balance of his Isbank accounts. Tuncay Depo. 86:15−18,

9   128:23−129:12.

10          In December 2015, Tuncay ended his relationship with Egeli & Co. and personally

11   transferred the balance of his DenizBank accounts to his Isbank accounts. Ex. 24, Dec. 2015

12   DenizBank Emails; Ex. 20; Ex. 23, USA002298; Ex. 25, Is Yatirim[3] Statement, USA002491;

13   Tuncay Depo. at 125:9−126:21. Thus, in 2015, Tuncay had financial accounts in Turkey with

14   DenizBank, Isbank, and Azbank with a total value of greater than $10,000. Exs. 17, 19, 23, 25;

15   Dkt. 1 ¶¶23−24; Dkt. 8 ¶¶23−24.

16          For 2015, Tuncay was required to file an FBAR reporting his Denizbank, Isbank, and

17   Akbank accounts by June 30, 2016. Dkt. 1 ¶13; Dkt. 8 ¶13. Tuncay did not file timely FBARs

18   reporting his foreign accounts for 2015. Dkt. 1 ¶27; Dkt. 8 ¶27; Montelongo Decl. ¶¶33, 77−79;

19   Ex. V. For tax year 2015, Dunn also prepared Tuncay's tax returns and met with him in person at

20   the H&R Block office. Ex. R, 2015 Tax Return, USA000488; Dunn Depo. at 47:17−48:5,

21   61:4−25; Tuncay Depo. at 159:3−160:1. On Tuncay's filed Schedule B for 2015, "No" was again

22   selected in response to the foreign account and FBAR questions. Ex. R, USA000498. Tuncay

23   had an opportunity to review his 2015 tax return and signed it under penalty of perjury. *Id.* at

24   USA000488; Tuncay Depo. at 162:6−19.

25

26

27   [1]Is Yatirim is the investment branch of Isbank. Tuncay Depo. at 134:3−16.

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

In both 2016 and 2017, Tuncay had financial accounts in Turkey with Akbank and Isbank with a total value of greater than $10,000. Exs. 17, 23, 25; Dkt. 1 ¶¶23−24; Dkt. 8 ¶¶23−24. For 2016 and 2017, Tuncay was required to file an FBAR reporting his Isbank and Akbank accounts by April 15 of the following year, with an automatic extension to October 15, 2017. Dkt. 1 ¶13; Dkt. 8 ¶13. Tuncay did not file timely FBARs reporting his foreign accounts for 2016 or 2017. Dkt. 1 ¶27; Dkt. 8 ¶27; Montelongo Decl. ¶¶33, 77−79; Ex. V.

For tax year 2016, German Gomez, a tax preparer with H&R Block, prepared Tuncay's tax returns in person at the H&R Block office. Ex. S, 2016 Tax Return, USA000501; Gomez Depo. at 46:14−47:21; Tuncay Depo. at 159:3−160:1. For tax year 2017, Morris Rorer, a tax preparer with H&R Block, prepared Tuncay's tax returns in person at the H&R Block office. Ex. T, 2017 Tax Return, USA000514; Rorer Depo. at 40:11−41:11, 60:15−62:9; Tuncay Depo. at 159:3−160:1. Both Gomez and Rorer always asked their clients at the start of an in-person meeting whether they had any foreign income or bank accounts. Gomez Depo at 14:25−15:22; Rorer Depo. at 42:19−43:15. And BlockWorks 2016 and BlockWorks 2017, the H&R Block software used by H&R Block tax preparers for tax years 2016 and 2017, required the tax preparer to input an answer to whether a client had a financial interest or signature authority over a foreign account as one of the first questions asked by the software, even if the client did not have to file a Schedule B. Ex. A, BlockWorks Screenshots; *see* Jorgenson Decl.

On Tuncay's filed Schedule Bs for 2016 and 2017, "No" was again selected in response to the foreign account and FBAR questions. Ex. S, USA000507−09; Ex. T, USA000525−26. Tuncay had an opportunity to review both returns and signed both under penalty of perjury. Ex. S, USA000501; Ex. T, USA000514; Tuncay Depo. at 162:6−19. All three H&R Block tax preparers who prepared Tuncay's returns from 2013 through 2017 testified that if a client told them that they had foreign bank accounts, they would either inform them of their obligation to report those accounts or refer them to a specialist. Dunn Depo. at 18:15−19:12, 24:20−26:4, 41:13−42:8, 74:24−75:15; Gomez Depo. at 21:2−23:3; Rorer Depo. at 53:1−55:17.

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

10

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

### VI. Tuncay Is Not Forthcoming with the IRS During His FBAR Examination.

In 2018, Revenue Agent Libertad Montelongo began her examination of Tuncay and Oya's compliance with the laws governing the reporting of foreign bank accounts. Montelongo Decl. ¶4. She first interviewed Oya and Tuncay on November 1, 2018. Montelongo Decl. ¶15; Tuncay Depo. at 182:24−183:5. At this interview, the Saydams disclosed only their Akbank accounts. Montelongo Decl. ¶¶16−18; Tuncay Depo. at 188:4−18, 190:23−191:15. On this same day, Revenue Agent Montelongo issued an Information Document Request ("IDR") to the Saydams, requesting bank records for all foreign financial accounts they had a financial interest in, or signature authority over, from 2012 through 2017. Montelongo Decl. ¶22−23; Ex. I, Second IDR. At Tuncay's second interview on December 7, 2018, he provided some bank statements and records from IsBank, DenizBank, and AkBank—but did not provide any records from ZKB, even though his accounts there were still open for part of 2012. Montelongo Decl. ¶¶26−31; Tuncay Depo. at 192:1−7.

On February 5, 2019, Tuncay filed untimely and inaccurate FBARs for 2012, 2013, 2014, 2015, 2016, and 2017. Montelongo Decl. ¶¶33−41; Ex. J, Late-Filed FBARs. The late-filed 2012 FBAR omitted his ZKB accounts, while the late-filed 2015 FBAR omitted the Akbank accounts he had that year. Ex. J at USA000326−33, USA000350−57. The late-filed FBARs also did not include all the accounts he had with Akbank and Isbank from 2012 through 2017. *Compare* Ex. J, *with* Ex. 17, *and* Ex. 23.

On August 21, 2019, Revenue Agent Montelongo interviewed Tuncay a third time. Montelongo Decl. ¶52. While Tuncay still had not provided his ZKB account statements at the time of this interview, he admitted that the funds he had with DenizBank originated from accounts he had with ZKB in Switzerland but only after he was confronted with evidence of the 2012 transfer. Montelongo Decl. ¶¶53−57; Tuncay Depo. at 196:17−198:12. Revenue Agent Montelongo then issued an IDR to Tuncay specifically requesting ZKB account statements for 2011 and 2012 by September 23, 2019. Montelongo Decl. ¶¶58−59; Ex. M, Fourth IDR. Tuncay

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

11

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

1
2
did not request the ZKB account statements until January 2020 and did not produce them to the IRS until March 6, 2020. Montelongo Decl. ¶¶66−67.

3
4
5
6
7
8
9
10
11
12
13
On April 15, 2020, Tuncay consented to extend the time to assess FBAR penalties against him for 2013 and 2014 to June 30, 2021. Montelongo Decl. ¶¶73−74; Ex. U, Consent to 2013 and 2014 Extension. On March 1, 2021, the IRS assessed willful FBAR penalties against Tuncay for 2013, 2014, 2015, 2016, and 2017.[4] Ex. 26, Certified Forms 13448. Tuncay has admitted that, if he is liable for the willful FBAR penalties, the IRS correctly calculated the penalty amounts as: $129,346 for 2013, $133,511 for 2014, $109,764 for 2015, $32,565 for 2016, and $32,378 for 2017. Montelongo Decl. ¶76; Ex. 12, RFA No. 5; Ex. 13, RFA No. 5. As of June 6, 2024, the unpaid balance owed to the United States for the 2013 through 2017 willful FBAR penalties, penalties for late payment of these penalties under 31 U.S.C. § 3717(e)(2), applicable fees and interest, less any payments, is $534,947.09. Presnell Decl. ¶9; Ex. X, Payoff Calculation Summary.

## ARGUMENT

14
15
16
17
18
19
20
21
22
It is undisputed that Tuncay is a United States citizen who stored his life savings in foreign bank accounts, first in Switzerland and then in Turkey, without complying with his FBAR reporting requirements under 31 U.S.C. § 5314(a). It is also undisputed that Tuncay received notice of potential disclosure obligations—both through the letters he received from ZKB when it closed his accounts and later through the Schedule Bs he filed with his annual tax returns. The only issue is whether Tuncay's decision not to file timely FBARs from 2013 through 2017 was "willful" and thus renders him liable for civil willful FBAR penalties under § 5321(a)(5)(C).

23
24
25
Civil willfulness is expansive. It encompasses reckless and willfully blind violations of a statute, as well as knowing ones. Because Tuncay received multiple warnings of his disclosure obligations and still did not comply, his violations of his FBAR disclosure obligations were

26
27
[4] The IRS did not assess willful FBAR penalties against Tuncay for 2012 because the statute of limitations had expired for that year. See 31 U.S.C. § 5321(b)(1).

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)    12    **U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

reckless, willfully blind, and knowing as a matter of law. Thus, Tuncay is liable for willful FBAR penalties for 2013 through 2017, and this Court should enter judgment against him.

## I.      This Court Has Jurisdiction to Grant Summary Judgment on the Timely Willful FBAR Penalty Assessments Against Tuncay for 2013 through 2017.

31 U.S.C. § 5314(a) demands that the Secretary of Treasury require United States persons to report certain transactions or relationships with foreign financial agencies. Pursuant to this statutory obligation, the Secretary of Treasury has required a United States person to annually file an FBAR reporting his financial interest in or signature authority over financial accounts in a foreign country if the total balance in his accounts exceeds $10,000. 31 C.F.R. §§ 1010.306, 1010.350. If a United States person willfully fails to comply with § 5314 and its regulations, the IRS may impose a civil money penalty amounting to "the greater of" $100,000 or 50 percent of "the balance in the [foreign] account[s] at the time of the violation." 31 U.S.C. § 5321(a)(5)(C)(i), (D)(ii). The IRS must make this assessment within six years of "the date of the transaction with respect to which the penalty is assessed" unless the accountholder consents to extend the statute of limitations. *Id.* § 5321(b)(1). The United States then may bring suit to recover the civil penalty assessment within two years of the IRS's assessment. *Id.* § 5321(b)(2)(A).

The IRS assessed willful FBAR penalties against Tuncay on March 1, 2021 for 2013 through 2017. Ex. 26. The March 1, 2021 assessments were timely because Tuncay consented on April 15, 2020 to extend the time to assess FBAR penalties against him for 2013 and 2014 to June 30, 2021 and the statute of limitations had not yet expired for 2015 through 2017. Ex. U. Since the 2015 FBAR was due by June 30 of the following year and the 2016 and 2017 FBARs were due by April 15 of the following year, the six-year statute of limitations did not expire for 2015 until June 30, 2021, for 2016 until April 15, 2022, and for 2017 until April 15, 2023. *See* 31 C.F.R. § 1010.306(c) (2011); Pub. L. No. 114-41, Tit. II, § 2006(b)(11). The United States then timely filed suit under § 5321 to recover on the willful FBAR penalty assessments on November

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

13

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

22, 2022, which was within two years of the March 1, 2021 assessment. Dkt. 1. Thus, no statute of limitations bars this case.

The parties do not dispute that this Court has jurisdiction over this action to recover the unpaid willful FBAR penalty assessments against Tuncay under 28 U.S.C. § 1355, as well as §§ 1331 and 1345. Dkt. 1 ¶8; Dkt. 8 ¶8. The United States need prove Tuncay's liability for the willful FBAR penalties by only a preponderance of the evidence. *United States v. Goldsmith*, 541 F. Supp. 3d 1058, 1081 (S.D. Cal. 2021); *United States v. Hughes*, No. 18-cv-05931-JCS, 2021 WL 4768683, at *12 (N.D. Cal. Oct. 13, 2021). Because this Court reviews the evidence of Tuncay's liability for the penalties de novo, the IRS's reasoning in assessing the willful FBAR penalties against him is irrelevant. *Jones v. United States*, No. SACV 19-00173, 2020 WL 4390390, at *5 (C.D. Cal. May 11, 2020). Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## II. Tuncay Is Liable for Willful FBAR Penalties for His Failure to File Timely FBARs for 2013 Through 2017.

A person is liable for a willful FBAR penalty under 31 U.S.C. § 5321(a)(5)(C) if: (1) he is a U.S. citizen or permanent resident; (2) he had a financial interest in or signature or other authority over a foreign financial account; (3) the total balance of his foreign accounts exceeded $10,000 at some point during the year; and (4) he willfully failed to timely disclose the accounts on an FBAR. 31 C.F.R. § 1010.350(a); *United States v. Burga*, --- F. Supp. 3d ----, 2023 WL 8190173, at *4 (N.D. Cal. 2023). Tuncay does not dispute that he has been a United States citizen since at least 1989. Tuncay Depo. at 19:15−20:1. And he does not dispute that he had a financial interest in foreign bank accounts from 2013 through 2017 nor that the total balance in those foreign bank accounts exceeded $10,000 for each of those years. Dkt. 1 ¶¶23−24; Dkt. 8 ¶¶23−24. Tuncay also admits that he did not file timely FBARs reporting his foreign accounts for 2013 through 2017. Dkt. 1 ¶27; Dkt. 8 ¶27. The only point of contention is whether Tuncay's failure to file was willful.

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

Title 31 does not define "willful" or "willfully" for purposes of § 5321's willful FBAR penalty or otherwise. But the Supreme Court has held that "where willfulness is a statutory condition of civil liability," it "cover[s] not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. v. Burr*, 551 U.S. 47, 57 (2007). Thus, the Third, Fourth, Eleventh, and Federal Circuits have all held that § 5321's willful FBAR penalty applies not only to cases where a person knowingly failed to timely disclose his foreign bank accounts but also where the failure to disclose was objectively reckless. *United States v. Collins*, 36 F.4th 487, 491 (3rd Cir. 2022); *United States v. Horowitz*, 978 F.3d 80, 88 (4th Cir. 2020); *United States v. Rum*, 995 F.3d 882, 888−89 (11th Cir. 2021); *Norman v. United States*, 942 F.3d 1111, 1115 (Fed. Cir. 2019). While the Ninth Circuit has not yet considered this issue, courts in this Circuit, including this Court, have also concluded that willfulness, for purposes of § 5321(a)(5)(C), includes objective recklessness. *Burga*, 2023 WL 8190173, at \*9; *Hughes*, 2021 WL 4768683, at \*13−\*14; *Goldsmith*, 541 F. Supp. 3d at 1082−83; *United States v. Bohanec*, 263 F. Supp. 3d 881, 888−89 (C.D. Cal. 2016). And based on the Supreme Court's holding in *Global-Tech Appliances, Inc. v. SEB S.A.* that willfulness in both civil and criminal cases includes "willful blindness," 563 U.S. 754, 769−71 (2011), courts have also concluded that the willful FBAR penalty applies to cases of willful blindness. *Horowitz*, 978 F.3d at 89; *Goldsmith*, 541 F. Supp. 3d at 1083−85; *Bohanec*, 263 F. Supp. 3d at 890 & n.2; *Hughes*, 2021 WL 4768683, at \*13.

There are certain hallmarks of willfulness, including objective recklessness and willful blindness, in the FBAR context. Declining to receive mail from a foreign account in the United States or taking other actions to conceal the account from the United States, like divesting from United States securities to avoid disclosure to the IRS, are signs that the accountholder intentionally did not report the account. *Rum*, 995 F.3d at 890−91; *Horowitz*, 978 F.3d at 90. Failing to disclose a foreign account to one's tax preparer—especially when the money in the account comprises a significant part of one's net worth—is another common sign of recklessness or even intentional concealment. *Horowitz*, 978 F.3d at 89−90; *United States v. Kimble*, 991 F.3d 1238, 1243 (Fed. Cir. 2021); *United States v. Gentges*, 531 F. Supp. 3d 731, 751−52 (S.D.N.Y.

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

15

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

2021). And signing tax returns denying the existence of foreign accounts an accountholder knows exist can be dispositive evidence of willfulness. *Goldsmith*, 541 F. Supp. 3d at 1094−97 ("[O]verwhelming authority holds that signing [] tax returns" asking about foreign income amounts to "constructive knowledge of [a] duty to report foreign income."); *Kimble*, 991 F.3d at 1242−43.

Tuncay's conduct in ignoring notices of the potential consequences of his foreign bank accounts, lying about his foreign bank accounts on his federal tax forms, and then withholding information about his foreign bank accounts from the IRS exemplifies these hallmarks of willfulness. And whether this Court holds that Tuncay's decision not to file timely FBARs was reckless, knowing, willfully blind, or all three, the willfulness requirement under § 5321 is satisfied. Because the evidence shows that Tuncay's failure to file timely FBARs was willful as a matter of law and Tuncay has conceded all other requirements of willful FBAR liability, Tuncay is liable for the 2013 through 2017 willful FBAR penalties. No reasonable jury would find otherwise.

## A. Tuncay Knowingly Failed to File Timely FBARs.

This Court need not even consider objective recklessness or willful blindness here because there is overwhelming evidence that Tuncay knowingly did not file timely FBARs reporting his foreign bank accounts from 2013 through 2017. Tuncay's knowledge that he was not complying with his disclosure obligations may "be proven 'through inference from conduct meant to conceal or mislead sources of income or other financial information.'" *Jones*, 2020 WL 4390390, at *6 (quoting *United States v. Williams*, 489 F. App'x 655, 658 (4th Cir. 2012)). Because Tuncay knew of his FBAR reporting requirements and chose not to timely file, he acted willfully as a matter of law. *See Safeco*, 551 U.S. at 56−59.

The undisputed facts show that Tuncay used his foreign accounts to conceal his savings from the United States government. Tuncay kept his "life savings" in Switzerland until 2012 even though he had not worked in Switzerland since the 1990s, had lived in the United States

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

16

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

since 1980, and had to have been exposed to the 2008 and 2009 press coverage of the United States' fraud investigations into the Swiss banking system. And when he opened the ZKB accounts, Tuncay provided only his Turkish passport and an address in Turkey that was not where he was residing and in fact was his wife's mother's house—a residence he could only access during the couple times a year he visited Turkey. *See Horowitz*, 978 F.3d at 90 (preventing a Swiss bank from sending mail to the United States was evidence of willfulness). On the 2009 ZKB U.S. Withholding Tax Questionnaire, Tuncay denied living in the United States, declared he was not a U.S. taxpayer, and requested that ZKB not invest in United States securities. *See Rum*, 995 F.3d at 890−91 (directing a foreign bank not to invest in U.S. securities is evidence of willfulness). And when ZKB closed his accounts in 2012 against his will "due to the expected tightening of the U.S.-regulations," Tuncay ignored ZKB's repeated advice in its letters to "consult with a qualified tax advisor" and choose a financial institution regulated by the United States. Exs. 10, 15. Instead, he opened new accounts in Turkey with DenizBank—despite already having Akbank accounts—and went in person to ZKB in Zurich, Switzerland to ensure his life savings were "<u>securely</u>" transferred to Turkey. Ex. 14; see *Horowitz*, 978 F.3d at 90 (traveling to Switzerland to specifically look after "nest-egg retirement account" was evidence of willfulness). And at no point did he file timely FBARs disclosing any of these accounts. Given that Tuncay is a well-educated sophisticated individual, the only reasonable explanation is that he was hiding his savings from the United States government.

The 2012 ZKB letters provided Tuncay with notice of his disclosure obligations before Tuncay needed to file FBARs for 2012 and 2013 reporting his foreign accounts. But Tuncay did not timely file FBARs for those years. And then Tuncay signed tax returns for 2014 through 2017 declaring that he did not have an interest in a financial account in a foreign country despite being well-aware of his multiple foreign bank accounts. These returns were prepared by three different H&R Block tax preparers, all of whom have testified that they asked their clients whether they had foreign accounts, as H&R Block trained them to do and the software, at least as of tax year 2016, required. It therefore cannot be reasonably disputed that Tuncay lied to his tax

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

17

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

preparers about his foreign accounts. But even if he did not lie to his tax preparers, Tuncay still lied to the United States by signing his tax returns under penalty of perjury, attesting that he had reviewed them and that they were correct. And by signing his tax returns under penalty of perjury, Tuncay had, at the very least, constructive knowledge of their contents—including the questions on his 2014 through 2017 Schedule Bs indicating that he may need to file an FBAR if he had any foreign accounts. *See Kimble*, 991 F.3d at 1242−43 ("[A] taxpayer signing their returns cannot escape the requirements of the law by failing to review their returns."). Because he had both actual and constructive knowledge of the FBAR requirements and did not comply with them, Tuncay acted willfully. *See id.*; *Goldsmith*, 541 F. Supp. 3d at 1094−97.

Tuncay's attempts to conceal his ZKB accounts during the IRS's FBAR examination show that he knew that he had not complied with his disclosure obligations. Tuncay did not provide records from his ZKB accounts until March 2020 despite receiving multiple IDRs, beginning in November 2018, requesting all foreign financial account records from 2012 through 2017. Given that Tuncay flew to Switzerland himself in 2012 to "<u>securely</u>" transfer the funds in his ZKB accounts to DenizBank, he cannot contend that he did not know that he had the ZKB accounts in 2012. Ex. 14. Yet he filed a false FBAR for 2012 omitting the ZKB accounts. Tuncay's decision to withhold information about the source of the funds in his Turkish bank accounts from the IRS during his FBAR examination is compelling evidence that he knowingly failed to file timely FBARs reporting his foreign accounts. *See Norman*, 942 F.3d at 1116 (lying to the IRS is evidence of willfulness); *Rum*, 995 F.3d at 891 (same). Thus, the undisputed facts show that Tuncay knew of his FBAR obligations and willfully chose not to comply.

B. <u>The Undisputed Facts Show that Tuncay's Failure to File Timely FBARs for 2013 Through 2017 Was Also Objectively Reckless.</u>

But even if the evidence is not sufficient at summary judgment to show that Tuncay knowingly did not comply with the FBAR reporting requirements, the undisputed facts show that Tuncay's conduct in failing to file timely FBARs was objectively reckless. A person's failure to file a timely FBAR is objectively reckless if he "(1) clearly ought to have known that (2) there

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)                    18                    **U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664

was a grave risk that an accurate FBAR was not being filed and if (3) he was in a position to find out for certain very easily." *Burga*, 2023 WL 8190173, at *19 (quoting *Horowitz*, 978 F.3d at 89). The undisputed facts show that Tuncay's conduct satisfies all three requirements of objective recklessness.

First, Tuncay clearly ought to have known of the FBAR filing requirements. Tuncay chose to place his "life savings" in bank accounts outside of the United States—first in Switzerland and then in Turkey. A man as well-educated and well-traveled as Tuncay, with an MBA from London Business School, ought to have known that such a decision would likely have tax and other legal consequences. *See Horowitz*, 978 F.3d at 89 (storing a significant portion of one's savings in foreign bank accounts is evidence of willfulness). And then Tuncay was repeatedly informed of potential reporting requirements associated with his foreign accounts. In 2009, Tuncay denied living in the United States and being a U.S. taxpayer on ZKB's U.S. Withholding Tax Questionnaire, which stated that its purpose was to determine whether there were U.S. tax withholding consequences associated with Tuncay's accounts. *See Rum*, 995 F.3d at 890−91 (foreign bank withholding form put person on notice of federal tax and reporting obligations); *Goldsmith*, 541 F. Supp. 3d at 1099−1101 (same). In 2012, Tuncay received two letters from ZKB that expressly told him he should "consult with a qualified tax advisor to determine if there exist any U.S. tax consequences in connection with the closure of the banking relationship, such as additional U.S. tax return filing or disclosure obligations," which he ignored. Ex. 10, USA000128; Ex. 15, USA000132; *see United States v. Ott*, 441 F. Supp. 3d 521, 530−31 (E.D. Mich. 2020) (failing to consult a tax expert about foreign investments "supports an inference of reckless conduct"). And Tuncay's 2014 through 2017 Schedule Bs each informed him that he may need to file an FBAR if he had a financial interest in an account in a foreign country—an interest he repeatedly denied having. *See Kimble*, 991 F.3d at 1242−43 (Schedule B provides a taxpayer with constructive notice of reporting requirements).

Second, Tuncay ought to have known that he was not filing timely and accurate FBARs. Tuncay was well-aware of his foreign accounts. Egeli & Co. sent him monthly summaries of the

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

activity in his DenizBank accounts after he opened them in 2012, and he personally visited Akbank and IsBank when he went to Turkey to check in on the status of his accounts with those banks. Indeed, Tuncay was so concerned about the dip in the value of his DenizBank accounts that he sued to recover the losses. But he did not file timely FBARs reporting these accounts. And Tuncay repeatedly signed tax returns under penalty of perjury stating he did not have a financial interest in any foreign accounts. When Tuncay did finally file untimely FBARs for 2012 through 2017 during his FBAR examination in February 2019, he still did not disclose all his foreign bank accounts. He omitted his ZKB accounts entirely, did not include his Akbank accounts in 2015, and left off many of the additional Akbank and Isbank accounts he had had during those years. Because Tuncay was deeply involved in his foreign accounts while denying their existence on his Schedule Bs and not filing timely nor accurate FBARs, he should have been well-aware of the grave risk that he was not complying with the FBAR reporting requirements. See *Burga*, 2023 WL 8190173, at *12, *15 (person who denies existence of their foreign bank accounts on their tax returns is at a grave risk of not meeting FBAR requirements).

Third, Tuncay was in a position to find out the FBAR requirements very easily. Tuncay has been fluent in English since he was at least an undergraduate at Istanbul Technical University in the late 1950s or early 1960s. Indeed, he has written over forty technical articles in English and has an MBA from London Business School. Thus, there was no language or knowledge barrier preventing him from understanding that he had a responsibility to file an annual form reporting his foreign bank accounts to the United States. And Tuncay had a local H&R Block office that he went to every year to have his taxes prepared where he easily could have asked about his disclosure obligations that both the 2012 ZKB Letters and his Schedule Bs put him on notice of. All three of the H&R Block tax preparers he worked with would have either informed him of his reporting obligations or referred him to a specialist if he had disclosed that he had foreign accounts. But instead Tuncay ignored "numerous red flags" expressly informing him of the possibility of disclosure obligations related to his foreign bank accounts, declined to "ma[k]e a simple inquiry to" H&R Block regarding his foreign accounts, and then,

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

1  despite being an accomplished professor, did not even give "the minimal effort necessary to

2  render meaningful [his] sworn declaration[s] that [his] tax returns were accurate." *Horowitz*, 978

3  F.3d at 90. Such conduct—none of which is disputed—is objectively reckless and thus

4  constitutes willfulness as a matter of law.

5          C.   Alternatively, Tuncay's Conduct in Failing to File Timely FBARs Was Willfully
             Blind as a Matter of Law.

6

7          If Tuncay's actions in failing to comply with FBAR filing requirements were not

8  knowing or reckless, then Tuncay's actions were willfully blind. There are "two basic

9  requirements" for willful blindness: "(1) The defendant must subjectively believe there is a high

10 probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning

11 of that fact." *Global-Tech*, 563 U.S. at 769. Both are met here.

12         As an extremely well-educated professor with an MBA, Tuncay was likely already aware

13 that there were potential legal consequences to housing his life savings in Swiss bank accounts

14 when he opened his ZKB accounts. Nevertheless, the two 2012 letters from ZKB telling Tuncay

15 to consult a "qualified tax advisor" to see if there were "disclosure obligations" associated with

16 closing his ZKB accounts would have alerted him that there was a high probability of disclosure

17 obligations associated with his foreign accounts. Exs. 10, 15. But instead of taking the minimal

18 steps necessary to inquire into these highly probable disclosure obligations, Tuncay took

19 deliberate actions to avoid learning about such obligations. First, he had his mail from ZKB sent

20 to Oya's mother's house in Turkey—which meant he could only access his mail from ZKB

21 during his biannual trips to Turkey. *See Bohanec*, 263 F. Supp. 3d at 890 (not providing foreign

22 bank with home address is evidence of willful blindness). Second, he did not consult H&R Block

23 or any other qualified tax advisor about his foreign accounts even though he kept most of his

24 savings in those accounts and had been instructed by ZKB to inquire about his disclosure

25 obligations. *See id.* (not disclosing foreign bank account to tax preparers is evidence of willful

26 blindness); *United States v. McBride*, 908 F. Supp. 2d 1186, 1212 (D. Utah Nov. 8, 2012)

27 (same). Third, Tuncay did not read his tax returns informing him of his potential FBAR

U.S. DEPARTMENT OF JUSTICE
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

1    disclosure obligations (or alternatively blatantly lied on them) before signing them under penalty

2    of perjury. *Horowitz*, 978 F.3d at 90 (failing to read tax returns before signing is evidence of

3    willful blindness); *Hughes*, 2021 WL 4768683, at \*15 (same). If Tuncay was not aware of his

4    FBAR disclosure obligations, then his actions show that he took active steps to conceal that

5    knowledge from himself. That is quintessential willful blindness.

6           The undisputed facts permit only one of two conclusions: (1) Tuncay knew of his FBAR

7    disclosure obligations for 2013 through 2017 and did not comply with them or (2) Tuncay acted

8    objectively recklessly and/or was willfully blind in failing to file timely FBARs from 2013

9    through 2017 reporting the foreign accounts that housed his life savings. Either way, Tuncay's

10   actions were willful, and he is liable for willful FBAR penalties.

11   ### III. This Court Should Enter Judgment Against Tuncay on the Willful FBAR Penalties.

12          Since Tuncay is liable for the willful FBAR penalties, this Court should enter judgment

13   against him in the amount of the willful FBAR penalties. Tuncay has already conceded that the

14   willful FBAR penalties were correctly calculated at the time of assessment as: $129,346.00 for

15   2013, $133,511.00 for 2014, $109,764.00 for 2015, $32,565.00 for 2016, and $32,378.00 for

16   2017. Ex. 12, RFA No. 5; Ex. 13, RFA No. 5. As detailed in the Declaration of Revenue Agent

17   Chad Presnell, the balance due on these FBAR penalty assessments is $534,947.09 as of June 6,

18   2024. Presnell Decl. ¶9; Ex. X, Calculation Summary. The pre-judgment interest and the late-

19   payment penalty applied in this calculation are mandatory. 31 U.S.C. § 3717(a)(1), (e)(2); 31

20   (setting rate of pre-judgment interest at 1%); 31 C.F.R. § 5.5(a) (setting rate of late-payment

21   penalty at 6%); *see United States v. Texas*, 507 U.S. 529, 536 (1993); *United States v. Kerr*, No.

22   CV-19-05432, 2023 WL 2308415, at \*8 (D. Ariz. Mar. 1, 2023); *United States v. Reyes*, No. 21-

23   CV-5578, 2024 WL 2293750, at \*2 (E.D.N.Y. May 21, 2024). And post-judgment interest under

24   28 U.S.C. § 1961 and collection fees under 31 U.S.C. § 3717(e)(1) are also mandatory. *Planned*

25   *Parenthood of Columbia/Willamette Inc. v. Amer. Coal. of Life Activities*, 518 F.3d 1013, 1017

26   (9th Cir. 2008) (post-judgment interest); *Texas*, 507 U.S. at 536 (collection fees).

27

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

22

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664

The United States thus respectfully requests that the Court enter judgment against Tuncay Saydam in the amount of $534.947.09 as of June 6, 2024, plus: (1) additional pre-judgment interest under 31 U.S.C. § 3717(a) from June 6, 2024 through the date judgment is entered, (2) post-judgment interest under 28 U.S.C. § 1961 from the date judgment is entered until it is paid in full; (3) a continuing late-payment penalty under 31 U.S.C. § 3717(e)(2) from June 6, 2024 until this judgment is paid in full, and (4) potential other collection fees under 31 U.S.C. § 3717(e)(1). The United States also requests that it be awarded its costs under Federal Rule of Civil Procedure 54(d)(1) and Civil Local Rule 54-1.

## CONCLUSION

Despite receiving many warnings of his FBAR disclosure obligations, Tuncay Saydam chose to keep his life savings in unreported foreign bank accounts. The undisputed facts show that this decision was willful as a matter of law. Thus, this Court should hold that Tuncay is liable for the 2013 through 2017 willful FBAR penalties and grant summary judgment to the United States.

Dated: June 6, 2024               Respectfully submitted,

                                  DAVID A. HUBBERT
                                  Deputy Assistant Attorney General


                                  */s/ Lolita De Palma*
                                  AMY MATCHISON
                                  LOLITA DE PALMA
                                  Trial Attorneys, Tax Division
                                  U.S. Department of Justice
                                  P.O. Box 683, Ben Franklin Station
                                  Washington, D.C.  20044-0683

                                  *Counsel for United States of America*

US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)                23                **U.S. DEPARTMENT OF JUSTICE**
                                                             Tax Division, Western Region
                                                             P.O. Box 683
                                                             Washington, D.C.  20044
                                                             Telephone: 202-305-3664

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2024, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will provide electronic notice to counsel for all parties that have appeared in this action.

*/s/ Lolita De Palma*
LOLITA DE PALMA
Trial Attorney, Tax Division
United States Department of Justice

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664