# In the Matter Of:

## UNITED STATES vs TUNCAY SAYDAM

4:22-cv-07371-DMR

## LINDA DUNN

*September 22, 2023*



800.211.DEPO (3376)
*EsquireSolutions.com*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF          )
AMERICA,                  )
          Plaintiff, )Civil Action No.
                          )4:22-cv-07371-DMR
v.                        )
                          )
TUNCAY SAYDAM,            )
          Defendant.  )

Deposition of LINDA DUNN,

taken pursuant to notice at the United

States Attorney's Office, 1313 North

Market Street, Suite 400, Wilmington,

Delaware, beginning at 9:25 a.m. on

Friday, September 22, 2023, before

Jennifer M. Guy, Registered

Professional Reporter and Notary

Public.



APPEARANCES:


    LOLITA DE PALMA, ESQ.
    AMY MATCHISON, ESQ.
    UNITED STATES ATTORNEY'S OFFICE
       P.O. Box 683
       Washington, DC  20044
       For the Plaintiff


    DOUGLAS GREENBERG, ESQ.
    THE LAW OFFICE OF DOUGLAS GREENBERG
       201 Spear Street
       Suite 1100
       San Francisco, CA  94105
       For the Defendant


               - - - - -



          LINDA DUNN, after having

      been first duly affirmed, was

      examined and testified as follows:

                  - - -

             EXAMINATION

BY MS. DE PALMA:

  Q.   Welcome, Ms. Dunn.  Today is
September 22, 2023.  We are now on the
record in the case pending in the U.S.
District Court of the Northern District
of California, United States v. Tuncay
Saydam, Civil Action Number
4:22-cv-07371-DMR.  My name is Lolita
De Palma, and I am an attorney for the
US Department of Justice, Tax Division.
At this time, would the attorneys who
are present make their appearances.

          MS. MATCHISON:  Amy
Matchison for the government.

          MR. GREENBERG:  Douglas
Greenberg for Tuncay Saydam.

BY MS. DE PALMA:

  Q.   Please state your full name and
spell it for the record.

  A.   Linda Sharon Dunn, D-U-N-N.



Q.   And what is your current address?

A.   18 Green Meadow Court, Newark, Delaware 19711.

Q.   So the oath that you just took is the same oath that you would take in a courtroom, so you are under the same obligation to tell the truth as you would be in a court of law.  Does that make sense?

A.   Yes.

Q.   I'm now going to set out the ground rules for a deposition.  This deposition is being taken in accordance with the Federal Rules of Civil Procedure.  That means that your answers will be recorded by the court reporter, and she is going to record every word.  She is here at my request, and she will keep recording until I ask her to stop.

Because your answers will be recorded by the court reporter, it is important that you answer verbally and speak up.  Gestures such as nodding



your head will not be recorded, or any sort of movements won't be.  Do you understand?

A.   Yes.

Q.   If I ask a question that is unclear, please let me know and I will rephrase it.  If you answer the question, I will assume that you have heard it and understand it and are giving me your best recollection.  Does that make sense?

A.   Yes.

Q.   It may become conversational as we talk, but it is important that you let me finish my question before you give an answer so that she can record both the question and the answer, and I will extend you the same courtesy so that the record is clear.  Is that okay?

A.   Yes.

Q.   The purpose of the deposition is not to try to trick you into saying something that is not true but to find out the truth.  If you don't understand



the question, say I don't know. Sometimes it will happen that you give an answer as completely as you can, then later on you will remember some additional information or perhaps some clarification to an answer. If that happens to you, just let me know that you want to add something to an earlier answer, and we'll do it right then while it's on your mind. Does that make sense?

A.   Yes.

Q.   And please don't consult anyone or anything while a question is pending or talk to anyone else while the questioning is ongoing. Does that make sense?

A.   Yes.

Q.   And let me know if you're ever speculating.

We will go at a pace that is comfortable for you. If you need a break, let me know. If we are in the middle of a line of questioning, I will finish my questioning and see what we



can do about having a break.  Does that make sense?

A.   Yes.

Q.   We'll probably take breaks on an hour, but we probably will not be going for more than an hour or two.  But if you need a break, let me know.

You'll have an opportunity to read over the transcript and make any corrections before you sign it.  If you make any changes other than grammatical or typographical changes, I'm going to reserve the right to come back and ask you about more substantive changes you made to the record.  Does that make sense?

A.   Yes.

Q.   Some of these questions may seem obvious or redundant, but so we can get a clear record, I may ask you something that you feel you've already answered.  Is that okay?

A.   Yes.

Q.   It is critical that we get your full, complete, and accurate answers.



800.211.DEPO (3376)
EsquireSolutions.com

The following questions are not meant to embarrass you in any way, they just have to be asked on the record before a deposition is taken.  Are you in any pain?

A.   No.

Q.   Are you able to sit for a long period of time?

A.   Yes.

Q.   Are you under the influence of any medication that might affect your ability to remember?

A.   No.

Q.   To understand?

A.   No.

Q.   Or to tell the truth?

A.   No.

Q.   Have you ever been convicted of a criminal offense?

A.   No.

Q.   Have you ever had a speeding ticket?

A.   Yes.

Q.   Can you tell me a little bit about the speeding ticket?



A.    I was speeding.  It's been several years.

Q.    Okay.  Multiple speeding tickets?

A.    No.

Q.    Have you ever given testimony under oath before?

A.    No, I don't think so.

Q.    And is there any reason or any other reason why you would not be able to give full, complete, and accurate testimony today?

A.    No.

Q.    What did you do to prepare for this deposition?

A.    I tried to remember some of the questions that I ask all my tax clients.  I tried to remember him, and I remember very little because it was several years ago that I prepared his return.

Q.    That makes sense.  We're not, you know, asking you to comb every nugget, but whatever you do remember is useful for us to know.



Did you speak to anyone prior to this deposition about the deposition?

A.   Yes.  I called up a guy who retired several years ago and I just told him that I had gotten a subpoena and I suspected he would have gotten one, too, and he did.

Q.   And which man was that?

A.   Morris Rorer.

Q.   Was there anyone else you talked to?

A.   No.

Q.   And what did you and Morris discuss?

A.   Just wanted to know if either one of us remembered him, and we didn't.

Q.   Did you review any documents in preparation for the deposition?

A.   I did not.

Q.   Did you bring any -- have you brought any documents to the deposition today?

A.   No.



Q.   So the United States has brought this case against Tuncay Saydam to recover unpaid civil FBAR penalties arising from Saydam's failure to report his financial interests in several foreign financial accounts from 2013 through 2017.  Tuncay Saydam is the only defendant in this case, and the sole issue is whether his failure to file the required FBARs reporting his foreign accounts was willful.  H&R Block is not a defendant nor a party to this case.  Of course you are not a defendant or a party to this case.  We just need some information from you for this case because you prepared Mr. Saydam's tax returns for a few years at issue.

I'll just start with a little bit of background.  Where did you go to college?

A.   I went to UMBC, University of Maryland Baltimore County, and got my master's from Tucson State University and my doctorate from the University of



Delaware.

Q.    What were your degrees in?

A.    History at the undergraduate level and secondary education, higher education at the master's level, and administration at the doctorate level.

Q.    And I'm assuming, did you teach for a few years?

A.    I taught in secondary school, and then I worked at the University of Delaware.

Q.    What did you teach?

A.    I wasn't teaching there, I was in the dean's office.

Q.    But what did you teach when you were a teacher?

A.    History.

Q.    I was a teacher, as well.  That is why I find it interesting.

So after working -- so how long did you work at the University of Delaware?

A.    About 33 years.  And I retired from there in 2009.

Q.    And when did you start working



at H&R Block?

A.    I actually started in I think it was around 2002, just, I had some time on the weekends and so I took a course and I really liked it.  And so I started working part time until I retired, and then I increased my hours after that.

Q.    So you were working at H&R Block at the same time that you were at the --

A.    Yeah, a little bit of an overlap, yes.

Q.    -- at the University of Delaware.  Wonderful.  And so why did you decide to take the tax course?

A.    Well, I just was looking for -- I had some free time on the weekends, and I knew I liked numbers.  So I thought I would just learn a little bit more about it, initially just for personally.  And then as I got into it, I just thought it would be fun.  And so I decided to try it.  And I enjoyed meeting people, I enjoyed the tax part



of it.  And so I continued.

Q.    And the courses you take, is that one H&R Block offered?

A.    Yes.  And at the end you took an exam.  And they offered me a job after that, I applied and they offered me a job and I accepted.

Q.    Is this a course that you have to take every year that you work for H&R Block, or is it a different one every year?

A.    The initial course was a lot longer.  Each year you have to take an additional 18 hours of something.  A couple of hours of ethics, tax update, and about 13 hours of coursework that relates directly to the taxes.

Q.    So the first introductory course, what did that cover?

A.    Basically every line of the tax return in terms of income and deductions.

Q.    So the 1040?

A.    The 1040, yeah.

Q.    Any other tax forms?



A.    Well, the A, the B, the C.

Q.    And in your coursework, since, you know, you've been working at H&R Block, what other sort of courses have you taken?

A.    I've tried to take courses that just would enhance what I already know. A little bit more on each of the schedules, really, whether it be A, B, C, D, bankruptcy, trying to help families get the most out of their deductions, and states, trying to be familiar, especially with the states, surrounding states, because you do a lot of multi-state, just given where the office is in relation to the other states.

Q.    So when you --

A.    Investments.

Q.    What sort of tax forms do you prepare when you're working with clients?

A.    Typically the 1040, the backup schedules, schedules 1, 2, and 3; the A, B, C, D, are the most familiar ones



that I use.

Q.   And you've taken classes in all of those areas?

A.   Yes.

Q.   And do you have an expertise in any particular tax area?

A.   Probably basic preparation of the 1040 I feel that I have an expertise in, with the backup schedules.

Q.   And for --

A.   Multi-state.

Q.   And for the IRS, do you also have to complete certain assessments or training in order to be able to prepare taxes?

A.   I believe that the H&R Block courses count.  And I also take each year the IRS refresher course.  There was initials that go with it, annual something, I take that one.  And then I get the PTIN.

Q.   And what's the PTIN?

A.   It's just a -- when I sign a return, it's a federal number that I


DEPOSITION SOLUTIONS

use to verify that I'm working for a
company and that I am eligible to sign
the tax return and am responsible for
it.

Q.   Just to clarify, remind me, when
did you begin working for H&R Block?

A.   It was for tax season 2002, so I
think it was 2003 was my first year,
January of 2003.

Q.   And besides H&R Block, have you
worked for any other tax preparation
companies?

A.   I have not.

Q.   For H&R Block, you said you
first worked part time.  What does that
mean?

A.   I worked a couple nights a week
after my work at the university, and I
also worked on Saturdays and about half
a day Sunday.

Q.   And when you were working part
time, about how many clients would you
see a year?

A.   Maybe 100.

Q.   And when you started working --



and after you left the University of Delaware and you started working more for H&R Block, was that still as a seasonal employee?

A.    Yes, yes.  January through the middle of April.

Q.    And about how many clients would you see every year when you were working?

A.    About 225, 230.

Q.    Did you ever prepare -- so you prepared 1040s and you said the Schedule As, Bs, Cs, and Ds, correct?

A.    Mm-hmm.

Q.    Did you ever prepare tax returns that had to do with foreign income?

A.    No.  If someone had foreign income, what I did was sent them back to the front desk to have someone else prepare the return, reassign them. Because I'm not really familiar with all of the treaties that the different countries have as far as the credits that you can give for that.

Q.    How would you find out that the



client had foreign income?

A.   Well, I would ask them as part of the tax preparation when I started talking with them.  There's a series of questions on the tax return, questions for the H&R Block system that you have to answer and check yes or no.  And one of the questions is do you have any additional income, do you have any foreign income, do you have signature authority over any foreign interest accounts.  So that's how I would know.

Q.   And how did H&R Block set you up with the clients to prepare returns for them?

A.   Most of my clients or a lot of my clients now are just repeat clients, so they call in and ask for me. Initially, as say a first year person, what they would do is if someone called in and wanted their taxes done, I believe they asked them some questions to be sure that as a first year person, it was something that they were comfortable with letting me do.  And



then after that, it was more -- at some
point they released if they had income
because of consulting or any type of
self employment.

Q.   So when you say most of your
clients are repeat clients, what
percent would you say do you see or
what percent are new clients, I guess,
every year?

A.   Probably maybe 20 percent are
new clients that call in.

Q.   And so 80 percent are people
you've seen previously, you'd say?

A.   70 to 80, yes.

Q.   Can you request not to have a
client come again for any particular
reason?

A.   Possibly, I guess.  I don't
think I've ever done that.  Just about
all my clients are really nice people.

Q.   But the clients could ask to
work with somebody different?

A.   Oh, sure, sure.

Q.   And does that happen?

A.   Possibly.  I wouldn't know,



because they've called the front --
sometimes what happens is they ask for
a certain day or a certain time and I
might already be booked and then
they'll say is somebody else available,
and then they could assign them to
somebody else.

Q.   That makes sense.  And so you
said that you prepare taxes during the
tax season from January to April.  Have
you ever worked for H&R Block for the
sort of, I don't know, the post season?

A.   The off season?  No, I have not.
I've chosen not to.

Q.   Okay.  So once you have an
appointment with a client, do you do
anything before the appointment to
prepare for preparing the tax return?

A.   I'm trying to remember.  I
sometimes go back and look up last
year's return, especially if I didn't
do it last year, and if they were at
Block.  Because I just like to know
something about the return, if they had
children, review it, give me something

to open the conversation with, just ask them if they're still at the current employer.

Q.   Once you're in the meeting with the client, what's the first thing that happens?

A.   I think sometimes people coming in to do taxes are not exactly intimidated, but don't want to be there.  So what I do is try to relax them a bit and just start a general conversation, how was your year, how is everything, are you still working at such and such a place, how do you like it.  So that might be how I begin the return, begin the discussion.

Q.   And then what do you do?

A.   Then I tell them we're going to be asking a lot of questions so that we get all of the income included and any deductions that they're entitled to, and at any point, just feel free to stop and ask me any questions that you have as to why I'm asking what I'm asking and what I'm doing.

I then go through -- so we'll start with some basic information, and that's where I double-check their name, marital status, social security numbers, find out are they a citizen, or if not, you know, what kind of visa they might have.

And then we'll talk about some more specific questions of -- that's where the questions come in about do you have any cryptocurrency that you're working with now -- that's a new one -- and in terms of income, do you have any signatory authority over foreign accounts, do you have any addition to W-2s you're showing me, and I don't ask them to show me, I just want to know, do you have any 1099 forms, any self-employment forms, any foreign income other than the basic, interest and dividends, stock sales, those are the things we'll get into now.  And there are boxes I'm checking as I'm asking those questions.



If I miss a question, at the end, there's a diagnostic, and it won't let me finish until I go back in to answer a question.

Q.   So you're filling this out on the computer as you're meeting with the client?

A.   Yes.  It's little checks that you have to put in yes or no for the various questions.

Q.   Is there a particular software that is used to go through the returns that you get the questions from?

A.   Yes, it's called BlockWorks, and it's a proprietary computer system.

Q.   And are there certain questions that you have to answer in order for the return to be completed?

A.   Yes.

Q.   And are the questions about signatory over a foreign account?

A.   Yes, cryptocurrency is a new one.

Q.   For the reporter, I'm just going to redo the question so the record is



clear.  Is the question about having signatory over a foreign account, is that a mandatory question?

A.    Yes, that's a yes or no question.

Q.    If they answer yes, what happens?

A.    What I do is because it's going to apply foreign income, I ask them to go up to the front desk and we will reschedule them.  I just am not comfortable doing foreign income.

Q.    So you would reschedule with a different tax preparer?

A.    Tax preparer, yes.

Q.    Even if they said I have signatory authority over a foreign account but I have no income from that account?

A.    I would complete the return.  As long as they don't have foreign income they're receiving.

Q.    So if it's just signatory authority but they say there's no income from that account, I haven't put



anything in there over the course of the year or anything?

A.    And they haven't received anything from it, yes.

Q.    So after you go through all the questions to complete the return, what happens?

A.    They then give me all of their tax documents, and the first thing I do is put in any W-2 information, and then see if there's any additional information as it relates to income. Did they do any lawn mowing business, did they do any consulting, did they do anything where they received an NEC form, a miscellaneous income form, and did they do anything with -- and these aren't check box questions, they're just questions I'm going through.  Did they do anything as it relates to Uber or anything at all where they received income for doing something for somebody else.

Q.    And then after that?

A.    After that, I put all of their



an introductory course at some point just to know a little bit more about it, still knowing that I'm not going to do it.  It's not mandatory that you have to take courses on foreign accounts or foreign income.

And the other thing is that you can have foreign income and be in a foreign county but be a U.S. citizen, and I just, I've chosen not to do that. I've chosen not to work with people who have foreign income.

Q.   When somebody has said yes to the foreign bank account question, do you give them or have you told them that they need to report the bank accounts?

A.   Under the FBAR?

Q.   Yes.

A.   Yeah, if it's a signatory authority over $10,000, and I think the deadline for that, it used to be June, I would say, just remember that you have to file this form.

Q.   So this is something that you



would tell them?

A.    Oh, yeah.  Yeah.  So it just says there do they have to file this, and then you would just check yes and remind them that they have to do that.

Q.    So the software itself prompts you to say that?

A.    Yes.

Q.    And do you still work for H&R Block?

A.    I do.  I do.  I haven't been offered a job yet for next year, but that's because it's a little early right now.  And I don't opt to work the November/December preseason.

Q.    And so you've been doing this same process for many years.  How has the tax return software process, has it changed from maybe 2013 to 2017?

A.    There used to be a system that we used called TPS, and they stopped using that system and came out with a different computer system called BlockWorks.  The questions were the same probably, but just updating.  But



the system needed to be more powerful
with the additional tax laws that were
coming in.  So they basically did a
transition from a TPS system to a
BlockWorks system.

Q.   Do you remember when that was?

A.   When it was?

Q.   Yeah.

A.   I thought it was around maybe
'13, '14, when the new system -- they
ran dual for a year, and you could do
either one for that one- or two-year
period.

Q.   Do you remember if you -- when
it was dual, do you remember which one
you used?

A.   I used both.  I used both,
because it was new and I wanted to use
it just to be familiar with some of it.
So I tended to use it if I saw that a
tax return may have had one or two
W-2s, I would use it on that because I
knew there wouldn't be a lot of new
kinds of things that I would have to
encounter during the tax return where I



was of sitting with them.  So I used both to become familiar with it, so when they did kill the TPS, I had some knowledge of it.

Q.  Did the TPS have the same foreign account question?

A.  Yes.  They were always in there, the foreign account questions were always there.

Q.  And in the TPS system, was it also right after the preliminary questions?

A.  Yes, I believe it was.  Yeah, that's really getting back a few years, but I believe that the basic form, the introductory page, has always been the same.

Q.  Because with the foreign account question on the actual tax form, that's on the Schedule B, correct?

A.  The foreign account question was on the front page of the introductory page, the name, name of the spouse, any kids, did they have cryptocurrency, which wasn't there in 2013, and then



the questions related to the foreign income.

Q.  So that was for the software, correct?

A.  That was for the software.

Q.  But for the tax return itself, where would you find that question?

A.  I didn't do foreign income, so it wouldn't be on something I was looking at.

Q.  Okay.  Besides asking a client that question about signatory authority over a foreign bank account, would there be any other way for you to discover if they had foreign income?

A.  Well, when you ask them, is there any other worldwide income that you have?

Q.  And when was that question asked?

A.  That wasn't a check box at all, but it would be before I would begin, or even after, at any point when I'm trying to get all their income information, is there anything else you



have. Sometimes I might even try and make light of it and say, now, you're not sandbagging that Swiss account on me, are you, and try to get that additional income that way.

Q. Does the name Tuncay Saydam sound familiar to you?

A. It does sound familiar, yes, because it's an unusual name. And I was trying to think of what I might remember about that. What I think I remember is that he -- I think he worked for the University of Delaware. And I remember that because I worked for the University of Delaware. I never really discussed that with clients, where I worked before typically. And I remember because his retirement forms were multiple because under TIAA-CREF, they do a separate 1099R form for each of your funds that you're in. So you might get like six retirement forms from somebody who worked for the University of Delaware TIAA-CREF, because that's how they did



their funds, one for CREF, one for I guess the high risk, and I remember putting in several forms.  That's really all I remember.  And I hope I have the right person when I say that.

Q.    Do you remember an Oya Saydam?

A.    That might have been the name of his spouse.  Because again, that's an unusual name.  I don't remember her, which means that she did not come with him.

Q.    Do you remember when you prepared their tax returns?

A.    Not in recent years.  I really think my memory is good enough to remember recent years.

Q.    Do you remember -- well, what do you remember about any meetings that you had with Tuncay Saydam to prepare the returns?

A.    It means he would have come by himself and given me his returns, tax info.  It means that he would have had to have me printed off everything for him to take home to have his spouse



sign and bring back.  And then at that point, trade, whether it's me or whoever is at the front desk, giving me the signed forms and my giving him a copy of his return.

Q.    Do you remember anything that he said or you talked about during any of these interviews?

A.    I'm sorry, I do not.

Q.    And do you remember any medical or memory issues that he may have had?

A.    No.

Q.    Do you remember discussing foreign income or foreign bank accounts with him?

A.    Other than the check boxes, no.

Q.    Do you ever remember preparing a Schedule B for him?

A.    If he had a statement from the bank saying that he had interest, I would have prepared a Schedule B, and I would have prepared a D if he had a brokerage statement or something that indicated that he sold stocks in that year, in that tax year.  Do I



specifically remember?  I do not.

Q.   And do you ever remember reviewing the returns with Mr. Saydam?

A.   I can only say that I review all the returns.

Q.   Okay.  I know it was a long time ago, just, it's important to see if you remember any of these things.

A.   Are you allowed to tell me what years you're talking about that I prepared his returns?

Q.   So this would have been 2013 through 2015.  Actually, you would have prepared from 2011, I believe, to 2015.

A.   No.

Q.   It's okay.  Do you remember why you stopped or do you remember anything about why you or when you stopped preparing returns for Mr. Saydam?

A.   No, I just assumed that he came in and just wanted next available, or if he called to make an appointment, that he wanted someone different or someone next available or went to a different office.  I don't know.  I



don't know what his decisions were with that.

Q.   If Mr. Saydam had filed, I mean, if he was usually your customer, but for one year he was filing during the off season, would you be able to work with him?

A.   In the off season?

Q.   Yes.

A.   Not if I was not employed there, no.

Q.   And, I mean, have you had any communication with Mr. Saydam after you completed the last return, to your recollection?

A.   I have not.

Q.   Or Mrs. Saydam, Oya?

A.   I don't believe I ever met her.

Q.   Okay.  At this point, if you could take a look at the binder in front of you.  We're going to turn to tab 7.  At this point I'd like to direct your attention to this document, which I will mark as Exhibit 4.

(Exhibit Number 4 was marked



for identification.)

BY MS. DE PALMA:

Q.    This is the 2013 tax return. The first two pages of this exhibit are Bates numbered USA 000469 through USA 000470.  This is a weird looking one. I'm going to represent to you that these first two pages are the information from Mr. Saydam's 2013 tax return.  Then for your reference, these next couple pages are what the return itself should have looked like for 2013, to make it a little easier to look at this first document.  So just take a look at that for a little bit.

A.    The standard deduction is pretty low.

Q.    So taking a look at this first page, USA 000469, do you see the -- and I'm looking for it on here -- the preparer TIN?  It's the very top of the front page.  I think it's five down, preparer TIN.

A.    Mm-hmm.

Q.    That number, P00341059, do you



recognize that?

A.    I believe that's my PTIN.

Q.    Then this phone number where it says prep tele, 302-368-7500, do you recognize that?

A.    That's our office number, yes.

Q.    Is there any reason for you to believe that this return was not prepared by you?

A.    No.

Q.    Based on looking at this, do you know if you prepared a Schedule B for 2013?

A.    Yes.

Q.    So you would have prepared a Schedule B?

A.    Yes.

Q.    And why?  Why do you think that?

A.    I would have gotten a statement from a bank, a tax form indicating that I had Schedule B information to input.

Q.    And how did you determine whether or not to prepare a Schedule B for a taxpayer?

A.    Do they have a tax form, and if



I did the return last year, check and see if I had one for last year from a bank.  And if I did and they had it, great, or if I didn't, I might say, did you take money out of it, or why don't you have one this year?

Q.   And how would the -- would the software provide you with those questions?

A.   No, that's just something I would want to make sure I had all the forms.

Q.   And how did the software populate the Schedule B?

A.   You pull up input for Schedule B, and you put in the name of the bank and the amount of interest, and then it populates onto the schedule.  B.

Q.   And even if you weren't preparing a Schedule B, would you still ask the foreign account question?

A.   No, because I had already asked it.

Q.   When did you ask it?

A.   I'd be asking that in the



beginning, is there any foreign income that you have in addition to these documents that you're giving me.

Q.   And the Schedule B questions would often come later?

A.   Yes.  Yes.

Q.   When in the tax inputting process would the Schedule B questions come up?

A.   Usually -- I put in W-2 information first, and then just basically go down all of the income after that.  So I wouldn't do A next, because that's deductions, so I would look at is there any B, is there any C. There's no mandatory order that you have to follow.  You have all the forms there, you've selected all the forms that might be used.  Even before or after you look at the documents, you pull up any forms and then you just go one by one with the documents that you have in front of you.  And then I typically do a comparison to last year and say, I don't see this, I don't see



that, is there anything else here.

Q.   Let's take a look at tab 8, the next tab.  I would like to direct your attention to this document which I will mark as Exhibit 5, this is a 2014 tax return.

(Exhibit Number 5 was marked for identification.)

BY MS. DE PALMA:

Q.   The first two pages of this exhibit are Bates numbered USA 000473 through USA 000476.  And you can just take a look at these.

A.   I also would have been advising him all along to have tax withheld.

Q.   Have what?

A.   Tax withheld from these 1099Rs.

Q.   What do you mean by that?

A.   Well, if you take a look at the fact that he owes and you take a look at box 4 on any of the 1099Rs, he's not having any tax withheld.  And I always encourage them to consider having tax withheld, because what's going to happen is you are liable for tax on



retirement income.  So therefore, not only is he owing each year, he is getting a tax penalty for not having taxes withheld -- enough tax withheld.

So whenever I see that zero tax has been withheld, I suggest that they start having tax withheld or they are going to owe at the end of the year; they are not going to get a refund.  Some people say, I didn't realize that, how much should I have withheld; some people say I don't want the government holding my money when I can have interest in a bank.  Now I say, at half a percent?

Q.   So you're saying that you would have advised him on these two --

A.   Have tax withheld.

Q.   So the fact that he didn't have tax withheld on these, does that mean that he affirmatively said that he didn't want tax withheld?

A.   He might have said I'll think about it.  But I can tell you, he would have been aware that he is not having

tax withheld and he's going to owe money.

Q. All right. That's useful to know.

Can we take a look at the second page, USA 000474. If you take a look at the bottom there, what's the listed preparer's name?

A. Linda Dunn.

Q. Is that your name?

A. Yes, it is.

Q. And the PTIN, what's that number?

A. P00341059.

Q. Is that your PTIN?

A. Yes.

Q. Is there any reason to believe that this return was not prepared by you?

A. No.

Q. And the address, 561 College Square, Newark, at the bottom.

A. That's correct.

Q. What address is that?

A. That's the address of the H&R



Block office.

Q.    And the phone number, 302-368-7500?

A.    That's the office phone number.

Q.    Let's take a look at 00483, which is the 11th page, it's the Schedule B.  So if you keep turning through the same exhibit, it will say 11 of 14 at the top.

A.    Okay.

Q.    What is the Schedule B?

A.    Schedule B reports any interest that they might have, any dividends from stocks.

Q.    Let's take a look at the next page.  Do you know what M&T Bank is? It's a little hard to read.

A.    Where are you?  I'm sorry.

Q.    So if you're looking at part 1, interest, and you see payor.

A.    M&T Bank?

Q.    Yeah, do you know what that is?

A.    I think it's the bank that took over Wilmington Trust.

Q.    If you take a look at the next



page, part 3, foreign accounts and trusts, do you see those questions and answers?

A.    Yes.

Q.    So what did Mr. Saydam answer as to whether he had signatory authority over a financial account?

A.    No.

Q.    And at what point during your interview would this have been inputted?

A.    At the beginning.  At the beginning.  On the introductory page where you're asking your name, address, and a series of questions.

Q.    And after those questions, and it's being inputted here, would this text have been reviewed again?

A.    Doubtful.

Q.    Let's go back to 474, the second page where we were just looking at your name.  How would Tuncay and Oya have signed this document based on what you see here, or your own knowledge of how the process worked?  It's okay if you



don't know.

A.    He would probably not have used the pin pad because I would have had to have printed off the signature documents for him to take home to his spouse.

Q.    So if he had signed it at home, would the one he sent to the IRS have had a wet signature on it?

A.    I believe so.

Q.    If he had set up a time for her to come into the H&R Block office and sign it, would it have been e-filed then?

A.    It's not e-filed until all the signatures are on file.

Q.    So if he had signed it with you and then she had come in later and signed it in the office, what would have happened then?

A.    The person at the desk would have taken the papers, given him his copy of everything, and they would have given me back the papers.  And at that point, I would have released it for



e-file.

Q.    Okay.  Thank you.  That's useful.

Let's take a look at tab 9. At this point, I direct your attention to this document which I will mark as Exhibit 6; this is the 2015 tax return. This exhibit is Bates number USA 487 through USA 499.  And just take a moment and look through this one.

(Exhibit 6 was marked for identification.)

BY MS. DE PALMA:

Q.    Do you recognize this document?

A.    It has my PTIN number on it.

Q.    Which page is your PTIN number on?

A.    The second page, the 1040A.

Q.    And does it have your name on it?

A.    Yes.

Q.    And it has the same firm address as the last one?

A.    Correct, same phone number, same address.



making this up, you really did have -- you really did have the conversation with him; otherwise, you wouldn't have told the auditor that.

A.   He must have said -- it looks like he said I might possibly do that next year.

Q.   Right.  Then at that point in time, would you have taken any action, made a note in the notes section or queued anything up for the following year, et cetera?

A.   No, if somebody says I plan to, I might have made a note.  Under a maybe I might, I would not have.

Q.   Then when you say you made a lot of foreign account referrals, I mean, any specific number?  If you don't know, you don't know.  But any specific, do you know is it one, is it two, three, five?

A.   I don't know.  I'm sorry.  I don't know.

Q.   That's fine.  And then you were talking earlier, and I got a little



lost, about what you would do if somebody had signature authority over foreign accounts but no foreign income. Walk me through generally how that would be handled.

A.   If there's no foreign income, I would just remind them about the FBAR form they had to file; then I would just complete the tax return.

Q.   Right.  Yeah.  But then you guys don't actually file the FBAR, correct? You would just tell them to do it themselves or find another qualified person?

A.   Correct.

Q.   And then does H&R Block give any kind of instructions or do they try to steer the client taxpayer in any way as to how they might accomplish this?

A.   Not to my knowledge.

Q.   Then you said earlier that you -- one of the questions that is asked, maybe in an introductory page or at least somewhere early on in the session is the legal status of the



need to input, additional information like income and deductions.

MR. GREENBERG:  Let me conclude with that.  Thank you, everybody; I'm done.

MS. DE PALMA:  I have no further questions, so I think at this time, we can go off the record.  Thank you, Doug.

(The deposition adjourned at 11:17 a.m.)



I N D E X

DEPONENT: LINDA DUNN                          PAGE

Examination by Ms. De Palma            3
Examination by Mr. Greenberg          73

E X H I B I T S

EXHIBITS                               MARKED

4       Document Bates stamped
        USA 469 through 470            53

5       Document Bates stamped
        USA 473 through 476            57

6       Document Bates stamped
        USA 487 through 499            63

7       Document Bates stamped
        USA 438                       68

READING AND SIGNING INSTRUCTIONS      88
ERRATA SHEET                          89
CERTIFICATE OF REPORTER               90



800.211.DEPO (3376)
EsquireSolutions.com

READING AND SIGNING INSTRUCTIONS

After reading the transcript of your deposition, please note any change or correction and the reason therefor on the errata sheet that appears on the following page.  DO NOT MAKE ANY MARKS OR NOTATIONS ON THE TRANSCRIPT ITSELF. Please sign and date the errata sheet and return it to our office at the address indicated below.  Our office will distribute copies of the executed errata sheet to all counsel.  If necessary, you can make additional copies of the errata sheet.

Rule 30(e) governing this procedure provides the deposition may be filed as transcribed if you do not return a signed errata sheet within 30 days.

RETURN ORIGINAL ERRATA SHEET TO:

Esquire Deposition Solutions
1835 Market Street
Suite 555
Philadelphia, PA  19103
(215) 988-9191



DEPONENT:   LINDA DUNN
DATE:       Friday, September 22, 2023
CASE:       USA v. Saydam

            ERRATA SHEET

PAGE/LINE/CHANGE OR CORRECTION AND

REASON

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

I have read the foregoing transcript of
my deposition and, except for any
corrections or changes noted above, I
hereby subscribe to the transcript as
an accurate record of the statements
made by me.

Date:

                  Signature of Deponent



CERTIFICATE OF REPORTER

I, Jennifer M. Guy, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on Friday, September 22, 2023, the deponent herein, LINDA DUNN, who was duly examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.



Jennifer M. Guy, RPR

DEPOSITION ERRATA SHEET

Assignment No:     J10318729

Case Caption:      UNITED STATES OF AMERICA

                   vs.

                   TUNCAY SAYDAM


DECLARATION UNDER PENALTY OF PERJURY


I declare that under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.


        Signed on the 7th day of October, 2023


        **LINDA SHARON DUNN**
        **(signed electronically)**

DEPOSITION ERRATA SHEET CONTINUED

Page No. 11    Line No. 24    Change To: Towson (not Tuscon)
Reason For Change: correct name of graduate school attended

*LINDA SHARON DUNN*
*(signed electronically)*
*Date: 10/06/2023 17:03:02 PDT*

*800.211.DEPO (3376)*
*EsquireSolutions.com*