# In the Matter Of:

## USA vs SAYDAM

4:22-cv-07371-DMR

## GERMAN GOMEZ

*September 21, 2023*



800.211.DEPO (3376)
*EsquireSolutions.com*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA


UNITED STATES OF          )
AMERICA,                  )
          Plaintiff, )Civil Action No.
                          )4:22-cv-07371-DMR
v.                        )
                          )
TUNCAY SAYDAM,            )
          Defendant. )




          Deposition of GERMAN GOMEZ,

taken pursuant to notice at the United

States Attorney's Office, 1313 North

Market Street, Suite 400, Wilmington,

Delaware, beginning at 3:04 p.m. on

Thursday, September 21, 2023, before

Jennifer M. Guy, Registered

Professional Reporter and Notary

Public.



APPEARANCES:


    AMY MATCHISON, ESQ.
    LOLITA DE PALMA, ESQ.
    UNITED STATES ATTORNEY'S OFFICE
        P.O. Box 683
        Washington, DC  20044
        For the Plaintiff


    DOUGLAS GREENBERG, ESQ.
    THE LAW OFFICE OF DOUGLAS GREENBERG
        201 Spear Street
        Suite 1100
        San Francisco, CA  94105
        For the Defendant


                    - - - - -



GERMAN GOMEZ, after having been first duly affirmed, was examined and testified as follows:

- - -

EXAMINATION

BY MS. MATCHISON:

Q.    Good afternoon, Mr. Gomez.

A.    Good afternoon.

Q.    My name is Amy Matchison; I'm an attorney with the United States Department of Justice.  I'm accompanied here by my colleague, Lolita De Palma, she also works for the Department of Justice, and we've been assigned to represent the interest of the government in this case.

If you would, please state your full name and spell it for the record.

A.    German Gomez.  G-E-R-M-A-N G-O-M-E-Z.

Q.    What is your current address?

A.    49 Lanford Road, New Castle, Delaware  19720.

Q.    I'm just going to set out some



ground rules for you today so you have some kind of understanding and expectation for how things are going to go.

The first thing is the oath you've taken is the same oath you would take if you were in a courtroom, so you're under the same obligations to tell the truth as you would be if you were testifying with a judge and in a court of law.

This deposition is being taken in accordance with the Federal Rules of Civil Procedure, and what that means is every word will be recorded by the court reporter here.  She's here at my request, and she'll keep recording everything I say, everything we say, everything everybody says unless I instruct her to stop.

Because your answers will be recorded, it's important that you respond to every question in some way. Nods, gesturing, which I think we're both probably going to be guilty of,



can't be recorded by her.  So it's important that you give an audible response.

If I ask a question that's unclear, please let me know and I'll do my best to rephrase it.  If you answer a question, however, I'm going to assume that you understood it when you answer it, so if you are unclear, please just don't hesitate to let me know.

It may tend to get conversational between the two of us, but it's important for her that only one of us speak at a time so we don't speak over each other.  So I'll do my best to let you answer before I follow up, and if you let me complete my question before you answer, that will help her.

The purpose of this deposition is not to try to trick you into saying something that's not true, but merely to get the truth or your best recollection as you have it.  If



800.211.DEPO (3376)
EsquireSolutions.com

you don't know the answer to a question, a perfectly fine answer is I don't know, I don't recall.  You can give me an estimate.  I might sometimes ask you to guess, or if you're speculating at some point, you can let me know that and that's perfectly fine.

If at any point during the deposition you think of something that you forgot, that you want to add to something earlier that kind of comes to you, let me know that and we'll go ahead and get that on the record.

We're going to go at a pace that's comfortable for you, so that means if you need a break, let me know; we'll take a break.  But if I ask you a question, we're going to want to go ahead and have you answer that question before we take a break.

You'll have the opportunity to read the transcript after it's done and make any corrections if you need to.

One question I need to ask



you: Are you under the influence of any medication or substance that might affect your ability to tell the truth today?

A. No.

Q. Have you ever given any other testimony under oath?

A. No.

Q. Can you think of any other reason that you may not be able to give full, complete, and accurate testimony today?

A. No.

Q. And did you do anything to prepare for this deposition?

A. No. I tried to look for the tax return, but I couldn't find it.

Q. And we'll get to the specifics, but do you still work for H&R Block?

A. Seasonal, yes.

Q. So you did not speak to anyone else about this deposition prior to the deposition?

A. No.

Q. And did you bring any documents



with you today?

A.   No, I just brought the letter that you guys send me.

Q.   The letter with the subpoena for your testimony?

A.   Yes.

Q.   Very good.  And just so you know, the United States has brought this case against Tuncay Saydam to recover what are commonly referred to as FBAR penalties arising from his alleged failure to report his financial interest in several foreign bank accounts from 2013 to 2017.  Mr. Saydam is the only defendant in this case, and the sole issue is whether his failure to file those FBAR forms was willful. H&R Block is not a defendant in this case, you are not a defendant in this case, neither one of you are parties in this case, you are just a witness that might have information that we need to get on the record.  Okay?  Do you have any questions?

A.   No.



Q.   Okay.  When did you start working as a tax preparer?

A.   1999.

Q.   And was that with H&R Block?

A.   Yes.

Q.   And if I call it Block, is that what people tend to call it?

A.   Yes, H&R Block.

Q.   You started with Block in 1999 as a tax return preparer.  Had you worked for anybody else before that as a tax return preparer?

A.   No, only for them.

Q.   In your employment with Block, are you a seasonal employee or a full-time employee?

A.   Seasonal.  Every year I would come back.

Q.   And what does it mean to be a seasonal employee at Block?

A.   We just work for the tax season, from January to April 15th.

Q.   And I believe you said you're still currently employed by Block?

A.   Yes, I'm coming back for this



season.  I did it for '22, I'm now working on the '23 season.

Q.   You know you're coming back for the '23 season; did you interview?

A.   I just applied for it and they're going to interview me.

Q.   I personally have never gone to Block, so I want to have some understanding how someone comes to Block and then the process.  So we'll go ahead and walk through it.  So how does someone initially get an appointment at Block, do you know?

A.   They know the name, they call the office, and then they set up an appointment.  And they ask them some questions, is it a simple return, family return, if they have any investments or any property, own any property.  And that way it's assigned to somebody, you know, whoever can handle the tax return.  But normally if they know the tax preparer, they just request for them.

Q.   So most often if you're a



previous customer of Block, you would go to whoever you went to the year before?

A.    Yeah, and we try to set it up the same way, go to the same tax preparer.

Q.    What if somebody was to -- a new client can book online for the first time; is that true?

A.    They can book online or just call the number.  We are everywhere, so they could just see the name and they can call in and get an appointment.

Q.    And do you happen to know, if someone books online, is there an intake questionnaire that tries to suss out the same things on the phone?

A.    Yes, they do, the same questions probably.  Yeah, because it's assigned to a specific tax preparer, or they can pick their own tax preparer.

Q.    Does the computer assign that based on information they have, or would that information go to a manager who would then assign it?



A.    The computer or the person who is making the appointment, he can select who they want to see.

Q.    So I've set up my appointment. When I set my appointment up either by phone or on the computer, does it instruct me or am I instructed to bring certain documents with me?

A.    All the tax documents, basically.  There's not detail.  Just bring all the paperwork, W-2s, 1099s, any form that says tax information.

Q.    So anything that a client might think would be related to their taxes?

A.    Right.

Q.    It may be suggested, like W-2s, 1099s?

A.    Yeah, that's the main ones are the W-2, 1099s or investments, dividends.  1099-INT or dividends.  And if they have a business or if they own rental property, basically.

Q.    So if I'm a new client and I call up and I give my information and I get matched with you, does that mean



that I have -- like, do you specialize in 1040s?

A.    1040s and kind of small business.

Q.    So like 1120s?

A.    No, Schedule C.

Q.    Just a Schedule C attachment to the 1040.  I see.  And have you ever done a partnership return?

A.    No.

Q.    And never an 1120?

A.    No.

Q.    What about an estate return? Did you ever do one of those?

A.    The K-1, no.

Q.    So I have my appointment, I show up at your office with my tax documents.  What happens?  Walk me through it.

A.    They set you up.  If you have the appointment, normally you are already set up with somebody, you're matched with somebody, a tax preparer. And once they tell me the client is here, pick them up at the waiting area



and then bring them to my desk.  Just welcome them to H&R Block, ask them if they've been there before, or sometimes if they have been there before, I already know that they've been there before even if it was somebody else.

I just ask them for -- first I ask them for the documents that they have and I look at them, and depending on the documents, I put them in order. Like follow the 1040.  Do you have the W-2, do you have 1099, where is the income coming from.  If it's somebody older, I see if they have any social security or pension coming in. Basically their income first, then any investments, you know.  If they have any deductions, basically.

Q.   So I know, other than a couple of people, no one does their returns on paper anymore.  So you're not preparing their return on paper.  Once you have their stuff in order, I assume you turn to your computer?

A.   We start from the computer,



yeah, fill in the personal information, and then ask the questions, single, married, or the status.  And then dependents, if they have any dependents.  That's the main thing. Then going by the forms that they have, then you put them in the computer and we keep asking them, you know, what's the next form that comes in.  And then we ask them if they have -- personal information, then we ask for the question, the foreign, if they have any foreign income, if they have any trusts, foreign trusts.  And normally I ask them, you know, do you have any accounts outside the United States or do you have any money outside the United States that you need to report. That's the main -- that's at the beginning.  And then we start with the income that they have, the forms that they have.

As we go along, another form comes up, we ask them do you have this, do you have that.  Sometimes people



they forgot or they don't know what it is.  And the prior years, we go by what they had last year.  If they don't have the form from last year, we ask them do you have this form this year.  Or if it's a new form, we ask them if they had it the year before.  And whatever they show up.  Whatever they give us, that's what we use.

Q.   And so the program on the computer, I assume it's not TurboTax, right?

A.   No.

Q.   It's Block's own version?

A.   It's Block's own, it is, and it's different from the one they have online, too.

Q.   How is it different than the one they offer online?  Is it more comprehensive?

A.   We know where the forms go, it doesn't ask me the questions.  I put it in according to the form and I can navigate the systems to any form they give me and any information they give



me, I can navigate.  The one online, it asks you questions.  You ask one question, they give you another question.  Because they don't know you're talking to the computer -- not talking to the computer, but a computer is trying to ask you what you mean.

Q.   And now I think you said that the personal information includes various categories of information, the first thing you start with, is that right?

A.   Yeah, social security, name, address, phone number, email now, and dependents.

Q.   If they're a prior client, is that automatically populated into the system?

A.   It's populated into the system, we just verify the information is correct, address, phone number, married, not married, if anything change.

Q.   So you still go through each one of those categories?



A.   Yes.

Q.   Even if it's auto populated?

A.   Yeah.

Q.   It's not one of these things where all the information comes from the last year and you carry on, you go through every single thing?

A.   We review it.  We review it in front of them.  Because it change all the time.  A lot.  A lot.

Q.   I believe that another witness we spoke to said there was a two-screen system?

A.   Yeah, nowadays we have two screens.  The input screen I'm using, and they can see on the second screen what I'm doing, what form I'm doing and where I am.  Everything, same thing I see, they see.

Q.   I see.  That way they can confirm that what you're putting in is what they've told you and there's confirmation there.

A.   Yes.  And it's also better because you can point to them.  You



have your screen pointing to them, you can point to that, is that correct, can you verify that, yeah.

Q.   Very good.  And when did they start with the two screens, do you know, what tax year?

A.   I would say three years maybe. Three or four years maybe.  It wasn't too long.

Q.   And then before that, the double screen, how would you get that same kind of verification or simultaneous kind of impact?

A.   Well, you will show them the form, which form.  Basically, we talk to them, I'm doing this form, this is your total, or show them the form, we just flip the screen, you know.  At the end, there's a summary page.  You can show it to them on the screen, where it shows everything, the bottom line, the bottom numbers, all the totals.  I will show them the summary screen where it shows everything, how much income, how many adjustments, and total taxes, you



know, and then the credits, and then the final number.

Q.   Okay.  So you talked about the personal information is auto populated for continuing clients.

A.   Right.

Q.   But you still go through each category and verify each answer?

A.   Verify, yes.

Q.   Then I think after you said there's questions about foreign income, foreign trusts, and foreign bank accounts that are outside the United States; is that correct?

A.   Yes.

Q.   Do the answers to those populate from the last return?

A.   No, they're new, they're clean. You have to answer them.

Q.   Is there any way to avoid answering them?

A.   No, you have to answer yes or no.

Q.   You have to give an actual affirmative response for a yes or no?



A.    Yes.

Q.    If you respond, I don't know if the first one if it's foreign income, but if you answer yes that you have foreign income, what happens?

A.    I know if they have more than $10,000, they have to report it to the Fincen, and then we just notify them that they have to fill out the form, you have to do the form and report it. I know it's not the same day as the tax due, I think it's May, I think, when they have to do it.  And the couple that I had done, probably they know that they need to report it.  But we just, all we can do is tell them to do it.

Q.    So if they have foreign income, you notify them of their filing requirement?

A.    Right.

Q.    And you've only done that a couple of times?

A.    Where somebody says yes, I have. I can see they're foreign or they tell



me they're foreign, from different country, and I ask, they tell me they have it, and then if it's more than 10,000, I remind them that they have to report it to the IRS, I mean, to the federal government basically. There's a form, there's a hyperlink there, we give the website and the form, I can print it for them and give it to them, or just give them the website.

Q. Okay. And what about, you said foreign accounts outside the United States. What happens if you say yes to one of those?

A. Same thing. Do you have any interest from that account or any dividends. That's basically what I ask. If I don't see the form with me, I ask them if they have them. Normally if it's any, you know, they don't or if they have less than 10,000 outside, you know, we keep going.

Q. And so has anyone ever answered, yes, they have a foreign bank account?

A. Yeah, that's what I meant, three



of them probably on my last ten years, probably three people have say yes, and we just report it.

Q.    And where is that reported on the form, do you know?

A.    The foreign tax --

Q.    Not the foreign income, the foreign bank account.  If they have a foreign bank account, do you know where that's reported on the --

A.    Not on the tax return.  The tax return we only do the dividends or interest.  If they need to report it, that's the website that we give them.

Q.    Okay.  An additional form, like you were saying before, there's an additional form they have to fill out?

A.    They are required to fill it out, not us.

Q.    But if they do answer in the affirmative, I believe that would populate something on Schedule B; is that correct?  Does that sound familiar?

A.     It populates the Schedule B, and



don't use blue.

Q.   I see.  Okay.  This is probably the e-file copied, received by the IRS.

A.   Oh, okay.

Q.   And I actually made color copies, which is unusual.  You can actually see that.

So do you recognize this document, sir?

A.   Normally 1040A.

Q.   And it's a 1040A for Tuncay and Oya Saydam for tax year 2016, correct?

A.   Correct.

Q.   And if you would turn to the second page, this is page 501, if you would look at the, what is the listed preparer's name, if you can see at the bottom?

A.   My name, German Gomez.

Q.   And is there any reason to believe that this return was not prepared by you?  Do you have any reason to think that?

A.   No.  All the information is there, my tax ID, my PTIN number, and



H&R Block number.

Q.    That PTIN is your assigned PTIN by the IRS; is that correct?

A.    Yes.

Q.    And the HRB Tax Group, that's H&R Block you work for, correct?

A.    Correct.

Q.    And it looks like the address kind of gets cut off a little bit, but it looks like 4756 something with an L road.  Do you know what that is?  It's on the next page, top of 502 before the hole punch.  Is that one of the offices?  Do you see that there?

A.    Limestone Road.

Q.    And is that the office where you were working?

A.    Yeah, that's the seasonal office.  That's the all-year-open office.

Q.    I see.

A.    And that was in May.  Yeah, that's after the season.

Q.    If you would turn to the eighth page, 507, that's that little USA stamp



which one it is.  But it has to do with
the foreign income.

Q.   Do you know what the first
question is?  There's actually no
foreign income related question.

A.   No.  I will say no.

Q.   Do you know what the second
question is?

A.   Not specific.

Q.   Third question?

A.   No.  I haven't seen the form in
years -- in months.

Q.   So any one of the four
questions, can you tell me what
specifically it's asking?

A.   No.  Not right now, I can't.  I
haven't seen it in a while.

          MR. GREENBERG:  That's it.
I don't have any further questions.

          MS. MATCHISON:  Nothing
further here.  We can go off the
record.

          (The deposition adjourned
at 4:17 p.m.)



I N D E X


DEPONENT: GERMAN GOMEZ                    PAGE


   Examination by Ms. Matchison          3
   Examination by Mr. Greenberg         59




         E X H I B I T S



EXHIBITS                             MARKED


3       Document Bates stamped
        USA 500 through 510          45




ERRATA SHEET                             76
CERTIFICATE OF REPORTER                  77



DEPONENT:  GERMAN GOMEZ
DATE:      Thursday, September 21, 2023
CASE:      USA v. Saydam

                ERRATA SHEET

PAGE/LINE/CHANGE OR CORRECTION AND

REASON

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____


I have read the foregoing transcript of
my deposition and, except for any
corrections or changes noted above, I
hereby subscribe to the transcript as
an accurate record of the statements
made by me.

Date:

                Signature of Deponent



CERTIFICATE OF REPORTER

I, Jennifer M. Guy, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on Thursday, September 21, 2023, the deponent herein, GERMAN GOMEZ, who was duly examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.



Jennifer M. Guy, RPR