**In the Matter Of:**

USA vs SAYDAM

4:22-cv-07371-DMR

**MORRIS RORER**

*September 21, 2023*



800.211.DEPO (3376)
*EsquireSolutions.com*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA


UNITED STATES OF        )
AMERICA,                )
            Plaintiff,  )Civil Action No.
                        )4:22-cv-07371-DMR
v.                      )
                        )
TUNCAY SAYDAM,          )
            Defendant.  )


        Deposition of MORRIS RORER,

taken pursuant to notice at the United

States Attorney's Office, 1313 North

Market Street, Suite 400, Wilmington,

Delaware, beginning at 1:00 p.m. on

Thursday, September 21, 2023, before

Jennifer M. Guy, Registered

Professional Reporter and Notary

Public.



APPEARANCES:


     LOLITA DE PALMA, ESQ.
     AMY MATCHISON, ESQ.
     UNITED STATES ATTORNEY'S OFFICE
         P.O. Box 683
         Washington, DC  20044
         For the Plaintiff


     DOUGLAS GREENBERG, ESQ.
     THE LAW OFFICE OF DOUGLAS GREENBERG
         201 Spear Street
         Suite 1100
         San Francisco, CA  94105
         For the Defendant


                    - - - - -



800.211.DEPO (3376)
EsquireSolutions.com

MORRIS RORER, after having been first duly affirmed, was examined and testified as follows:

- - -

EXAMINATION

BY MS. DE PALMA:

Q.   Welcome, Mr. Rorer.  Today is September 21st, 2023.  We are now on record in the case pending in the U.S. District Court of the Northern District of California, United States vs. Tuncay Saydam, Civil Action Number 4:22-cv-07371-DMR.  My name is Lolita De Palma, and I am a trial attorney with the US Department of Justice, Tax Division.  At this time, if all the attorneys present could make their appearances?

MS. MATCHISON:  Amy Matchison, I'm also here with the government.

MR. GREENBERG:  Douglas Greenberg.  I'm representing Tuncay Saydam, the taxpayer defendant.



MS. DE PALMA:  Thank you.

BY MS. DE PALMA:

Q.  Morris, could you state your full name and spell it?

A.  Morris Padgett Rorer. M-O-R-R-I-S; Padgett, P-A-D-G-E-T-T; last name Rorer, R-O-R-E-R.

Q.  Thank you.  Do you have any former names that you've used?

A.  No.

Q.  And no aliases?

A.  No.

Q.  What is your current address?

A.  310 Sentinel Lane, Newark, Delaware 19702.

Q.  So the oath that you just took is the same oath that you would take in a courtroom.  So you're under the same obligation to tell the truth as you would be in a court of law.  Do you understand?

A.  Yes.

Q.  I will now set out just a few ground rules for the deposition.  The deposition is being taken in accordance



with the Federal Rules of Civil Procedure.  That means your answers will be recorded by the court reporter and she will record every word.  She is here at my request and she will keep recording until I ask her to stop.

Because your answers will be recorded by the court reporter, it is important that you answer verbally and you speak up.  So gestures like nodding your head are not going to be able to be recorded.  Does that make sense?

A.   Yes.

Q.   If I ask a question that is unclear, please let me know and I will rephrase it.  If you answer the question, I will assume that you've heard it and understood it and are giving me your best recollection.

A.   Okay, yes.

Q.   It may tend to become a little conversational as we start to talk, but it is important that you let me finish my question before you give an answer just so the court reporter can get both



of what we would say.  I will extend the same courtesy to that so the record is clear.

A.    Okay.

Q.    The purpose of the deposition is not to try and trick you into saying something that's not true but to find out the truth.  If you don't know the answer to a question, say I don't know. Sometimes it happens that you will give an answer as completely as you can and then later on you remember some additional information or perhaps some clarification in response to an earlier question.  If that happens to you, please tell us that would you like to add something to the earlier answer, and we will do that right then when it is on your mind.  Will you do that?

A.    Yes.

Q.    Please don't consult anything or anyone while a question is pending or talk to anyone else while questioning is ongoing.  And let me know if you are ever speculating instead of just



remembering or telling me what you know about something.

We will go at a pace that's comfortable for you. If you need a break, let me know. If we are in the middle of a line of questioning, I will finish my question and then we will take a break if you need to break. Do you understand?

A. Yes.

Q. You'll have an opportunity to read over the transcript the court reporter is putting together today and make any corrections before you sign it. If there are any changes other than grammatical or typographical changes, I'm going to reserve the right to come back and ask you about the changes you made to the transcript. Does that make sense?

A. Yes.

Q. Some of the questions may seem obvious or redundant. And oftentimes -- or there might be a few times where I might ask you a question



that you might feel like you already answered.  Just be patient; it's just part of the process and it's important for us to get as much information as we can.

It is critical that we get full and complete and accurate answers. And so we have a few questions that are not meant to embarrass you in any way; it's just so that we can -- these are just questions that we have to ask to make sure we get the best answers from you today.

Are you in any pain today?

A.   No.

Q.   Are you able to sit for an hour or two today?

A.   Yes.

Q.   Are you under the influence of any medication or substance that might affect your ability to remember?

A.   I do take medications, but none in that category.

Q.   Do any of these medications affect your ability to understand?



A.   No.

Q.   Or to tell the truth?

A.   No.

Q.   Have you ever been convicted of a criminal offense?

A.   No.

Q.   Have you ever been convicted or have you ever gotten, you know, a speeding ticket?

A.   No speeding tickets, but I've had a couple of warnings, at least one.

Q.   Okay.  Have you ever given any other testimony?

A.   Let me back up.  They were for a bump.  I bumped into a vehicle.

Q.   Okay.  So you received a warning for that?

A.   Yeah.  I wasn't speeding.

Q.   When was that?

A.   It's been maybe ten years ago, something like that.

Q.   Okay.  Have you ever given testimony under oath before?

A.   I'm not sure if it was under oath, but a few years ago, there was



another tax situation and we went to --
it was just an office, and we were
asked some questions individually,
there were three of us, and it was
over.  And I'm not sure --  I don't
recall the name of the person.  But it
was the person who did it the prior
year to me, I did it, and then the
person who succeeded me, and we were
asked some questions.

Q.   Was it a deposition like this
where you received a subpoena?

A.   No, it was just a would you show
up and give us some information.

Q.   Do you know who was asking you
to give this information?

A.   Well, it was somebody in the
court or law.  They contacted Block --
that's who I worked for -- and asked if
we would give some information.  And it
was just basic questions, and that was
it.

Q.   And this investigation was not
related to Mr. Saydam?

A.   At this point, I don't think so.



It doesn't sound like it.

Q.   Okay.  Is there any reason why you cannot give full, complete, and accurate answers today?

A.   No.

Q.   Okay.  What did you do to prepare for this deposition?

A.   I read over this thing you gave me here, and I was thinking something had to do with a Schedule B and maybe this 3520 foreign trust thing, so I just looked it over.  And for the record, I've never done a trust return or anything like this, but I have done one return related to it, and if the question comes up, I can explain it.

Q.   So just so it's clear for the record what you were referring to, the first document that you said you reviewed was the subpoena and the letter that you were served with, correct?

A.   Yes.

Q.   And then the other documents it seems printouts of --



A.   Of the tax forms.  I was just looking over this 3520 form.  And I also looked over 8938, but I don't do them in my level, so it was just in case those questions came up.

Q.   Okay.  Did you speak to anyone prior to this deposition about the deposition?

A.   Linda Dunn -- I believe she's on the list of people you're going to interview -- and she called me and she asked me if I had gotten the subpoena. And we were both trying to recall who it was, because we both knew the name. And we couldn't -- we couldn't come up with a recognition for the client.

Q.   Did you discuss anything else with Linda Dunn about this deposition?

A.   We speculated about what it might be about, and we thought it had to do with foreign income somehow, but that's the closest we could get to it.

Q.   And when did this conversation happen?

A.   It's been within the last couple



of weeks.  Last week maybe.

Q.  Okay.  And besides those documents that you brought with you, is there anything else you reviewed, any other documents for this deposition?

A.  No.  I did not contact H&R Block -- that's who I was working for -- because I don't think they would have shown me anything since I'm not employed by them.

Q.  Okay.  We're going to start with some of your background.  Where did you go to college?

A.  I went to Roanoke College, got a bachelor's degree in organic chemistry, then Virginia Tech, got a PhD in organic chemistry.

Q.  Any other degrees?

A.  No, just those two.

Q.  And what was your first job out of college?

A.  First job out of college -- well, actually, the first full-time job was with DuPont.  But while I was in college, I worked for the YMCA in



Roanoke, Virginia part time.  And in graduate school, I didn't; I had a fellowship, so I didn't have to work then.

Q.   What does the DuPont Company do?

A.   Chemistry.

Q.   What was your job at DuPont?

A.   I was a research organic chemist.

Q.   Did you have any other jobs at DuPont?

A.   No, I was not in management; I just strictly did lab research.

Q.   And how long were you there?

A.   From 1970 through 2001, I believe.

Q.   And why did you stop working at DuPont?

A.   They had a -- they were having some downsizing, and they asked for volunteers so that the younger people wouldn't get downsized and I volunteered.

Q.   Where did you work after DuPont?

A.   After DuPont, in 2004, I joined



H&R Block working during the tax seasons, January through April.

Q.    The United States has brought this case against Tuncay Saydam to recover unpaid civil FBAR penalties arising from Saydam's failure to report his financial interest in several foreign financial accounts from 2013 to 2017.  Mr. Saydam is the only defendant in this case, and the sole issue is whether his failure to file the required FBARs reporting his foreign accounts was willful.  H&R Block is not a defendant in this case; you are not a defendant or a party to this case.  We just need some information from you for this case and you prepared Mr. Saydam's tax returns for one of the years at issue.

When did you start working as a tax preparer?

A.    In 2004.

Q.    So you were a chemist before. Why did you switch over to tax preparer?



A.    Well, after I left DuPont, I had a period of time where I was free to do whatever I wanted to, and I, out of boredom, in part, I joined Block.  Plus I'd always had someone else do my tax returns, so I figured I better learn how to do my own tax return, and that's what I did.

Q.    Did you have to take any courses to become a tax preparer?

A.    Yes, it was a summer course of nine weeks or so, and I was doing it primarily at that point so I could do my own taxes.  And afterwards, there was an exam, and then those who met a certain bar were given an option to work for Block then.  I got one, so I accepted and I liked it and I kept going.

Q.    What sort of information did the course cover that you took that summer?

A.    It was basically the basic type of returns.  Family returns, you know, the 1040, Schedule A, B, C, D, and the C for business returns for individuals.



No corporations or anything like that. And states, it covered some of the states, Delaware, Maryland, and Pennsylvania, I believe.

Q.    And who offered that course? Where did you take it through?

A.    It was H&R Block.  One of the older tax professionals or more experienced tax professionals taught us.

Q.    Did you have to take any other training?

A.    Well, every year we have to take X number of hours of classes; X can vary.  And then the IRS required that we would pass a test to get a number, meaning we could do individuals' taxes. But we needed that.  Otherwise, Block would not rehire us.

Q.    So when you first wanted to become a tax preparer, you took the summer course through H&R Block, correct?

A.    Yes.

Q.    And then you also had to get a



preparer TIN, I'm assuming; is that
what you're talking about?

A.    That could be what they called
it.  I forget what they called it.

Q.    A number from the IRS in order
to prepare people's tax returns?

A.    It's on the tax returns that we
did.

Q.    And what test did you have to
take to get that number, or what did
you have to do in order to get that
number?

A.    Well, it was a test, it was a
written test, and we could take it
individually, and you could take it
more than once if you needed to.  But
you had to get a certain level, 70 or
something, to do it.

Q.    And when did you take the
course, what year was that?

A.    Well, every year you have to
take that course.  And then I took
one -- I took a course -- I took an
exam for the IRS to become a senior tax
advisor for Block.  And it was taken in



that office where people, lawyers take it and so forth.  I mean, you take everything out of your pockets and they check you out.  If you go to the bathroom, someone has to escort you. And there were a number of questions and then the test was timed.  And I think I took it maybe eight or nine years ago, something like that.

Q.   So did you take this test after the first time you took the summer course with H&R Block?

A.   Well, every year I took the -- pardon me.  I took the summer course, then every year I took additional courses.  And, yes, it was after those things.

Q.   Do you remember what year you took the test?

A.   No, but it was -- it had to be within the last four or five years at best.  I didn't want to get too far advanced because I didn't want certain types of tax returns.  I didn't want to be involved with them.  Block has an



office in Wilmington that handles specialized tax returns, foreign tax returns, things like that.  Foreign income taxes, so forth.

And I'll interject, if I ever had someone, if I knew they had foreign income, I would immediately tell them I'm not qualified, we'll have to find someone else for you to do it. It's not -- I didn't have experience doing foreign income, per se.  With one exception, and I don't know if you want to hear this.  It's a little bit...

This couple came in, and I did it for two years.  And one of them as I recall inherited a part of a foreign estate and the estate had been transferred to a trust.  And their share of it was sent directly from the trust to a bank in Delaware.  And they came in and they had the tax document showing that it had been prepared by a member of the bank, I think it was PNC Bank, just showing the details.  And that's why I think there's this 3520



form.  And they brought it in, they gave me the phone number to call her to confirm everything.  And if that hadn't happened, I wouldn't have been able to do the tax return, because I've never done this type of tax return before.

Q.   So let's just take a step back so we can kind of clarify the history. When did you stop working for DuPont again?

A.   2019 was my last year of doing taxes, the tax year.

Q.   When did you start working for H&R Block?

A.   In 2004.  That was my first tax year.

Q.   And when did you take the first course to become a tax preparer?

A.   Well, it would have been the summer of 2004.

Q.   And when did you take the first test you needed in order to get the numbers that you could prepare tax returns?

A.   Well, every year you have to do



something to get it.

Q.   Yes, but what was the first time you did that?

A.   I guess it was the first year.

Q.   So you took the test every year?

A.   Yeah, every year.

Q.   And what was on the test?

A.   It was questions about standard forms.  Nothing exotic.

Q.   So standard forms.  What type of forms?

A.   Well, schedule -- a 1040, Schedule A, B, C, so forth like that. There were no 1040 NR returns.  I don't think that was on there or anything like that.

Q.   And you mentioned at some point that you took maybe a different test or a different course to become a senior advisor.

A.   For Block.  Senior tax advisor.

Q.   What does that mean?

A.   It just means a difference in pay scale and I could handle more variations of taxes.  But I wasn't --



their other levels, there's research associate, which is above that, and you could be tax something -- there are two or three more levels at Block.  And they're the people who do the more advanced tax returns.

Q.   And so what other tax returns did you have to learn how to do in order to become a senior tax advisor?

A.    Just standard types, the 1040 and the schedules that go with that. There was no foreign taxes involved.

Q.   Did you have to do partnership?

A.   No partnerships and no corporation things and no charities; I never did a charity return.

Q.   Okay.  And the courses that you took every year, what did they cover?

A.    The basics.

Q.   What were the basics?

A.    Well, who is required to file a tax return, how to determine a dependent, you know, the basic things for a schedule, regular tax return.

Q.    Besides these classes through



H&R Block, did you ever take any other courses related to tax?

A.   No.

Q.   Did you take any tax-related courses at college or in your graduate programs?

A.   No.

Q.   Do you subscribe to any publications or newsletters related to tax?

A.   No.

Q.   Have you written any tax-related articles?

A.   No.

Q.   Or blog posts?

A.   No.

Q.   Have you attended any conferences on tax-related issues?

A.   No.

Q.   Are you a member of any organization related to tax preparation?

A.   No.

Q.   Have you ever, outside of H&R Block, have you ever prepared taxes?



A.    No.  In fact, prior to joining Block, I never even did my tax returns; Block had always did them.  But once I joined Block and had an understanding of the basics, I started doing my own taxes.

Q.    And do you have any specialized tax expertise?

A.    I wouldn't think so, no.

Q.    Any particular areas that you specialized in that you prepared?

A.    Just the regular returns.  That's it.

Q.    And do you have any legal background?

A.    No.

Q.    No courses on law?

A.    No.

Q.    So when you were working for H&R Block, was that as a full-time employee or a seasonal employee?

A.    All but two years it was seasonal.  And two summers, I worked in the summer from maybe August through November, something like that.  This is



the part of the year where people get statements from the IRS or state about their tax returns, and they bring them in and they want someone to clarify what's this all about and so forth.

Q.   So what were the two years that you were a full time -- or not just a seasonal employee?  You said that you were a seasonal employee besides two years.

A.   No, no, I was a seasonal employee -- seasonal in the summer for two years, two of the total number of years.  And I think it was around 2009, give or take a year.

Q.   So those years you worked during the summer, 2009 you said?

A.   I'm guessing it was around '10 or '11.  Somewhere in there.  But it was just two years.

Q.   After that, when would you work for H&R Block?  Were you working full time or part time?

A.   Just the seasons, seasonal tax returns.



Q.    And what's the season for tax returns?

A.    It was January through April 15th, I guess.  And, of course, we were taking courses from September through December.  So in a way -- no, we weren't paid for those courses.

Q.    So you would be taking courses related to tax you're saying from September to December, then doing tax returns from January to April?

A.    Yes.

Q.    What was the H&R Block hiring process?  Did you submit an application?

A.    Well, I took that basic course, the summer course, and then I was recommended.  And then I was interviewed by one of the officials at Block, so I was hired.

Q.    And who recommended you?

A.    The woman who taught the course, Linda Sheer.

Q.    How many of the seasonal employees --



A.   Yes.

Q.   -- of H&R Block are hired?

A.   Yes.  The exception is some have, what is that a degree -- you would know.  What is it?  A lawyer thing --

Q.   A law degree?  An accountant degree, some sort of certification?

A.   Lawyers who do these advanced taxes, corporation, partnerships and so forth.  Sometimes when they retire, they like to keep busy, so they'll work for Block.

Q.   That makes sense.  Was there an interview as part of the process?

A.   For them, I guess.  I wasn't part of it.

Q.   No, but for you.

A.   Was I interviewed?

Q.   Yes.

A.   Every year, a Block tax preparer has to be approved.  We're not hired from one year to the next without the approval of the management.  So every year we have to be approved to move



forward.  And they look at our records and so forth.

Q.    And so every year, you would go through -- you would have an interview?

A.    Well, I wouldn't have an interview per se, but the supervisor would write down notes.  And some years, they would discuss it with us, and other years, you're hired.

Q.    So how long would that process take to be hired?

A.    It wasn't long.

Q.    Like a week?

A.    No, no.  You just go in, like now, we'd talk, and that's it.

Q.    So you would go to the H&R Block offices?

A.    We would go to the district manager's office and have an interview, so to speak, and they would look at your record, our records, because they have records of those.  And on that basis, they would say congratulations, for another year, you've been hired for the next year.  But it wasn't any



permanent hiring.

Q.   So when would you apply each year?

A.   Well, this would happen, let's see, it would be in that September through December section.

Q.   So while you were taking the course?

A.   Yeah, yeah.

Q.   You would apply?

A.   Yeah.

Q.   And would that just be sending an email, or was there a form you would fill out?

A.   Well, the manager would send a note saying we've scheduled an appointment for you for this particular time, and we'll interview you, see what happens.

Q.   Okay.  I think we've covered this a little bit, but just to make it clear, what sort of tax returns would you prepare for H&R Block?

A.   I did the standard type, the regular 1040 return with the schedules



on it, A, B, C -- well, A, B, D, sometimes the business thing, the Schedule C.  I didn't do any foreigners' returns, and I did not do any partnerships or charities or any corporate returns.  All the business returns would have been individual owner, just the standard return.

Q.   So you didn't usually prepare tax returns involving foreign income?

A.   No, I didn't.  I didn't.  And including this would be a 1040 NRs.  Although I did a couple with the assistance of somebody else in the office, where it's routine.  But they're individuals.  I had taken a course in non-resident returns, 1040 NR.  But I didn't do them, per se.  We had people in office who would specialize in things like that.

Q.   You mentioned earlier one instance where you had a couple who had like a foreign trust.

A.   Yes.

Q.   You said you had to reach out to



somebody else to help with that return. How did that work?

A.    Well, I didn't reach out.  They came in, and at the beginning of our -- we have just an interview thing, where it says do you have a foreign bank account, a foreign trust and so forth, one of them said yes, and here, and they showed me this tax return and this tax document that had already been prepared, and they gave me a phone number that said you can call and confirm it.  I called it.  It was someone at a bank.

And I don't know, maybe it's standard protocol, because as I say, the money had been transferred from the foreign trust or foreign -- I guess it was a trust, directly to the bank.  And the bank provided the document. Otherwise, I wouldn't have had any tax documents there.

And all I did was, after talking with the woman at the bank, I just entered her information on the tax



return and I believe the document had to be mailed in.  And I'm not sure if it was her document or my document.  And I did it for two years.

Q.   In this instance when the couple came in and mentioned that they had an interest in a foreign bank account, did you have to put that anywhere on the return?

A.   At Block, that's part of the initial interview.  They asked married, dependents, blah, blah, blah, do you have any foreign accounts and so forth, do you have a foreign trust or foreign other things.  And the idea at Block is to match up the client with the appropriate tax preparer.  So if a red flag comes up, you let them know and the manager would -- the office manager would try to set that person up with a person, tax preparer who had experience in that particular area.  In this case, this was already done, and so I may have mentioned it to some folks, but I basically just followed through on it.



So it's part of their tax return.

Q.   Do you know if this couple had already reported that foreign bank account?

A.   Well, apparently not.  This was the first year of it, the first time, first year and then the second year. And I think this was probably the final two years I was there.  So I don't know what happened after that.

Q.   And that's the only instance you remember ever dealing with foreign income on a return?

A.   Yes.

Q.   About how many people's tax returns would you prepare every season?

A.   Well, generally it was between 2 and 300, except for the last year, it was around 130.  I'd say it's closer to 300.

Q.   And what was the last year that you worked at H&R?

A.   It was in 2019.

Q.   And why did you stop working for H&R?



A.   Health reasons.  I had surgery.

Q.   Oh, I'm sorry.

A.   And that did me in.  I could have gone back after that, but I chose not to.

Q.   And why did you choose not to?

A.   I just didn't want the hassle of the hours and so forth.  I had heart surgery, so I didn't want stress or all that stuff.  And, of course, when you're doing taxes, you don't get a chance to eat very healthy, you just go on through the day, and then you just splurge at night.  In my mind, it's not overly healthy.  I wasn't doing it properly, let's put it that way.

Q.   You said in 2019, your last year, you had more than like 130 clients instead of 2 or 300?

A.   Yeah, I didn't do as many.  And I don't recall exactly why.  Well, towards the end, April, I guess the way it works is I was doing them, and then to get to middle of March to April, this is when the really complicated



ones came in, and I kept getting these things that I didn't really want to do. So I just, I sort of fudged, I said instead of appointment for an hour, I'd set it for two or three hours. And there were people who wanted to do those returns, so I just passed them on.

Q. Did you have any other responsibilities at H&R Block besides preparing tax returns?

A. No.

Q. How did H&R Block set you up with clients to prepare tax returns for?

A. How? Well, clients, they can call the office to get an appointment, or they can -- well, they can call the office for an appointment, or they can set it up with a particular tax preparer. And if they call the office for an appointment, the person answering the phone would, as I recall, would ask them questions about the tax return so they can match that person up



with the appropriate tax preparer.  But people online could always just go in and set up an appointment with a given tax preparer based off what they saw. And so the person would show up, and you either did it or it was up to the tax preparer to pass it on to someone else.

Q.    So the client could select a particular tax preparer?

A.    Yes.

Q.    But H&R Block would also sometimes match people up?

A.    Well, they always matched people up if they called and asked for an appointment.  But if they set up with a given tax preparer, then it was up to the tax preparer to either let them know when they come in, hey, this is not my ballpark, or just do it.

Q.    And if they had been assigned to one tax preparer in the past, were they typically assigned to the same one again?

A.    No.  Again, the way it works is



if prior clients, they come in, you do the taxes.  The next year if they call in for an appointment, the receptionist would automatically set them up with the person that did it the previous year.  Well, that's what you said, yeah.  And -- what's the question again?

Q.   So would a client have to request to go to a different tax preparer than the one they had the year before?

A.   Yes, I believe that's the way it works.  Or the tax preparer could request that they work with somebody else.

Q.   So either the client could I guess go into the system online and set an appointment with a different tax preparer?

A.   If they wanted -- oh, yes, yes, they can definitely do that.

Q.   And then the tax preparer could also say they didn't want to work with a particular client?



A.    They never said we didn't want to work with them, we would let them know your tax return is out of our expertise and we would need to set you up with someone that could do your taxes more efficiently and accurately.

Q.    But automatically they would have been set up with the same person unless somebody opted out?

A.    Yeah, yeah.

Q.    Once you received a client, what was your first step?

A.    Well, we'd introduce ourselves and we'd ask them, first of all, do you have any questions?  And after that, then we'd say, okay, what kind of tax information do you have, see your tax documents, okay.  And if they were a prior client, we did enter a social security number, and the documents from the previous year would be available; they would be on the software program. And as we're going along, we ask them, if you have any questions, please ask us.  And when we get to the end,



there's a summary showing the prior year tax return and the current year tax return.

And during the tax return, if there's a document from the previous year that's not part of the current year, there'd be a question mark in the software, what about this document? And it was up to the preparer to delete the ones that didn't apply.

Q.    And so this first meeting, this would be in person, correct?

A.    Yeah.

Q.    Would you --

A.    Well, they nowadays do them online, but I didn't want any part of that.

Q.    But all of your meetings with your clients were in person?

A.    Were in person, yes.

Q.    And how many times would you usually meet with them?

A.    Well, when they come in, we'd try to get the return completed in that particular session, which could be up



to an hour or more.  Some I did were a lot longer.  But clients don't like that, and put it on hold or you'd tell a client to come back, I'll work on it later and I'll give you a call on it, that sort of thing.  But for me, I didn't like to do that, and most of my clients, just about all of them, I finished when they came in, unless they were lacking a particular tax document; that happens sometimes.

Q.   What documents would you need them to provide you?

A.   What's that?

Q.   What documents would you need them to provide to you?

A.   Any tax forms showing earnings, income, dividends, interest, and if they had a business, Schedule C, what their expenses were, what information they had, and their mileage, did they have their mileage documented, things like that.  Dependents.  Sometimes you'd have a conflict of interest, several people might be claiming the



same dependent, and try to work that

out with them, things like that.

Q.   And when were they informed that

they needed to bring these documents?

A.   Well, when they called -- if

it's a new client, they called for an

appointment.  I'm sure the

receptionist, or at least I assume,

would ask them, bring in all your tax

information and your ID, information

about your IDs, and any expenses that

you have.  And if you have a business,

blah, blah, blah and so forth.  And if

they're a prior client, they just know

to bring in their documents, or that's

what they do, they just bring in their

documents based on their previous

year's return or any recent documents.

But we always ask -- well, I

did, I'm sure the others -- always ask,

is it all of your tax information?  And

this Schedule B, these two things down

here at the bottom about foreign

accounts or foreign trusts and so

forth, I think, as I recall, that



occurs in the early interview for every client.

Q.  So at the beginning of your interview with every client, you would ask them about foreign trusts?

A.  Well, the software, these questions pop up on the software.  So we're just basically asking the questions based on the software.  And in the last four or five years I was at Block, they had a separate screen so that the client could see everything going on and the tax preparer would have a screen where it's inputted, so they would see all that.

Q.  So when you would be preparing 2017 tax returns, that would have been 2018, correct?  2017 tax year, when would you be preparing those tax returns?

A.  Income from 2017, that would be done in 2018.

Q.  So at that time, did they have the --

A.  No, no, when they come in to



actually have their taxes done, their prior -- if they were a prior client, that information would show up in 2018 as you start the return, see.

Q.   And they had that, the two screen thing in 2018, they had it at that time?

A.   Yes, I believe, yes.

Q.   And so this software, who provided the software?

A.   Block.  H&R Block.

Q.   And how were you trained to use it?

A.   Well, there was no training, it just automatically -- the system is set up so whatever is in one, the screen you're looking at, it's going to appear on the second screen right next to it. So the clients could -- in the past, clients had to look at the screen that the tax preparer was using, and that was sort of awkward sometimes.  But this made it very easy for them to use the screen.

Q.   And the software provided the



questions that you would ask?

A.    Yes.

Q.    Would you ask all the questions that the software put up?

A.    Yeah, yeah.  In fact, if there was questions and there was no answer, we'd get an alert, you know.  You have to answer it.

Q.    So you couldn't continue with the tax return unless you input the answers to the software?

A.    Well, for the questions, yeah, you have to input something.

Q.    And would you ever not ask a question and still input something into the software?

A.    I don't think so.  I don't think myself or anyone else was that bright to do that.

Q.    Okay.

A.    I mean, we had -- oh, I see.  If it was a question yes or no, do we just assume?

Q.    Yes.

A.    No, no.  Nobody ever assumed



anything.  You always ask the question and put in the answer given.  And sometimes you have a husband and wife there and you'd ask a question, and one would say one thing, oh, are you sure about that, let me think about it, and they'd have to decide what was the appropriate answer.

Q.   And were these mostly yes or no questions?

A.   Well, no.  Again, there would be identity questions and dependents and expenses, and your itemized deductions on Schedule A.  Basically, though, we did follow what's on the screen.  I guess that's the best way to put it.

Q.   And the software wouldn't allow you to skip questions?

A.   Well, it would ask a clarification.  I suppose some of the questions could be skipped if they were non-essential.  But as I recall, you had to -- we had to input an answer for every question, something.

Q.    Were there any way to bypass the



software, get around?

A.   Well, you could, but then at the end you'd get a big fat alert, go back and clarify this.  The software wouldn't -- it had to meet whatever the software guidelines were before it would get done.

Q.   If you inputted one answer and then later a client told you an answer should be something different, how would you change that in the software?

A.   Well, we'd just go back to that given thing and delete the original answer and put in a separate answer. And sometimes, not always, sometimes, we'd put in a note as to why it was changed, but not always.

Q.   And could they do that after the interview?

A.   Well, after the return is complete, the only way to do that would be to amend the return.  I'm not sure when you said after the return -- oh, when we finished the return, there's a summation about the return, and we'd go



through that, and that's their time to question it.  Plus if they were a prior client, you've got the prior year information there and the current year.  And if those don't match up, you'd get an alert, why not?  If there was the previous year, there was a given tax form and the current year, it wasn't in there, you'd get an alert saying double-check, see if that income applies to the current year or not.  I mean, it worked.

Q.   And were you ever asked to do an amended return, like after a return was filed, you had to do a change?

A.   During the summer, I worked during the summer, that's all we basically did, was amend returns. People would get letters from the IRS, they'd bring them in, what's this all about, and we'd read it and then try to interpret it.  And then we'd send an amended return, if that's what was required.  But if a return had not been filed, we could always go back and





amend it.  But once it's filed, the only way to do it is to file an amended return.

Q.   So along with going through all the questions in the software, what else would you do during the in-person interview?

A.   Well, again, in the beginning, we'd go through this, what tax information have you provided, dependents, so forth.  And also would ask do you have any questions, because sometimes there's a question, may not have anything to do with taxes, but sometimes a question.  And when we finished -- when I say we, I'm talking about myself, but I'm assuming the others did the same.  When we're finished, we would go through the return and ask them, anything more?  That's always a good question, anything else, did we miss anything?  Do you agree with the return?  And that's it.  Because they have to sign it saying that they agreed with the information.



Q.   Would they sign it in that same
meeting?

A.   Yeah.  We couldn't file it
unless they signed it, the return.

Q.   And so they would sign it in
person with you?

A.   Yes.  I don't know if I did a
return -- I guess somebody else
could -- if they came in, say I wasn't
there, it was my return, I'm not sure.
I don't think anybody else would touch
it unless I just couldn't -- I wasn't
available at all.  It didn't happen
anyway.  Most of the returns were
completed when the taxpayers were
there.

Q.   So most returns were completed
in that one hour, hour to two-hour
interview, and it was signed at the
end?

A.   There were some others that
preferred to get all the information
and tell the client, thank you, I'll
let you know when we're done with the
return and you'll come in and review



it.  And it worked quite well for them.
I did it the other way.  I finished it
there so I could ask questions and so
forth.  However, it's more stressful
that way versus the other way.  I think
they had a better way of doing it.

Q.   And what was the process for
signing the return?

A.   Well, again, we went over the
final return and asked generally, I
guess every time, do you agree,
everything look in order for you?  And
if so, then sign it.

MS. DE PALMA:  I think this
is a good time for a short five-minute,
ten-minute break.

(A brief recess was taken.)

BY MS. DE PALMA:

Q.   If a client had a foreign bank
account, how would you find this out
during the process of preparing their
return?

A.   The only way I would know would
be -- I would first of all ask, do you
have any tax information, whatever your



tax information is.  And that question on I believe it's Schedule B, we have to enter an X or a Y there, yes or no. And that's early on in the tax interview.  And that's the one way I would know.  And the other, if they volunteered the information or if they've brought in the tax documents to that effect.

When I mentioned about the couple that brought in the tax document that had been prepared by the banker, that's the only way I would have known what's going on.  That was the only tax information they provided me.

Q.   Do you remember for this couple that you've been mentioning, do you remember what country their bank account was in?

A.   No, I don't.  I just vaguely recall that they indicated it was an estate that had been transferred to a trust.  And the money then was transferred directly from the trust to the bank.



Q.   So the software would require you to ask about foreign bank accounts?

A.   Well, it would just be those two questions at the bottom of the Schedule B.  But if they would occur before that in the beginning of the tax interview, do you have any foreign accounts, business accounts, trusts, foreign trusts.  And that's where we'd find out.

Q.   And would those questions be asked even if you weren't preparing a Schedule B for that tax preparer?

A.   Yeah.  To the best of my knowledge, that question would be at the very beginning among the other questions about the dependents and so forth.

Q.   And if the taxpayer answered yes to those questions, what would happen?

A.   Well, if they did, we would have to see the documents.  And in my case, if it was a foreign, I would let them know I'm not qualified -- I don't have the training for this kind of return,



and I'd like to set you up with someone who has experience in this area. And we had one person in our office that probably could have handled it, but there's an office in Delaware, H&R Block office in Delaware that handles the specialized tax returns. And I assume that's one of those things, foreign tax information.

Q. So you would not be able to complete their tax return?

A. Well, I could try, but I would quickly get lost in it. And at that point, it would -- it didn't serve a useful purpose. If I started a foreign tax statement and I was blubbering all over the place, the client I'm sure would say, well, can you give me somebody else to do it? They'd lose confidence in me, and it's just not worth the effort.

Q. So --

A. In other words, I did not favor learning on the job, let's put it that way. I'd rather what I already knew I



would do.  And there weren't that many I guess foreign information anyway.

Q.   So when you would refer them to someone else, would you give them a phone number, would you send them down the hall?  How would that work?

A.   I would talk with the tax preparer first to find out if they could handle such a return or not.  And if not, we always had an office manager those days, and could let them know that this return was beyond my expertise and let the manager handle it.  And he would know perhaps in another office someone who could handle it or that office that specializes in these types of returns.

Q.   As part of these questions or this initial interview, were you required to tell the taxpayer that they had to report the foreign bank account?

A.   Again, it's just pretty much reading what was on that Schedule B. And I guess the assumption would be if they had foreign income, maybe the



people would know that that's something that had to be included in their tax return.  But I don't recall ever asking somebody, do you know, do you realize if you have any foreign income, you're required to pay taxes on it?  Even though you may pay taxes on it in the other country, that could be a write-off against the taxes you would pay in the US.  But I just didn't have -- I just don't recall I ever had anybody who had it, other than that client who had, when asked, had a foreign income.

Q.   And did H&R Block give you any training in what to do when somebody said yes to one of those questions?

A.   Well, Block's training was if you get a return that you don't feel comfortable in doing, don't do it.  Let the manager know, pass it on, or let the client know.  And I have to admit, that there were -- I've had a few clients who I'd start the return and maybe I was blubbering too much and



they felt uncomfortable, and they'd say, well, maybe we'll try somebody else.  Maybe one or two.

Q.    But there wasn't any training in particular for everyone on what to do about foreign returns?

A.    Other than that it's income.  I don't think -- I don't know what the training would be.  Again, this 3520, for example, I don't recall any training on that, or I brought the other one, 8938, I don't recall any training on that, although I'm sure there must be something.  Because for those who took the -- became advanced tax preparers, they must have done it, because you have to pass those tests with the IRS before you can reach those levels.  So there must have been available.

Q.    Besides asking the client directly, were there any other ways you could discover if they had foreign income?

A.    Pardon?



Q.   Besides asking the client about foreign income, was there any other way from the documents that you could tell if they had foreign income?

A.   I don't think so.  I wouldn't know.  Unless if it was obvious that he was from a foreign country.

Q.   Does the name Tuncay Saydam sound familiar to you?

A.   I've been trying my darnedest to remember that name and I just can't do it.  About three years ago -- I may have mentioned this -- three or four -- pardon me.  I retired four years ago. Within a couple of years prior to that, myself, another tax preparer, Linda Dunn, and Gomez, we were called to an office in Newark, and we were asked a few questions, and that was it.  Now I've lost --

Q.   That's all you remember?

A.   Yeah.  And we just did it, and that was it.

Q.   Do you know the name Oya Saydam, O-Y-A?



A.   No.

Q.   Do you remember preparing Tuncay and Oya Saydam's 2017 tax return?

A.   No.  But interestingly, I was looking at this book here; according to this, Linda Dunn did their return prior to my doing it; is that right?

Q.   Yes, she did.

A.   And I thought it was the reverse.  I was thinking of that one where we went into the office a couple, four, five years ago, and it was just a few minutes of questions.  This one is totally unique.

Q.   Well, let's take a look at tab 2 in this binder.

MS. DE PALMA:  At this point, I'd like to direct your attention to tab 2 which I will mark as Exhibit 1.  And this is Bates numbered USA 000511 to USA 110530.

(Exhibit Number 1 was marked for identification.)

BY MS. DE PALMA:

Q.   And just take a minute or two to



take a look at this.

A. Well, it's got their name at the top, 2017, and social security numbers, wages, business income. So this is the return I did for them, right?

Q. Do you recognize what this document is?

A. Well, it's a tax return and their name is there. I mean, what else?

Q. Do you recognize this particular return?

A. Well, I'm looking to see if there's something that stands out.

Q. Well, let's turn to Bates number USA 000514, which is also I think the fourth page. Basically the second whole page, but it will say 4 of 20 at the top.

A. 4 of 20?

Q. Yes. Do you recognize that name that's listed as the preparer name?

A. Well, this doesn't have a preparer name. Oh, it's right there. Morris Rorer, that's me.



Q.    So that's your name?

A.    Yes.

Q.    There's also a PTIN number. What's that number?

A.    That's the number that the IRS assigned to me, meaning that I met the qualifications of the IRS to do the return, I guess.  And the other one is H&R Block, their employer identification number.

Q.    And so that number there, if I'm reading that correctly, is P00407350. That's the PTIN?

A.    Yes.

Q.    Is that your PTIN?

A.    I don't know if I've still got the...

Q.    It's okay if you don't remember.

A.    Let me just take a quick look here.

Q.    For the record, he seems to be looking for a particular card.

A.    Well, I used to carry it.   I don't have it now.

Q.    But that is your name under the



preparer's name?

A.    That's me.  I'm the only one.

Q.    And the address, 140 College Square, Newark, Delaware?

A.    That's the office number.

Q.    That's the office, and the phone number, 302-368-7500, whose number is that?

A.    That's the office number.

Q.    Let's take a look now at -- this is the 15th page, but at the bottom it will say USA 000525.

A.    It's got some M&T Trust Company, it's a Schedule B, so this is dividends.

Q.    So what is a Schedule B?

A.    Well, that's interest and dividends.

Q.    Would you always prepare a Schedule B for your clients?

A.    Well, we'd ask them if their interest is over 1,500 or if their dividends is over 1,500, that automatically would show up.  And I don't know about those questions --



It's sort of like that client, lawyer-client privilege situation.

And I would meet people on the street, I'd recognize their name, but I couldn't recall their -- I'd recognize them, but I couldn't recall their name.  And I explain to them the situation.  I just didn't want to memorize that stuff.

Q.   Gotcha.  Yeah.  Join the club. Learning everyone's name is not easy at any age.

MR. GREENBERG:  I think that I don't have any other questions.

MS. DE PALMA:  I have no further questions.  So I think you're all good to go.  Thank you so much for your time.

(The deposition adjourned at 3:52 p.m.)



I N D E X


DEPONENT: MORRIS RORER                      PAGE


    Examination by Ms. De Palma        3
    Examination by Mr. Greenberg       75



        E X H I B I T S



EXHIBITS                                MARKED


1       Document Bates stamped
        USA 511 through 530             59

2       Document Bates stamped
        USA 439                         70




ERRATA SHEET                            90
CERTIFICATE OF REPORTER                 91



DEPONENT:   MORRIS RORER
DATE:       Thursday, September 21, 2023
CASE:       USA v. Saydam

            ERRATA SHEET

PAGE/LINE/CHANGE OR CORRECTION AND

REASON

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

I have read the foregoing transcript of
my deposition and, except for any
corrections or changes noted above, I
hereby subscribe to the transcript as
an accurate record of the statements
made by me.

Date:

                Signature of Deponent



CERTIFICATE OF REPORTER

I, Jennifer M. Guy, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on Thursday, September 21, 2023, the deponent herein, MORRIS RORER, who was duly examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed by use of computer-aided transcription and computer printer under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

Jennifer M. Guy, RPR



MORRIS RORER
USA vs SAYDAM

*No changes*
*mPR*

September 21, 2023
90

DEPONENT:    MORRIS RORER
DATE:        Thursday, September 21, 2023
CASE:        USA v. Saydam

ERRATA SHEET

PAGE/LINE/CHANGE OR CORRECTION AND

REASON

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

I have read the foregoing transcript of
my deposition and, except for any
corrections or changes noted above, I
hereby subscribe to the transcript as
an accurate record of the statements
made by me.

Date: *10-13, 2023*

                    Signature of Deponent
