Douglas Greenberg, CA Bar #255505
Law Office of Douglas Greenberg
201 Spear Street, Suite 1100
San Francisco, CA 94105
Ph: (415) 287-9990
Fax: (415) 408-6890

Attorney for:
Tuncay Saydam

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>vs.<br><br>TUNCAY SAYDAM,<br><br>             Defendant. | No. 4:22-CV-073710-DMR<br><br>DEFENDANT'S OPPOSITION TO UNITED STATES' MOTION FOR SUMMARY JUDGMENT<br><br>Hearing Date: July 11, 2024<br>Hearing Time: 1:00 PM<br>Judge: Chief Magistrate Judge Donna M. Ryu |

     DEFENDANT Tuncay Saydam, respectfully submits this opposition to Plaintiff's Motion for Summary Judgment. The parties have conferred on Plaintiff's Statement of Undisputed Material Facts and agree that it is a separate, not joint statement of undisputed facts. Many statements therein are in fact contested.

Opposition to Plaintiff's Motion for SJ - 4:22-CV-073710-DMR

1

# TABLE OF CONTENTS

Table of Contents…………………………………………..……………………………. 2

Introduction……………………………………..…………………………………. 3

Statement of Undisputed Facts……………………………………………………... 7

Standard of Review.…………………………………………………………………. 8

Statement of Disputed Facts and Issues……………………………………………… 9

    I.      Whether Mr. Saydam Was Confused About His Finances………… 9

    II.     Dealings with Swiss Bank……………………………………….. 10

    III.    Account Closures and Transfers to Turkey.………………………. 13

    IV.    ZKB's Illicit Practices……………………………………….... 15

    V.     Foreign Income and Losses…………………………………….... 16

    VI.    Preparation of Tax Returns…………………………………….... 16

    VII.   IRS Examination……………………………………………….... 19

Legal Analysis…………………………………………………….. 20

    I.      Willful Fbar Penalty Case Review………………………………... 20

    II.     Willfulness Standard……………………………………………. 22

    III.    Standard Applied……………………………………………. 23

Conclusion………………………………………………………….... 24

Opposition to Plaintiff's Motion for SJ - 4:22-CV-073710-DMR

# INTRODUCTION

Plaintiff's motion requests a severe punishment. The motion seeks $534,947 from Tuncay Saydam, the highest level of Fbar penalties. Plaintiff's Motion for SJ; Plaintiff Ex. X. Mr. Saydam lacks sufficient retirement savings to pay. If approved his primary home will be seized by the Justice Department—a one-bedroom apartment in San Francisco that he shares with his wife. Defendant Ex. 1. At 86 years old, Mr. Saydam will lose both his home and his retirement savings without a trial, an opportunity to testify in court or a jury of his peers.

In order to justify this result, Plaintiff has created a very compelling and sinister narrative. The narrative mischaracterizes the dealings of an ordinary American who has lived much of his life abroad. Plaintiff seeks to lump Mr. Saydam with financial schemers who specifically sought out foreign accounts for the purpose of evading taxes. The motion disregards key facts. Key evidence is omitted as well.

For instance, the motion implies that Mr. Saydam actively hid his U.S. identity, U.S. tax status and U.S. address from his bank in Switzerland. Plaintiff's Motion for SJ p. 4-5. However, Plaintiff completely omits the completed IRS Form W-9 Mr. Saydam provided to the bank. Defendant Ex. 2. This form, which Defendant received from Plaintiff, provides the bank with his U.S. address, his social security number and his full name. Id. Mr. Saydam provided this information despite express instructions from the bank that the information would ultimately be shared with the IRS. Plaintiff Ex. 6, p. 8.

A willful schemer would have sought to hide his identity from the U.S. tax authorities. Mr. Saydam did not. A willful schemer would have refused to provide identifying forms which would ultimately be forwarded to the IRS. Mr. Saydam did not. A willful schemer would have used Form W-8 instead of Form W-9 to identify himself as a non-U.S. taxpayer. Mr. Saydam

did not.  Plaintiff's motion implies repeatedly that Mr. Saydam actively hid his U.S. status.  Yet omits key evidence where he does exactly the opposite.  If Plaintiff truly believed there were no triable issues of fact in this case, it would not need to hide inconvenient material evidence.  Such omissions are irresponsible if not egregious in light of the penalties being sought against him.

Truly there were financial schemers at Mr. Saydam's Swiss bank, who were seeking to game the tax system.  Past court filings describe, in graphic detail, the way the bank helped these willful actors evade U.S. tax.  Defendant Ex. 3 & 4; see United States v. Fellmann, Huppi, and Reist, 12 Cr. 962 (S.D.N.Y. Dec. 19, 2012).   For instance, ZKB bank would offer these clients 'numbered' instead of named accounts, undeclared accounts, sham entities, code words, clandestine meetings and other illicit practices.  Id.  Mr. Saydam engaged in none of these things.

Truly there are also financial schemers elsewhere who seek to game the tax system by using foreign accounts.  As explained below, they are distinguishable.  Universally, past defendants in willful Fbar cases had no bona connection to the country where their foreign accounts were located.  Mr. Saydam is different.  The undersigned counsel could not find a single case where heightened, willful Fbar penalties were sought from a taxpayer who actually had a legitimate connection with the country where they held their foreign accounts.

Mr. Saydam had such connections.  He is in Turkey now as of this writing.  He and his wife traveled there after their depositions in late April and will still be there in July when the hearings on this motion are held.  His attached travel history shows regular and extensive travel to the country, even during the pandemic.  Defendant Ex. 5.  He spent the first half of his life there and even now Turkey continues to be as much his home as the USA.  Id.  The parties agree he spent extensive time in Switzerland as well, the other country where he banked.  Plaintiff's Motion for SJ, p. 3.

Plaintiff has described Mr. Saydam as highly intelligent and sophisticated. Indeed his education and career are very impressive. However, Mr. Saydam is not as financially savvy or organized as one might assume. As detailed below, Mr. Saydam, now in his mid-80s, required an entire team of professionals simply to locate his foreign accounts. Defendant Ex. 6. In 2020, he moved in with his daughter and son-in-law because he could no longer manage his affairs independently and continues to depend on their assistance. Tuncay Depo. 198:18-23.

As a method of tax evasion, his foreign accounts were poor vehicles indeed. As Plaintiff's own evidence shows, the accounts generated little income, and what little income they did generate was typically subject to foreign tax withholding. Plaintiff Ex. 17, p. 7-25. Mr. Saydam even incurred substantial losses in those accounts, which led to a protracted and successful litigation in Turkey. Plaintiff Ex. 22, p. 2-3. Reporting these losses on his U.S. tax returns would have actually benefited Mr. Saydam by substantially offsetting his other income and dramatically lowering his U.S. tax liabilities. See 26 U.S.C. §165; IRS Rev. Proc. 2009-20 (procedures for claiming Ponzi scheme losses). If this motion is approved, Mr. Saydam may go down as the first taxpayer in history to incur heightened penalties for years where he actually overpaid his U.S. taxes.

Mr. Saydam simply did not realize the accounts were relevant to his U.S. returns. As explained below, his local tax preparers were not foreign account specialists and rushed him through the filing process. See generally German Gomez Depo.; Linda Dunn Depo.; Morris Rorer Depo.; Tuncay Depo. 159:3-162:19. They did not use a questionnaire. Tuncay Depo. 159:3-162:19. They only spent about 20 minutes with him and never asked about foreign accounts. Id. As explained below, they were unfamiliar with the foreign account questions and admitted that they rarely if ever identified anyone with a foreign account.

Mr. Saydam sincerely regrets his oversight and has since hired counsel to prepare his returns. He genuinely believes that he made a mistake. He is not alone. Millions of Americans living abroad do not file Fbars. In 2020, the U.S. State Department estimated that nine million Americans were living abroad. Defendant Ex. 7. According to the GAO, in 2016 only 204,009 Americans abroad filed FBARs. Defendant Ex. 8, p. 57-58. Thus only a handful appear to actually be filing the form. Many factors may contribute to this gap. Defendant Ex. 9, p. 116. The Taxpayer Advocate cites a lack of taxpayer outreach, lack of qualified professionals and the complexity of the requirements, which increasingly fall on unsophisticated, ordinary taxpayers. Id.

In its recent reports to Congress, the Taxpayer Advocate has strongly warned of an international tax penalty regime that is increasingly being weaponized against unsophisticated lower and middle-income Americans. *Id.* p. 101-131. The report reads, although "thought of as a niche issue impacting only the very wealthy with lucrative and vast holdings abroad… (the international information return penalty) regime sweeps lower- and middle-income taxpayers into its broad and punitive grasp." *Id.* p. 107. Once a means to punish serious tax evaders, the penalties have increasingly become a trap for the unwary as they sweep up ordinary taxpayers who trigger them due to life circumstances. The report warns that these taxpayers unexpectedly face draconian penalties that are "disproportionately harsh when compared to the offense" and expose them "to potentially life-changing penalties for failure to meet information filing requirements that are obscure and complex." *Id.* p. 102-103.

Mr. Saydam's case is not so different from millions of other ordinary Americans. A sinister narrative could likely be constructed around their lives and tax returns as well.

## STATEMENT OF UNDISPUTED FACTS AND ISSUES

The parties agree on the following basic facts. Defendant Tuncay Saydam was born in Turkey in 1938. Tuncay Depo. at 13:7-17. He is fluent in English and attended Istanbul Technical University. Tuncay Depo. at 13:18-25. He later completed a graduate program at the University of Texas at Austin in Engineering and Computer Science. Tuncay Depo. at 14:5-12. He then returned to Turkey to work as an assistant professor at Istanbul Technical University, teaching computer science. Tuncay Depo. 16:5-20.

Around 1980, Mr. Saydam immigrated to the U.S. to work as a professor at the University of Delaware. In 1988 or 1989 he became a U.S. citizen. Ever since he has been a dual citizen of the United States and Turkey.

In 1988, he began a temporary teaching position at the ETH Zurich in Zurich, Switzerland. Plaintiff Motion for SJ p. 3-4. At some point he began a second temporary teaching position at EFPL in Lausanne, Switzerland. *Id.* While in Switzerland he published various research papers. *Id.*; Plaintiff's Ex. 4. He also developed contacts in the private sector. *Id.* He continued to do consulting work in Switzerland into the mid 1990's. *Id.*

Mr. Saydam established accounts at Zurcher Kantonalbank ("ZKB") in Switzerland, which were closed in 2012. *Id.* p. 5-6. The funds from these accounts were transferred to Turkey. He continued to hold financial accounts in Turkey, primarily at Akbank, Denizbank and IS Bank. *Id.* p. 9. The parties dispute many facts about Mr. Saydam's foreign accounts.

During the years at issue, Mr. Saydam filed joint federal income tax returns (Form 1040) with his wife. The returns were prepared at a local H&R Block office. During the years at issue three different preparers at H&R Block were used. Mr. Saydam maintains that his preparers

never asked him about foreign accounts. The preparers maintain that this is a standard procedure and that they did.

The parties agree that Mr. Saydam held foreign accounts from 2013 through 2017 with total balances exceeding $10,000 USD. They also agree that he had Fbar filing requirements for those years and that he did not file his Fbars on time. The main issue in dispute is whether Mr. Saydam's failure to timely file Fbars for those years was willful.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine dispute exists if there is sufficient evidence that a reasonable fact finder could decide in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the burden of showing there is no material factual dispute. Hill v. R+L Carriers, Inc., 690 F. Supp. 2d 1001, 1004 (N.D. Cal. 2010). In judging evidence, the Court does not make credibility determinations or weigh conflicting evidence and is required to draw all inferences in a light most favorable to the nonmoving party. First Pac. Networks, Inc. v. Atl. Mut. Ins. Co., 891 F. Supp. 510, 513–14 (N.D. Cal. 1995).

Thus, summary judgment is only appropriate if there is no genuine issue of material fact even after drawing all inferences in favor of Mr. Saydam.

# DISPUTED FACTS AND ISSUES

As detailed below, a large number of material facts remain in dispute.

## I. WHETHER MR. SAYDAM WAS CONFUSED ABOUT HIS FINANCES

Despite Mr. Saydam's impressive education, he is not as financially organized as one might assume. Nor was he ever wealthy. Mr. Saydam chose a lifelong career in academia. Throughout his life he earned only a teacher's salary and modest consulting income. Tuncay Depo. 40:9-11. He retired with a house in Delaware and just over $500,000 in retirement savings. Tuncay Depo. 67:4-9; Plaintiff Ex. 22, p. 2 ("With the aspiration of investing his life-time savings… Mr. Saydam deposited a total of $525,000..").

His foreign accounts were generally managed by others and he had little to no involvement in their activities. See Tuncay Depo. 74:4-:8; 78:18-20; 84:15-85:12. As Mr. Saydam aged, he grew increasingly disorganized with his finances and was confused by their details. In connection with his audit, he was required to produce information and records for all of his foreign accounts. Plaintiff Ex. G & I. Mr. Saydam produced substantial information but far short of a complete record. Plaintiff Ex. J.

In order to complete that record, an entire team was required with substantial involvement from his daughter, son-in-law and the undersigned counsel. Defendant Ex. 6. As the attached emails show, a substantial effort was needed simply to locate Mr. Saydam's accounts and then obtain the relevant statements. *Id.* When the family made its first contact with the undersigned counsel, Mr. Saydam had no idea how many accounts he had and barely any knowledge of their activity. See e.g. Tuncay Depo. 51:24-52:6.

As time went on, Mr. Saydam became less and less able to manage his affairs.  In 2020, he and his wife moved to San Francsico to live with their daughter.  Tuncay Depo. 233:18-234:2.  After the move, their daughter and son in law began receiving his mail.  Plaintiff Ex. W, p. 2 (IRS letter addressed to Tuncay c/o the MacKenzies at 55 Uranus Terrace).  They have since been instrumental in assisting him with his IRS issues and now this litigation.  See Defendant Ex. 6.

## II.  DEALINGS WITH SWISS BANK

Plaintiff's motion contains an incomplete and misleading narrative about Mr. Saydam and his Swiss bank.  The parties do not dispute that Mr. Saydam spent nearly a decade living and working in Switzerland.  Plaintiff Ex. 3, p. 1; Tuncay Depo. 22:21-24.  He performed extensive academic and private sector work there.  Plaintiff Motion for SJ p. 3-4.  A photo of Mr. Saydam and his Swiss research team is attached.  Defendant Ex. 10.  Plaintiff has cited some of the research papers he published while there.  Plaintiff Ex. 4.

At some point Mr. Saydam opened bank accounts at ZKB bank in Switzerland.  The record of his dealings with ZKB are fairly sparse.  However, what few records do exist are central to this case.

In or around May, 2009, Mr. Saydam and his wife signed a signature agreement with the bank.  Plaintiff's Ex. 6, p. 1-2.

On May 13, 2009, a U.S. Withholding Tax Questionnaire was filled out for Mr. Saydam and signed by him.  Plaintiff Ex. 6, p. 8.  This form is a key document, as it is one of the very few written records that give direct insight into Mr. Saydam's intent or lack of intent to hide his foreign bank accounts.  Thus, each detail is critical.

Tuncay's first and last name are included near the top of the form as well as the address of his flat in Istanbul. *Id.* He did not use his Delaware address. For nationality, Turkey is inserted. On that line he did not include U.S.A. to note that he was a dual citizen. However, below that there is a section which reads "Determining your status as a U.S. person / non U.S. person" with several checkbox options. *Id.* There are no instructions under "Determine your status." Answering yes to any one of these would self-identify the filer as a U.S. person for U.S. tax purposes. *Id.*; see also 26 U.S.C. §7701. Without any instructions it is not clear whether the customer is supposed to check yes to all applicable boxes or just the single most appropriate one.

In Tuncay's case, the checkbox for "Are you a U.S. citizen.." is checked YES. This alone is sufficient to self-identify him as a U.S. taxpayer. *Id.*, see also 26 U.S.C. §7701(a)(30)(A). There is no need to check any additional box to determine his U.S. tax status. Originally this box was checked no and then corrected. *Id.* Plaintiff's motion immediately seizes on this and lists off all of the other boxes which are checked 'NO.' See Plaintiff's Motion for SJ p. 4. The implication is that Mr. Saydam was hiding his U.S. tax status.

However, a person attempting to hide their U.S. tax status would have simply checked "NO" to all of the boxes. They would not check yes to any. The form reads further "If you have answered Yes to at least one of the above questions: You come under the designation of U.S. person." Plaintiff Ex. 6, p. 8. For all U.S. persons, it requests "a properly completed and signed U.S. Tax Form W-9." *Id.* Then in bold print it says, "Form W-9 will be forwarded to our external depository who will disclose the identities of the partners to the IRS." Mr. Saydam is listed at the top left as a partner. *Id.* Thus, he voluntarily made himself subject to the bank's disclosures to the IRS.

Plaintiff's motion makes no mention of the above details. However, such details are critical. Here Mr. Saydam is actually consenting to have his identity and information disclosed

to the IRS.  Such actions are not in keeping with a willful actor.  A person acting willfully would not want his identity disclosed to the IRS at all.

Plaintiff's motion entirely omits the IRS Form W-9, which Mr. Saydam filled out and provided.  Defendant Ex. 2; USA000744-745.  The instructions on this form state "Use Form W-9 only if you are a U.S. person." *Id.*  The second page states "If you are a foreign person, do not use Form W-9.  Instead use the appropriate Form W-8." *Id.*  Mr. Saydam filled in all required information, including his U.S. address and U.S. taxpayer identification number.  *Id.*  Then he signed it and provided the same.  This Form W-9 is a key document which goes to the very heart of this case.  The document completely refutes Plaintiff's contentions that Mr. Saydam was attempting to hide his status as a U.S. taxpayer from the bank.  The complete omission of this document from Plaintiff's motion is simply stunning.

Lastly, Plaintiff's motion mentions that Mr. Saydam opted not to invest in U.S. securities. Plaintiff Motion for SJ p. 5.  Plaintiff argues that this option was selected to "limit reporting requirements to United States authorities" and "was supposed to only be available to non-U.S. persons." *Id.*  Here again, a careful reading is required.  When examining the details, the reality is not so simple.

If the form is actually reviewed carefully it states, "if all of the above questions have been answered NO, the following options are open to you." Plaintiff Ex. 6, p. 8.  Tuncay had answered one of the questions YES ("Are you a U.S. citizen").  *Id.*  He did not check all boxes NO.  Based on a plain reading of the instructions, not all options would thus be open to him.  He selected the second option (to relinquish U.S. securities).  Logically then, this would have been the only option available to him.

In other words, there were only two options (invest in U.S. securities or relinquish U.S. securities).  *Id.*  The instructions provide that both options are available only if all questions were

answered NO. Not all questions were answered NO. Thus, it would appear that Mr. Saydam was only eligible to pick one option. He could not pick both. The option chosen would thus have been the only option available to him; the only remaining option that the bank would allow him to choose. Neither Mr. Saydam nor his undersigned counsel understand why the form is set up in this way. However, that appears to be its plain reading.

Plaintiff's motion argues that this selection was intended to "limit reporting requirements to United States authorities" and "was supposed to only be available to non-U.S. persons." Plaintiff Motion for SJ p. 5. Again, the form itself provides evidence to the contrary." Plaintiff Ex. 6, p. 8. Below in bold print it states that reporting to U.S. authorities is based on the submission of IRS Form W-9, which Tuncay provided. Defendant Ex. 2. Further, Plaintiff's conclusion that the relinquish option was only available to non-U.S. persons does not make logical sense. If this were the case, the bank would not have permitted Mr. Saydam to select this option in the first place. He had just disclosed that he was a U.S. citizen and provided a completed IRS Form W-9.

### III. ACCOUNT CLOSURES AND TRANSFERS TO TURKEY

In March, 2012, ZKB sent a form letter to Mr. Saydam's flat in Turkey notifying him that due to tightening U.S. regulations, it would be terminating its relationship with him. Plaintiff Ex. 10. Buried in the second page of this form letter it provides that, depending on personal circumstances, the recipient should consult with a qualified tax advisor to determine if there are any U.S. tax consequences in connection with the closure of the banking relationship. Id. In August, 2012, ZKB sent another copy of the form letter to the flat in Turkey. Plaintiff Ex. 15.

On September 4, 2012, Mr. Saydam wrote an angry handwritten letter to the bank on what appears to be graph paper. Plaintiff Ex. 14. The letter expresses Mr. Saydam's frustration

that his accounts were being "suddenly terminated" and goes on to describes the stress and inconvenience this has caused him. *Id.* He requests compensation for the inconvenience of traveling to the bank, which he did personally to close the accounts. *Id.*

The same day, Mr. Saydam provided handwritten instructions to transfer his remaining funds at ZKB, $525,033.90 USD, to an account at Denizbank. Plaintiff Ex. 11, p. 4. Shortly beforehand, on August 29, 2012, he had signed a portfolio management agreement with Egeli & Co. Plaintiff's Ex. 18 (the date begins to appear on p. 34). The Egeli arrangement is what directed him to transfer the funds to Denizbank and what ultimately led to the substantial losses he suffered. Plaintiff Ex. 20 & 22.

Taken as a whole, Mr. Saydam's conduct is not in keeping with a willful actor. As explained below, willful clients at ZKB and elsewhere actively monitored the news and took prompt action when news broke of U.S. investigations into Swiss banks. See Plaintiff Ex. 7; Defendant Ex. 3, p. 8; see also <u>Kimble v. United States</u>, 991 F. 3d 1238 at 1241 (Fed. Cir. App. 2021) ("In 2008, Ms. Kimble read an article in the New York Times reporting on the Treasury Department's Investigation into UBS for abetting tax fraud… Ms. Kimble later retained counsel"); <u>Bedrosian v. United States</u>, 42 F. 4th 174 at 180 (3rd Cir. App. 2022) ("Bedrosian does not dispute he saw an article in the Wall Street Journal about the federal government tracing mail coming into the United States and was therefore alerted to the possibility of the United States finding out about his foreign bank accounts.")

In stark contrast, Mr. Saydam ignored the news reports entirely. See Plaintiff Ex. 7 & 14. Even after the bank informed him that U.S. regulators were closing in, Mr. Saydam appeared to have no desire to leave the bank. Plaintiff Ex. 10, 14 & 15. He even wrote an angry letter expressing his frustration that his accounts were being "suddenly terminated." Plaintiff Ex. 14.

If anything, he appears to be upset that he is being forced to leave. A willful actor having any sense that he was doing something wrong simply would not behave this way.

## IV. ZKB'S ILLICIT PRACTICES

As a point of contrast, in December, 2012, an indictment was filed against several bankers at ZKB. Defendant Ex. 3 & 4; see <u>United States v. Fellmann, Huppi, and Reist</u>, 12 Cr. 962 (S.D.N.Y. Dec. 19, 2012). The defendants were charged with a conspiracy to defraud the U.S. by assisting clients commit tax evasion. Defendant Ex. 3, p. 3. The indictment lays out in graphic detail the practices used at ZKB to aid clients who were willful actors.

The bankers assisted them by opening undeclared accounts using code names or in the names of sham entities. *Id.* p. 4. They ensured that U.S. taxpayers' names appeared on the fewest possible number of documents. *Id.* p 5. Mail was not sent to their U.S. taxpayer clients in the U.S. and often held at the bank. *Id.* p. 5. The clients were sophisticated and kept up with news reports of the government investigations into that bank and others in Switzerland. *Id.* p. 8. When news broke of these investigations, they held meetings with the bankers at ZKB to discuss how to navigate the emerging risks. *Id.* p. 8. At various times they would meet at clandestine locations to sign documents and conduct illicit business. *Id.* at 12; see also Defendant Ex. 4.

The indictment as a whole paints a picture that is entirely different from Mr. Saydam. Mr. Saydam did not use code words, numbered accounts or hidden accounts to shield his assets. He did not use sham or other business entities. He did have his mail forwarded to an address in Turkey. However, he did not have the bank hold his mail for him and he was a dual citizen who spent extensive time in Turkey. Defendant Ex. 5. There were no clandestine meetings, no monitoring of news reports and no alarmed inquiries, even after Mr. Saydam was informed that the bank had serious issues with U.S. regulators. Plaintiff Ex. 10 & 15.

## V. FOREIGN INCOME AND LOSSES

Absent from Plaintiff's motion is much discussion of the income Mr. Saydam generated overseas. This is because the accounts generated little income and what income they did generate generally was subject to foreign tax withholding. See Plaintiff's Ex. 17, p. 7-25.

The U.S. has an unusual system of worldwide taxation, not shared generally around the globe. A taxpayer must report all of the income they generate, worldwide, on their U.S. tax returns. 26 U.S.C. §61. Mr. Saydam was genuinely unaware of this and wrongly, but justifiably believed that the tax already withheld and paid on his foreign accounts satisfied his tax requirements. Had he reported this income on his U.S. tax returns properly, as he does now, the foreign tax credits would have reduced much of the impact it would have had on his U.S. returns. See 26 U.S.C. §901.

During some years, Mr. Saydam actually incurred substantial losses in his foreign accounts. Plaintiff Ex.s 20 & 22. In 2015, he lost hundreds of thousands of dollars, losses he could have used to offset his U.S. tax liabilities substantially. *Id.* A truly sophisticated schemer would have used this opportunity to reduce his U.S. tax burden. See 26 U.S.C. §165; IRS Rev. Proc. 2009-20 (relating to the deduction of Ponzi scheme losses). Mr. Saydam did not. He was unaware of the accounts' relevance both on the upside and on the downside.

## VI. PREPARATION OF TAX RETURNS

Mr. Saydam used a local H&R Block office to prepare his tax returns. Tuncay Depo. 159:3-162:19. Each year he would go for an in-person appointment. *Id.* For the years at issue, there were three different preparers; German Gomez, Linda Dunn and Morris Rorer. The appointments were short and according to Mr. Saydam took only about 20 minutes to complete.

Tuncay Depo. 159:3-162:19.  This estimate is corroborated by the deposition of Morris Rorer.

Morris Rorer Dep. 84:21-84:22 ("a simple one might take 20 minutes, federal and state").  No

questionnaire was required.  Tuncay Depo. 159:3-162:19.  Mr. Saydam would simply walk in

and sit down with a preparer.  *Id.*  The preparer would then orally ask him what was new this

year and quickly generate a return, asking few questions.  *Id.*  The preparer would then provide

Mr. Saydam with a copy of the return which he would review in only a cursory way before

approving for filing.  *Id.*

   Mr. Saydam's experience is in keeping with H&R Block's service.  Defendant Ex. 11, p.

3.  According to the company's website, the company even offers a drop-off service.  *Id.*  The

website provides, "Can't stay?  Drop off and go.  Need expert tax help but don't have time to

meet?  Just bring by your tax docs and we'll handle the rest.  We can even schedule a quick chat

at dropoff if you have time and any questions."  *Id.*  Thus, no customer interaction is even

required for the firm to fully generate a return.

   In their depositions, the preparers all maintained that they ask each customer whether

they have any foreign accounts.  German Gomez Depo. 15:9-15:18; Linda Dunn Depo. 18:25-

19:12; Morris Rorer Depo. 33:10-33:15.  However, under questioning there was ample evidence

to indicate that this may not in fact be the case.

   Mr. Gomez had worked at H&R Block for 25 years.  German Gomez Depo. at 67:5-68:1.

According to Mr. Gomez, he prepared approximately 200 returns per season and had done

around 5,000 in total.  *Id.*  Despite having prepared about 5,000 returns, Mr. Gomez found a

possible Fbar issue in only three instances, in two and a half decades.  German Gomez Depo. at

71:4-8.  Thus, he discovered a potential Fbar issue only 0.06% of the time or one in every 1,666.

   These numbers would be surprising on their own but are all the more so given Mr.

Gomez's background.  Mr. Gomez started his career in H&R Block's Spanish office.  *Id.* at

55:14-55:17.  As a fluent Spanish speaker, he specifically serviced the firm's Spanish speaking clients who were regularly referred to him.  *Id.* at 68:5-69:14.  Presumably many such Spanish speakers would have been born in a foreign country.  Yet Mr. Gomez found virtually none to have had any financial interest or any signature authority whatsoever in even a single foreign account.

Schedule B is attached to a federal tax return to report the individual's interest and dividend income.  See Plaintiff Ex. 56, p. 11-13.  The bottom of Schedule B, Part III contains four questions relating to foreign accounts and foreign trusts.  *Id.* p. 13.  In deposition, Mr. Gomez maintained that he asked the questions regularly, agreeing with Plaintiff that he did so "every single time." *Id.* at 49:18-51:13.  Yet under questioning, Mr. Gomez could not even answer a single question about them correctly.  *Id.* at 73:19-74:19.  When asked "what four questions are asked at the bottom of Schedule B" Mr. Gomez answered "I believe it's the one for the foreign income and foreign trust, and the other one I can't remember exactly… But it has to do with the foreign income." In fact, not a single one of the questions at the bottom of Schedule B have anything to do with foreign income at all.  Plaintiff Ex. 56, p. 13.  Thereafter, Mr. Gomez could not say what the first, second, third or fourth question was even about.  German Gomez Depo. 73:19-74:19.  He then admitted "I haven't seen the form in years – in months." German Gomez Depo. 73:19-74:19.

The other preparers were not much different.  Mr. Rorer was not qualified to prepare returns with foreign issues, so said he needed to refer these to a special office. Morris Rorer Depo. 53:19-54:21.  As with Mr. Gomez, he had spent many years at H&R Block and had prepared thousands of tax returns.  Morris Rorer Depo. Id. 79:2-4.  Yet even Mr. Gomez eclipses him in his rate of identifying Fbar and foreign account issues.  According to Mr. Rorer he never

even once made a single referral to the office handling foreign issues, which was the procedure he was to follow if he identified a taxpayer with a foreign account. Id. 78:23-79:1.

Finally there was Linda Dunn. Linda Dunn had worked at H&R Block for many years as well, and also likely prepared thousands of tax returns. Linda Dunn Depo. 71:1-72:5. When asked how many referrals she had made for clients with foreign accounts her answer was "not that many." *Id.* When asked, specifically, how many foreign account referrals she had made, she could not even venture a guess and simply said "I don't know." In a surprising twist, Mr. Saydam may have even told her that he would potentially be receiving foreign teaching income in the future and that he made visits to Turkey. *Id.* 73:11-74:15; see also Plaintiff's Ex. 50, p. 2. However, at this time, the exact details of that purported conversation are unclear. *Id.*

Taken as a whole, a reasonable fact finder could find ample basis to conclude that Mr. Saydam was never asked about his foreign accounts. First, the preparers seemed wholly unfamiliar with the foreign account questions they purported to ask routinely, even though, if this were true, they would have asked these questions thousands of times. Second, despite long careers at H&R Block they each identified a shockingly low number of customers who had any involvement with a foreign account. Third, it appears Mr. Saydam may have even told one preparer that he travels to Turkey and would potentially be receiving foreign teaching income. A willful schemer would have simply kept this information to himself. Even more surprising is that it did not trigger any changes to his return or further inquiries from Ms. Dunn, even though it would have been a flashing red alert that Mr. Saydam likely had foreign reporting obligations.

## VII.    IRS EXAMINATION

In 2018, Mr. Saydam was selected for an IRS examination, which ultimately led to this case. Approaching the initial audit meeting, Mr. Saydam appears to have received an

"Information Document Request" which requests only documents related to the 2015 year. See Plaintiff Ex. G, p. 2 ("Tax Period(s): 201512"). Thus, a person receiving this request would only have sought information and records related to the 2015 year. Despite the bare bones request, Mr. Saydam provided substantial information at the initial meeting, including information about his foreign accounts, the approximate amount he had in those accounts, his past consulting income, his financial advisor in Turkey and other information. See Declaration of Revenue Agent Libertad Montelongo, p. 3. When the auditor's Information Document Request was revised to include 2012 (the last year for which, the ZKB accounts were opened), as well as other years and issues, Mr. Saydam returned and provided information about those accounts as well along with other dealings and accounts in Turkey. See Plaintiff Ex. I; Declaration of Revenue Agent Libertad Montelongo, p. 4-5. Thus by even the auditor's accounts, Mr. Saydam appears to have been, at a minimum, reasonably responsive, forthcoming and cooperative during the audit.

## LEGAL ANALYSIS

### I. WILLFUL FBAR PENALTY CASES

Since 2012, an increasing number of courts have seen willful Fbar enforcement actions. See United States v. Jung Joo Park, 389 F. Supp. 3d 561 (N. Dist. Ill 2019); United States v. Kelly, 92 F.4th 598 (6th Cir. App. 2024); United States v. Zwerner, 2014 U.S. Dist. Lexis 192271 (S. Dist. Fl 2014); United States v. Horowitz, 978 F.3d 80 (4th Cir. App. 2020); United States v. Collins, 36 F. 4th 487 (3rd Cir. App 2022); United States v. Goldsmith, 541 F. supp. 3d 1058 (S. Dist. CA 2021); United States v. Toth, 33 F. 4th 1 (1st Cir. App. 2022); Landa v. United States, 153 Fed. Cl. 585 (Fed. Ct. Claims 2021); Norman v. United States, 138 Fed. Cl. 189 (Fed. Ct.

Claims 2018); <u>United States v. Schwarzbaum</u>, 24 F. 4th 1355 (11th Cir. App. 2022); <u>Bedrosian v. United States</u>, 42 f. 4th 174 (3rd Cir. App. 2022); <u>Kimble v. United States</u>, 991 F. 3d 1238 (Fed Cir. App. 2021); <u>United States v. Williams</u>, 489 Fed. Appx. 655 (4th Cir. App 2012); <u>United States v. Rum</u>, 995 F.3d 882 (11th Cir. App. 2021).

After an exhaustive survey, undersigned counsel could not find a willful case where the defendant had a legitimate connection to the country where he or she held the foreign account. In all willful cases, the defendant lacked such a connection. In some cases, the foreign account was opened to evade creditors. See <u>United States v. Rum</u>, 995 F.3d 882, 884 (11th Cir. App. 2021) (entrepreneur opened Swiss bank accounts to evade judgment creditors); <u>United States v. Jung Joo Park</u>, 389 F. Supp. 3d 561 (N. Dist. Ill 2019) (businessman opened Swiss bank accounts to evade judgment creditors after FTC action). In others, the account was inherited from a parent who held money in Switzerland because of its privacy and neutrality status. See <u>Landa v. United States</u>, 153 Fed. Cl. 585 (Fed. Ct. Claims 2021); <u>United States v. Goldsmith</u>, 541 F. supp. 3d 1058 (S. Dist. CA 221); <u>Kimble v. United States</u>, 991 F. 3d 1238 (Fed Cir App. 2021). In others the account was opened simply to hide the money, often using sham entities. See <u>United States v. Williams</u>, 489 Fed. Appx. 655 (4th Cir. App 2012); <u>United States v. Zwerner</u>, 2014 U.S. Dist. Lexis 192271 (S. Dist. Fl 2014). In still others, professionals working in one foreign country opened an account in another, unrelated country in which they did not live or work. See <u>United States v. Horowitz</u>, 978 F.3d 80, 82-83 (4th Cir. App. 2020) (doctor working in Saudi Arabia opened bank accounts in Switzerland); <u>United States v. Collins</u>, 36 F. 4th 487 (3rd Cir. App 2022) (professor working in the U.S., Canada and France opened bank accounts in Switzerland).

Perhaps the most analogous case is <u>United States v. Collins</u>. *Id.* As here, the defendant was a dual citizen. *Id.* at 490. As here, the defendant was a professor. *Id.* As here, he worked

in multiple countries, the U.S., France and Canada. *Id.* He held accounts in those countries. *Id.* But in addition, he opened an account in Switzerland. *Id.* Unlike Mr. Saydam however, the defendant in <u>Collins</u> never lived or worked in Switzerland. *Id.* He had no legitimate reason for opening an account there.

Thus, Mr. Saydam's case appears to break new ground in Fbar litigation. His may be the first case in which a defendant with a bona fide connection to the relevant foreign country is being charged with heightened willfulness penalties. Not only does this create material issues of fact. As a legal development it has enormous implications for millions of Americans living abroad. See Defendant Ex.s 7 & 8 p. 57-58. Based on government estimates, approximately 9 million Americans live abroad and in 2016 approximately 204,009 of them filed Fbars. *Id.* Defendant Ex.s 7 & 8 p. 57-58. Thus, based on these government statistics, it would appear that approximately 2% or only about 1 in 44 filed an Fbar. See also Defendant Ex. 9, p. 101-130.

## II. WILLFULNESS STANDARD

The Fbar regime contains two levels of civil penalties for failures to file. For negligent violations the penalty is $10,000. See 31 U.S.C. § 5321(a)(5)(B). For willful failures, the maximum penalty is the greater of $100,000 or 50% of the account balance. See 31 U.S.C. § 5321(a)(5)(C).

Willfulness is not defined by statute. Formerly, willfulness required showing a voluntary, intentional violation of a known legal duty. See <u>Ratzlaf v. United States</u>, 510 U.S. 135, 157 (1994). Over time, many courts have relaxed this standard to include recklessness and willful blindness. See <u>United States v. Williams</u>, 489 Fed. App'x 655, 658-660 (4th Cir. 2012); <u>United States v. McBride</u>, 908 F. Supp. 2d 1186, 1204-1205 (D. Utah 2012). The government bears the burden of establishing willfulness. <u>Cheek v. United States</u>, 498 U.S. 192, 202 (1991).

The Ninth Circuit and the Supreme Court have not yet defined willfulness for purposes of 31 U.S.C. §5321(a)(5). See United States v. Burga, Case No. 5:19-cv-03246-EJD (N. Dist. CA 2023). Therefore, this may be an issue of first impression. An increasing number of courts however appear to be adopting the wider standard, which includes recklessness and willful blindness. Though such issues may remain unsettled, the distinction between recklessness and negligence has been defined by the Ninth Circuit, at least in other civil contexts. See Erickson Prods., Inc. v. Kast, 921 F.3d 822, 833 (9th Cir. App. 2019). A reckless defendant is one who knows of a substantial and unjustified risk of wrongdoing and a merely negligent defendant is one who should have known of a similar risk but, in fact, did not. Id. Thus, the distinction appears to be whether the defendant actually knew about the substantial risk of wrongdoing or whether he or she did not.

In order to defeat Plaintiff's summary judgment motion, the standard Mr. Saydam must meet is not especially high. Making all inferences in his favor, he must show only that there is one genuine material issue of fact. If a reasonable fact finder could decide in his favor, then summary judgment is not appropriate. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### III. STANDARD APPLIED

As explained above, there is not just one but numerous genuine material issues of fact in this case. There is a genuine issue of fact as to whether Mr. Saydam sought to hide his U.S. identity from his Swiss bank. Ample evidence suggests he did not. There is a genuine issue of fact as to whether his preparers ever asked him about foreign accounts. Considerable evidence suggests they did not. There is a genuine issue of fact as to whether he understood the relevance of his foreign accounts to his U.S. tax returns. Substantial evidence suggests he did not.

**CONCLUSION**

If Plaintiff were truly convinced there were no genuine issues of material fact it would not need to omit key facts and evidence. Plaintiff's omission of inconvenient facts and inconvenient evidence supplies the answer itself. This Court should deny Plaintiff's Motion for Summary Judgment and any and all relief it seeks.

Respectfully submitted,

_____          _____06/20/2024_____.
Douglas Greenberg                                                    Date
Attorney for Defendant
Law Office of Douglas Greenberg
201 Spear Street, Suite 1100
San Francisco, CA 94105
Ph: (415) 287-9990
Fax: (415 408-6890

Opposition to Plaintiff's Motion for SJ - 4:22-CV-073710-DMR