DAVID A. HUBBERT
Deputy Assistant Attorney General

AMY MATCHISON (CABN 217022)
LOLITA DE PALMA (WABN 57380)
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C. 20044-0683
(202) 307-6422 (AM)
(202) 305-3664 (LDP)
(202) 307-0054 (f)
Amy.T.Matchison@usdoj.gov
Lolita.DePalma@usdoj.gov
Western.Taxcivil@usdoj.gov
*Counsel for Plaintiff the United States of America*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 4:22-cv-07371-DMR |
| | ) | |
| Plaintiff, | ) | **REPLY MEMORANDUM IN** |
| | ) | **SUPPORT OF UNITED STATES'** |
| v. | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| | ) | |
| TUNCAY SAYDAM, | ) | Hearing Date: July 11, 2024 |
| | ) | Hearing Time: 1:00 PM |
| Defendant. | ) | Judge: Chief Magistrate Judge Donna M. |
| | ) | Ryu |

Reply in Support of US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

i

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664

# TABLE OF CONTENTS

Table of Contents ............................................................................................................ ii

Table of Authorities ....................................................................................................... iii

Introduction ..................................................................................................................... 1

Argument ......................................................................................................................... 1

I.   Tuncay Has Not Refuted the United States' Undisputed Facts. ............................. 2

   A.   Tuncay Cannot Genuinely Dispute That H&R Block Did Not Ask Him About His Foreign Accounts ............................................................................................. 2

   B.   Nevertheless, Whether H&R Block Asked Tuncay About His Foreign Accounts Is Not Material Because He Signed Tax Returns Stating He Had No Foreign Accounts. ................. 6

   C.   Tuncay's Reading of the U.S. Withholding Tax Questionnaire is Unreasonable. ........... 7

   D.   While Tuncay Asserts that He Was Cooperative During the FBAR Examination, He Does Not Dispute the Facts Showing Otherwise ................................................. 8

II.   Tuncay's Additional Facts Do Not Create a Genuine Dispute. ........................... 9

   A.   Much of the Evidence Tuncay Offers is Inadmissible. ..................................... 9

   B.   The Form W-9 Is Not Material. ................................................................ 10

   C.   Whether Tuncay Actually Had Income from His Foreign Accounts Is Irrelevant Because He Has Admitted that He Intended to Have Income. .......................... 11

III.   Because Tuncay Has Not Argued that His Conduct Was Not Reckless or Willfully Blind, Summary Judgment Should Be Granted to the United States. ....................... 12

IV.   Despite Tuncay's Arguments, There Is No Genuine Dispute that Tuncay's Decision Not to File Timely FBARs Was Knowing as a Matter of Law. ..................................... 13

V.   This Court Should Enter Judgment Against Tuncay in the Amount of $534,947.09, as of June 6, 2024. ........................................................................................................ 15

Conclusion ..................................................................................................................... 15

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*F.T.C. v. Publ'g Clearing House, Inc.*,
    104 F.3d 1168 (9th Cir. 1997) ................................................................................6

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011) ...........................................................................................12

*Kimble v. United States*,
    991 F.3d 1238 (Fed. Cir. 2021) ............................................................................6

*Rivera v. Phillip Morris, Inc.*,
    395 F.3d 1142 (9th Cir. 2005) ..............................................................................3

*United States v. Baroon*,
    No. 4:18-CV-05191-SAB, 2020 WL 1558157 (E.D. Wash. Feb. 27, 2020) ...........13

*United States v. Burga*,
    --- F. Supp. 3d ----, 2023 WL 8190173 (N.D. Cal. 2023) .......................................12

*United States v. Collins*,
    36 F. 4th 487 (3d Cir. 2022) .........................................................................11, 13

*United States v. Goldsmith*,
    541 F. Supp. 3d 1058 (S.D. Cal. 2021) ............................................................7, 15

*United States v. Hughes*,
    No. 18-cv-05931-JCS, 2022 WL 4768683 (N.D. Cal. Oct. 13, 2021) ...................13

*United States v. Mahyari*,
    No. 3:20-cv-1887-IM, 2023 WL 372656 (D. Or. Jan 24, 2023) ...........................13

*United States v. Markus*,
    No. 16-2133, 2018 WL 3435068 (D.N.J. July 17, 2018) ......................................13

*United States v. Ott*,
    441 F. Supp. 3d 521 (E.D. Mich. 2020) .........................................................13, 14

*United States v. Rum*,
    995 F.3d 882 (11th Cir. 2021) ............................................................................14

**Statutes, Regulations, and Rules**

31 C.F.R. § 1010.306 ......................................................................................................1

31 U.S.C. § 5314 ............................................................................................................1

Reply in Support of US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

iii

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664

31 U.S.C. § 5321 ..........................................................................................................12

Fed. R. Evid. 402 ........................................................................................................10

Fed. R. Evid. 801 ........................................................................................................10

Fed. R. Evid. 802 ........................................................................................................10

Reply in Support of US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

iv

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

## INTRODUCTION

The Bank Secrecy Act requires every United States person with financial accounts in a foreign country with a total balance of greater than $10,000 to file an annual Report of Foreign Bank and Financial Accounts ("FBAR") disclosing those accounts. 31 U.S.C. § 5314; 31 C.F.R. §§ 1010.306(c), 1010.350(a). This law applies even when a person has no income associated with his foreign accounts and even when he has legitimate reasons to live or work abroad.

In his opposition, Tuncay distorts the law and paints himself as a simpleton who did not understand the disclosure obligations associated with his many foreign bank accounts. But Tuncay is an accomplished professor, who has taught all over the world and written at least forty technical articles in English. He had the means and resources to open multiple accounts in both Switzerland and Turkey. And he had the comprehension skills to understand the plain language of the letters he received from his Swiss bank and of the tax returns he signed under penalty of perjury informing him of potential disclosure obligations. Whether he chose to hide his life savings from the United States because he believed it would be to his benefit or merely could not be bothered to make basic inquiries into his reporting obligations, his actions were willful.

## ARGUMENT

The parties agree that the only issue in this case is whether Tuncay's failure to timely disclose his foreign bank accounts for 2013 through 2017 was willful. The United States has presented three theories under which this Court may hold that Tuncay acted willfully: (1) Tuncay knowingly failed to file timely FBARs; (2) Tuncay's actions in failing to file timely FBARs were objectively reckless; and (3) Tuncay was willfully blind in failing to timely file FBARs. Tuncay addresses only the first argument in his opposition—contending that his actions were not those of a knowing actor. He presents no arguments or evidence that his conduct was not objectively reckless or willfully blind. Indeed, Tuncay admits that he ignored contemporaneous news reports of the Department of Justice's investigations into Swiss banks and chose not to make the appropriate inquiries after his Swiss bank informed him that it had problems with United States regulators. This is quintessential recklessness and willful blindness.

Reply in Support of US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

1

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664

And so, this Court may hold Tuncay liable for the willful FBAR penalties at summary judgment without even considering Tuncay's alleged evidence that he did not know of his FBAR obligations. But even if this Court chooses to consider whether Tuncay acted knowingly, the United States has presented overwhelming evidence that Tuncay knew of his FBAR reporting obligations and chose not to comply. The evidence that Tuncay has presented, much of which is inadmissible, does not refute this. Thus, the United States has met its burden of proving Tuncay's willfulness under all three of its discrete theories. And because Tuncay does not dispute the IRS's penalty calculations nor the United States' proposed judgment, this Court should enter judgment against Tuncay in the amount of $534,947.09, as of June 6, 2024

## I. Tuncay Has Not Refuted the United States' Undisputed Facts.

Tuncay claims that there are seven categories of disputed issues: (1) "whether Mr. Saydam was confused about his finances"; (2) "dealings with Swiss bank"; (3) "account closures and transfers to Turkey"; (4) "ZKB's illicit practices"; (5) "foreign income and losses"; (6) "preparation of tax returns" and (7) "IRS examination." Dkt. 36 at 9−20. But while Tuncay may disagree with the United States' interpretation of the facts of these issues, the only fact Tuncay expressly disputes is whether his tax preparers asked him about his foreign accounts. Dkt. 36 at 16−19. This dispute is neither genuine nor material.

As for disagreements regarding interpretation, Tuncay misreads the U.S. Withholding Tax Questionnaire ("the Questionnaire") and contends that he was cooperative during the IRS's FBAR examination without disputing the United States' evidence to the contrary. Dkt. 36 at 10−13, 20. Neither of these purported disputes present a genuine issue of material fact for a jury.

### A. Tuncay Cannot Genuinely Dispute That H&R Block Did Not Ask Him About His Foreign Accounts.

The United States presented the following evidence that Tuncay's H&R Block tax preparers asked him whether he had foreign bank accounts: (1) all three of the tax preparers testified that they always asked clients about foreign accounts; (2) the required annual H&R Block income tax course for tax preparers instructed them to always ask whether a client had a

U.S. DEPARTMENT OF JUSTICE
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

foreign bank account; and (3) for at least 2016 and 2017, the BlockWorks software all H&R Block tax preparers used required the tax preparer to input an answer to whether the client had a foreign account. Dunn Depo. at 18:25−19:12, 44:5−9, 45:11−46:5; Gomez Depo. at 14:25−15:22, 20:10−23:19; Rorer Depo. at 42:19−43:15; Arruda Decl.; Jorgenson Decl.; Exs. A−E. In rebuttal, Tuncay offers only his self-serving testimony that he does not remember his H&R Block tax preparers ever asking him about his foreign accounts. Tuncay Depo. at 162:3−5; 166:3−20. Even though this is no more than a "mere scintilla of evidence," *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005), Tuncay contends that a reasonable jury could still find that his tax preparers never asked him about his foreign accounts for three reasons: (1) the tax preparers' testimony shows they were unfamiliar with the foreign account questions; (2) the tax preparers testified that they rarely encountered clients with foreign accounts; and (3) Tuncay told one of the tax preparers that he may have future foreign income in Turkey. Dkt. 36 at 19. None of these reasons discredits the overwhelming evidence that the tax preparers asked Tuncay about his foreign accounts.

First, Tuncay contends that all the tax preparers were "wholly unfamiliar with the foreign account questions they purported to ask routinely" based on the testimony of just one of the tax preparers—German Gomez—who could not remember offhand the four questions "asked at the bottom of Schedule B of Form 1040." Gomez Depo. at 73:19−74:17; *see* Dkt. 36 at 18−19. Gomez said that the questions concerned "foreign income and foreign trust[s]." Gomez Depo. at 73:19−74:17. But the questions in fact concern foreign *accounts* and foreign trusts. Ex. Q at USA000485. This slight discrepancy in Gomez's recollection is explained by the fact that the BlockWorks software he uses to complete returns considers the foreign accounts and trusts questions as part of the client's personal information gathered at the beginning of the interview, so he would encounter these questions there rather than on the Schedule B. Ex. A at HRB-000102−03. When Gomez completed Tuncay's 2016 tax return, the software would have required Gomez to input an answer as to whether Tuncay had a foreign account and would have updated Tuncay's Schedule B accordingly. *Id.* Since Tuncay's 2016 Schedule B states that

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664

Tuncay had no foreign accounts for that year, Gomez would have had to affirmatively select "No" to the foreign account question without asking Tuncay—a client he had never met with before—for Tuncay to have not been asked this question. *Id.*; Ex. S at USA000509; Gomez Depo. at 20:10−21:1; 42:5−43:20. Because the software would have required Gomez to input an answer to the foreign account question, Gomez's memory of the exact wording of the Schedule B questions bears little on the issue of whether he asked Tuncay about his foreign accounts.

The other two tax preparers—Linda Dunn and Morris Rorer—were never asked to offhand recount the exact language of the questions on the bottom of the Schedule B. But all three tax preparers testified multiple times that they always asked their clients about foreign accounts. Dunn Depo. at 18:25−19:12, 44:5−9, 45:11−46:5; Gomez Depo. at 14:25−15:22, 20:10−23:19; Rorer Depo. at 33:5−15, 42:19−43:15, 53:1−10. Gomez's inability to recall the exact language of the Schedule B—language that differs from the language of the software he uses to complete a return—does not provide a reasonable basis for a jury to conclude that all three tax preparers were unfamiliar with the foreign account questions nor that they input the "No" answer on Tuncay's 2014 through 2017 Schedule Bs without asking him first.

Second, Tuncay contends that the fact that his tax preparers rarely encountered clients with foreign accounts is evidence that they did not ask the foreign account questions. But none of Tuncay's tax preparers specialized in foreign income returns. Dunn Depo. at 18:15−24; Gomez Depo. at 13:1−18, 34:15−35:5; Rorer Depo. at 53:19−54:9. Indeed, both Dunn and Rorer testified that if they saw a client with foreign income, they would direct them to a specialist. Dunn Depo. at 18:15−19:12, 24:20−26:4; Rorer Depo. at 53:1−55:17. Given that Tuncay's tax preparers did not specialize in foreign income and that most of their clients were repeat clients, it is not odd that they rarely encountered clients with foreign bank accounts. Dunn Depo. at 19:13−20:14, 80:1−4; Gomez Depo. at 10:7−11:6; Rorer Depo. at 76:12−23. Instead, H&R Block would have typically assigned a foreign income specialist to such clients. Rorer Depo. at 53:21−54:9; Dunn Depo. at 18:15−20:4, 25:1−15; Gomez Depo. at 10:11−22. Thus, the fact that

Reply in Support of US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

4

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

Tuncay's tax preparers only rarely encountered clients with foreign accounts bears little on whether they asked their clients if they had such accounts.

Third, the circumstances of Tuncay's disclosure to Dunn that he might have foreign teaching income for 2016 is evidence that Tuncay *did* lie to his tax preparers about his foreign accounts—not that he *did not*. When Revenue Agent Libertad Montelongo interviewed Dunn on February 15, 2019, Dunn told her that Tuncay had mentioned he could have foreign teaching income for 2016 when she was preparing his 2015 return and that Dunn had told Tuncay to make an appointment with one of the foreign income specialists. Montelongo Decl. ¶¶ 46−51; Ex. L. While Dunn did not remember this conversation with Tuncay during her September 22, 2023 deposition, she stated that she was "positive" that Montelongo's notes describing her recollection of this conversation in 2019 were accurate. Dunn Depo. at 64:10−68:6; Ex. L. Tuncay did not meet with a foreign income specialist; instead, he went to two different general income tax return preparers for the next two years—Rorer and Gomez—despite having been a repeat customer of Dunn's for many years. Tuncay's actions in ignoring Dunn's advice to consult with a foreign income specialist and switching tax preparers are strong evidence that he was hiding his foreign bank accounts—not that he would have told Dunn about them if she had only asked.

In any case, the conversation between Dunn and Tuncay regarding potential foreign teaching income for 2016 when she was preparing his 2015 return cannot be evidence that Dunn did not ask Tuncay about his foreign bank accounts. Indeed, it is compelling evidence that Dunn did ask Tuncay about his foreign accounts, as she said she did to Revenue Agent Montelongo and testified to always doing during her deposition, since this conversation would have flagged for Dunn that it was likely Tuncay had foreign accounts. Ex. L; Dunn Depo. at 18:25−19:12, 45:11−46:5. Because Tuncay's 2015 Schedule B declares that Tuncay did not have an interest in a foreign account for 2015, Tuncay must have lied to Dunn about his foreign accounts. Ex. R at USA000498. And since Tuncay disclosed the possibility of foreign teaching income for 2016— not 2015, there would have been no reason for Dunn to have made any changes to his 2015 return based on the information he did disclose.

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

Tuncay contends that he does not remember his H&R Block tax preparers asking him about his foreign accounts. Tuncay Depo. at 162:3−5; 166:3−20. But for this to be the case, three H&R Block tax preparers would have had to defy H&R Block policy and then lie under oath. Two of the tax preparers—Gomez and Rorer—would have also had to affirmatively select "No" to the question of whether Tuncay had any foreign accounts despite having never prepared returns for him before. Ex. A at HRB-000102−03. This is not a reasonable interpretation of the evidence. In addition, the Court would have to simultaneously credit Tuncay's representations that he is currently so discombobulated that he can barely understand, much less manage, his financial affairs *and* that he perfectly recalls all his decade-old visits with H&R Block. *See* Dkt. 36 at 5. Because Tuncay's self-serving testimony cannot amount to "significant probative evidence" that three different H&R Block tax preparers failed to ask him about his foreign accounts five years in a row, there is no genuine dispute of fact. *See F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

B. Nevertheless, Whether H&R Block Asked Tuncay About His Foreign Accounts Is Not Material Because He Signed Tax Returns Stating He Had No Foreign Accounts.

But even if there is a genuine dispute of fact as to whether Tuncay lied to his H&R Block tax preparers about his foreign accounts, it is not material because Tuncay still signed his tax returns for 2014 through 2017 declaring that he did not have foreign accounts. Exs. Q−T. Tuncay does not even mention—much less refute—that he signed these returns under penalty of perjury, denying his interests in his foreign accounts. Instead, he seemingly blames H&R Block for its streamlined process that enabled him to perform only a "cursory" review of his tax returns before signing. Dkt. 36 at 17. But it was Tuncay's duty—not H&R Block's—to read and review his tax returns to ensure that they were correct before signing them. *Kimble v. United States*, 991 F.3d 1238, 1242 (Fed. Cir. 2021) ("[A] taxpayer signing their returns cannot escape the requirements of the law by failing to review their tax returns."). Tuncay does not allege that H&R Block coerced him to sign his returns without thoroughly reviewing them. Indeed, Tuncay admitted that he would sometimes take his tax return home to his wife Oya Saydam to sign before submitting

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

it to H&R Block. Tuncay Depo. at 162:10−14. By signing his tax returns, declaring that he had reviewed them and that they were correct, Tuncay gained constructive knowledge of their contents—including the questions on the bottom of the 2014, 2015, 2016, and 2017 Schedule Bs asking him if he had foreign bank accounts and directing him to determine whether he needed to file an FBAR if he did. Ex. Q at USA000485; Ex. R at USA000498; Ex. S at USA000509; Ex. T at USA000526; *see United States v. Goldsmith*, 541 F. Supp. 3d 1058, 1094−97 (S.D. Cal. 2021). The 2014 through 2017 Schedule Bs thus provide sufficient evidence that Tuncay knew of the FBAR reporting requirements that it is not material whether the H&R Block tax preparers in fact asked Tuncay about his foreign accounts.

C.   Tuncay's Reading of the U.S. Withholding Tax Questionnaire is Unreasonable.

Tuncay misreads the Questionnaire as evidence that Tuncay was transparent with ZKB about his status as an American citizen by ignoring the significant evidence in the Questionnaire of Tuncay's intent to hide his Zürcher Kantonalbank ("ZKB") accounts from the United States. Along with listing the address for Oya's mother's house as Tuncay's address and his nationality as "Turkey," Tuncay at first selected "NO" to all questions about his "status as a U.S. person." Ex. 6 at USA000124. These questions included whether he was a U.S. citizen, lived in the United States for more than 183 days in the past year, and was "a U.S. taxpayer." *Id.* While the answer to whether Tuncay was a U.S. citizen was later changed from "NO" to "YES," it is still probative evidence of Tuncay's intent to conceal ZKB accounts that "NO" was initially selected. *Id.* And it is even more probative of Tuncay's intent that the answers to whether he lived in the United States or was "a U.S. taxpayer" were never corrected. *Id.*

Tuncay's selection of the box "to relinquish any investments in U.S. securities" and signature on the declaration of relinquishment is further evidence of his intent to conceal his ZKB accounts from the United States. *Id.* Tuncay contends that he was forced to select this option because he had admitted he was an American citizen. Dkt. 36 at 12−13. This is not a sensible reading of the form. After the questions determining the accountholder's status as a U.S.

Reply in Support of US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

7

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

person, the Questionnaire presents the accountholder with two options if he answered "NO" to all questions and was thus not a U.S. person: (1) invest in U.S. securities or (2) relinquish any investment in U.S. securities and sign a declaration of relinquishment. Ex. 6 at USA000124. If the accountholder had answered "YES" to any of the questions and thus was a U.S. person, the form presents only one option: sign the form as a U.S. person and submit a Form W-9. *Id.* Here, Tuncay originally selected "NO" to all questions about whether he was a U.S. person and proceeded to select the option to relinquish any investments in U.S. securities, which was only available to those who had selected "NO" and were thus not a U.S. person. *Id.* At some later point, Tuncay disclosed, or ZKB discovered, that Tuncay was an American citizen, and the form was thus changed to reflect Tuncay's status as a U.S. person (and a W-9 was submitted). *Id.*; *see* Dkt. 36-6 at USA000744. While the timeline surrounding these events is unclear because the Swiss Federal Tax Administration ("SFTA") has redacted almost all dates, it cannot be disputed that Tuncay lied in his responses to some questions on the Questionnaire and attempted at one point to relinquish his investments in U.S. securities. Ex. 6 at USA000124. There is thus no genuine dispute of material fact as to the Questionnaire.

   D. <u>While Tuncay Asserts that He Was Cooperative During the FBAR Examination, He Does Not Dispute the Facts Showing Otherwise.</u>

   The parties do not dispute what information the IRS requested from Tuncay, when Tuncay provided this information, nor what was provided. *See* Dkt. 36 at 19−20. Tuncay even admits that the information he provided the IRS fell "far short of a complete record." *Id.* at 9. But Tuncay still contends that he was "at a minimum, reasonably responsive, forthcoming and cooperative during the [FBAR examination]." *Id.* at 20. Tuncay provides no additional evidence to support this claim. Instead, he emphasizes that he provided "substantial information" in response to the first Information Document Request ("IDR") the IRS made to Tuncay requesting documents related to only the year 2015 and then eventually provided more information when the IRS revised the IDR to include 2012 through 2015. *Id.*; Exs. G, I.

Reply in Support of US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)                    8                    **U.S. DEPARTMENT OF JUSTICE**
                                                                    Tax Division, Western Region
                                                                    P.O. Box 683
                                                                    Washington, D.C.  20044
                                                                    Telephone: 202-305-3664

But Tuncay's portrayal obscures the timeline of these requests and Tuncay's responses. While the first IDR, dated September 20, 2018, does concern only the year 2015, the second IDR, dated November 1, 2018, included 2012, 2013, 2014, and 2015. Exs. G, I. Tuncay did not disclose the ZKB records, which he admits were relevant to this request, until March 6, 2020— almost a year and a half later. Montelongo Decl. ¶¶67; *see* Dkt. 36 at 20. Indeed, it took three sets of IDRs requesting these documents and a Formal Document Request for Tuncay to disclose these documents to the IRS. Montelongo Decl. ¶¶22−67; Exs. I, K, M, N, O. Such conduct cannot reasonably be considered "responsive, forthcoming, and cooperative." Dkt. 36 at 20.

Besides the issue of whether the H&R Block tax preparers asked Tuncay about his foreign accounts—which cannot genuinely be disputed, Tuncay has only recharacterized the United States' undisputed facts to fit his narrative—not disputed them. Because there is no genuine dispute as to the facts in the United States' motion for summary judgment, all the United States' facts should be accepted as true.

## II. Tuncay's Additional Facts Do Not Create a Genuine Dispute.

In Tuncay's "Disputed Facts and Issues" section of his opposition, he introduces additional facts and evidence. While the United States objects to the admissibility of most of Tuncay's evidence, the United States need not dispute the facts supported by this evidence should the Court deem the evidence admissible. None creates a genuine dispute for trial.

### A. Much of the Evidence Tuncay Offers is Inadmissible.

Tuncay's opposition includes 11 exhibits. On May 16, 2024, this Court sanctioned Tuncay for his failure to comply with his discovery obligations by holding that he "may not rely for any purpose on any evidence that was requested but not provided to Plaintiff as of May 14, 2024." Dkt. 33 at 1. The United States' Request for Production No. 1 requested that Tuncay "produce all documents [he] may use to support [his] claims or defenses." Ex. 30, U.S. First RFPs. Tuncay did not provide exhibits 3, 7, 8, 9, and 11 to the United States before he filed his opposition. De Palma Reply Decl. ¶¶ 2−4. Thus, Tuncay may not rely on these exhibits.

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

Furthermore, to the extent that Tuncay seeks to rely on his exhibit 11—the H&R Block press release—for the truth of its statements about H&R Block's drop-off service, the exhibit is inadmissible hearsay barred by Federal Rule of Evidence 802. *See* Fed. R. Evid. 801. This press release is also irrelevant since neither party contends that Tuncay used H&R Block's drop-off service. Nor may Tuncay rely on the statements made by Tuncay, his daughter Tippi MacKenzie, and his lawyers in the emails in Exhibit 6 because those statements are also inadmissible hearsay.

Tuncay's exhibit 1—the April 18, 2024 email stating that the United States could seize Tuncay's home if he did not pay a judgment against him in this case—is also not admissible. Federal Rule of Evidence 402 bars irrelevant evidence, and Tuncay has agreed "that email correspondence after November 22, 2022 is not relevant to this suit." Dkt. 12 at 6. In any case, the United States' collection methods are irrelevant to whether Tuncay is liable for willful FBAR penalties. And even if they were relevant, there is evidence that Tuncay is using his residence to shield his assets from collection. He purchased his San Francisco apartment on May 6, 2021— after the willful FBAR penalties were assessed against him on March 1, 2021. Ex. 31, Grant Deed. He then transferred this apartment to a trust on December 2, 2022—ten days after this case was filed against him on November 22, 2022. Ex. 32, Trust Transfer Deed.

B.  The Form W-9 Is Not Material.

Tuncay asserts that his exhibit 2, the Form W-9, "is a key document which goes to the very heart of this case" and "completely refutes Plaintiff's contentions that Mr. Saydam was attempting to hide his status as a U.S. taxpayer from the bank." Dkt. 36 at 12. The United States does not dispute that Tuncay at some point signed a Form W-9 and submitted it to ZKB but disagrees as to the legal significance of this document. First, as the Questionnaire states, Tuncay was required to provide ZKB with a Form W-9 as soon as he disclosed that he was a U.S. person. Ex. 6 at USA000124. The United States has never disputed that Tuncay did at some point disclose his American citizenship to ZKB. *Id.* Indeed, if ZKB had not known that Tuncay was American, it would never have closed his accounts. Exs. 10, 15.

U.S. DEPARTMENT OF JUSTICE
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

Second, the critical issue is whether Tuncay hid his foreign accounts from the United States—not whether he hid his status as an American citizen from ZKB. His lies on the Questionnaire are relevant because they demonstrate an attempt by Tuncay to limit disclosures by ZKB to the United States concerning his ZKB accounts. Even though Tuncay eventually admitted his American citizenship and completed a Form W-9, complying with ZKB's requirement of submitting a Form W-9 does not demonstrate that Tuncay intended to disclose his ZKB accounts to the United States. As the Form W-9 states in the top right corner, the form is not meant to be sent to the IRS. Dkt. 36-6 at USA000744. Thus, while the Form W-9 serves as additional evidence that Tuncay at some point disclosed his status as an American citizen to ZKB, it is not material to the central issue in this case: whether Tuncay complied with his disclosure obligations to the United States.

C.  Whether Tuncay Actually Had Income from His Foreign Accounts Is Irrelevant Because He Has Admitted that He Intended to Have Income.

Tuncay contends that he could not have willfully failed to disclose his foreign accounts because he had tax losses for one of the years and the income from the others was not significant. Dkt. 36 at 16. But the sole issue in this case is whether Tuncay willfully failed to comply with his obligations to report his foreign bank accounts—not whether Tuncay failed to report foreign income. The income generated by the accounts is only relevant to the extent Tuncay *intended* his foreign accounts to produce income because that provides Tuncay with a motive to conceal them. Given that he kept his "life savings" in his foreign accounts, entered an agreement for Egeli & Co Portfoy Yönetimi A.Ş. ("Egeli & Co.") to manage these savings to secure a "20 percent or something" return on the accounts, and then pursued a court case against Egeli & Co. when he did not get the return he was promised, Tuncay clearly intended for his foreign accounts to generate income. Tuncay Depo. at 80:2−12; 84:15−2, 96:23−97:2, 156:14−25; Guleryuz Letter, SAYD-003062. Because Tuncay intended for his foreign accounts to generate income, it is immaterial that he lost money during one of the years at issue. *See United States v. Collins*, 36 F. 4th 487, 496 (3d Cir. 2022) ("It is consistent with the Bank Secrecy Act" for the disparity

U.S. DEPARTMENT OF JUSTICE
Tax Division, Western Region
P.O. Box 683
Washington, D.C.  20044
Telephone: 202-305-3664

between an accountholder's "putative income-tax liability and his FBAR penalty" to be "stark.") And, as Tuncay admits, the foreign accounts were income-generating for most of the years. Dkt. 36 at 16. There is thus no genuine dispute of material fact for trial.

### III. Because Tuncay Has Not Argued that His Conduct Was Not Reckless or Willfully Blind, Summary Judgment Should Be Granted to the United States.

Tuncay admits that courts have held that recklessness and willful blindness constitute willfulness for purposes of 31 U.S.C. § 5321(a)'s willful FBAR penalty. Dkt. 36 at 22−23. But Tuncay presents no argument that his conduct in failing to file timely FBARs, despite receiving notice of his disclosure requirements through the ZKB letters and his Schedule Bs, was not objectively reckless or willfully blind. *Id.* Indeed, Tuncay admits that he "ignored news reports" concerning the Department of Justice's investigation into Swiss banks despite holding his life savings in Swiss accounts until 2012 and that he made "no alarmed inquiries, even after [he] was informed that the bank had serious issues with U.S. regulators." Dkt. 36 at 14−15. These admissions alone meet the standard of objective recklessness: Tuncay "(1) clearly ought to have known that (2) there was a grave risk that an accurate FBAR was not being filed and [] (3) he was in a position to find out for certain very easily." *United States v. Burga*, --- F. Supp. 3d ----, 2023 WL 8190173, at *19 (N.D. Cal. 2023) (quoting *United States v. Horowitz*, 978 F.3d 80, 89 (4th Cir. 2020)). These admissions also meet the standard for willful blindness: after he was informed of a high probability that his accounts did not comply with United States regulations, Tuncay ignored news reports and deliberately chose not to make the inquiries ZKB and Dunn instructed him to make to determine his disclosure obligations. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). Thus, this Court should hold Tuncay liable for the willful FBAR penalties under either an objective recklessness or willful blindness theory, or both.

Tuncay purports that this cases "break[s] new ground in Fbar litigation" by being "the first case in which a defendant with a bona fide connection to the relevant foreign country is being charged with heightened willfulness penalties." Dkt. 36 at 22. But there is no such exception in the law, and Tuncay provides no legitimate legal reason why an accountholder's

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664

personal connection to a foreign country should trump overwhelming evidence that he willfully failed to timely disclose his accounts in that country. And he is wrong that he would be unique in being held liable for willful FBAR penalties in these circumstances. Indeed, as Tuncay points out, the professor in *Collins*, who was a dual citizen of both the United States and Canada and had taught in France, was held liable for willful FBAR penalties for failing to disclose his French and Canadian bank accounts, as well as his Swiss bank accounts. 36 F. 4th at 490. Given that Tuncay kept his life savings in Switzerland until 2012 even though he had not worked there since the mid-1990s, this case is indistinguishable from *Collins*. And there are many other cases where courts have entered judgment in the United States' favor on willful FBAR penalties where the accountholder had a personal connection to the foreign country where the unreported accounts were kept. *E.g.*, *United States v. Mahyari*, No. 3:20-cv-1887-IM, 2023 WL 372656, at *1, *7–*8 (D. Or. Jan 24, 2023) (Iranian-American accountholders willfully failed to report Iranian accounts); *United States v. Hughes*, No. 18-cv-05931-JCS, 2022 WL 4768683, at *3, *15 (N.D. Cal. Oct. 13, 2021) (accountholder willfully failed to report New Zealand business accounts); *United States v. Baroon*, No. 4:18-CV-05191-SAB, 2020 WL 1558157, at *1, *3 (E.D. Wash. Feb. 27, 2020) (American resident working in Norway willfully failed to report Norwegian account); *United States v. Ott*, 441 F. Supp. 3d 521, 531 (E.D. Mich. 2020) (accountholder with sister in Canada willfully failed to report Canadian accounts); *United States v. Markus*, No. 16-2133, 2018 WL 3435068, at *1–*2 (D.N.J. July 17, 2018) (accountholder born in Egypt willfully failed to report Egyptian account). Thus, Tuncay's personal connections to Turkey and Switzerland do not preclude judgment against him on the willful FBAR penalties.

## IV. Despite Tuncay's Arguments, There Is No Genuine Dispute that Tuncay's Decision Not to File Timely FBARs Was Knowing as a Matter of Law.

This Court need not even consider whether Tuncay's decision not to file timely FBARs for 2013 through 2017 was knowing if it holds that Tuncay's actions were objectively reckless or willfully blind. But if the Court reaches this issue, the Court should hold that Tuncay knowingly did not comply with his FBAR obligations. Tuncay's central argument that he did not knowingly

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664

fail to file timely FBARs is that many of his actions were not those of a "truly sophisticated schemer." Dkt. 36 at 16. Tuncay compares his conduct to that described in a Swiss bank indictment for criminal conspiracy and contends that he could not have been a willful actor because he did not attempt to shield his account through code words or numbers, use sham entities, or engage in clandestine meetings with bankers regarding his accounts. Dkt. 36 at 15; Dkt. 36-7. "But a lack of sophisticated business dealings or specialized tax knowledge does not preclude a finding of willfulness when acts of concealment are present." *Ott*, 441 F. Supp. 3d at 531. To show that Tuncay acted knowingly, the United States need not meet a criminal intent standard. It need only demonstrate that Tuncay knew of his FBAR obligations for 2013 through 2017 and did not comply with them. Tuncay's lies on the Questionnaire and his 2014 through 2017 tax returns, his request that his ZKB mail be sent to his Oya's mother's house in Turkey, his transfer of the balance of his Swiss bank accounts to Turkey when he was warned of potential disclosure obligations, and his attempts to conceal his ZKB accounts during the IRS's FBAR examination constitutes overwhelming evidence that Tuncay knowingly chose not to comply with his FBAR obligations. *See United States v. Rum*, 995 F.3d 882, 890−92 (11th Cir. 2021).

Tuncay contends that "genuine issue[s] of fact" concerning whether Tuncay "sought to hide his U.S. identity from his Swiss bank," "whether his preparers ever asked him about foreign accounts" and "whether he understood the relevance of his foreign accounts to his U.S. tax returns" bar this Court from granting summary judgment to the United States. Dkt. 36 at 23. The United States has already shown that there are no genuine disputes of fact. But even if these three issues were genuinely in dispute, they do not bar this Court from holding that Tuncay acted knowingly because they are not material. First, Tuncay's lies on the Questionnaire are probative of his intent to hide his ZKB accounts from the United States by providing ZKB with a Turkish address and not immediately disclosing his status as a United States citizen, but it is immaterial whether he intended to hide information from ZKB when the central issue in this case is Tuncay's willfulness in not reporting to the United States. Second, along with the overwhelming evidence that his tax preparers asked Tuncay about his foreign accounts, Tuncay signed tax

Reply in Support of US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

14

U.S. DEPARTMENT OF JUSTICE
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664

returns for 2014 through 2017 under penalty of perjury declaring that he did not have any foreign accounts and did not need to file an FBAR. Such evidence is sufficient to hold that Tuncay knew of his FBAR reporting requirements. *Goldsmith*, 541 F. Supp. 3d at 1094−97. Third, whether Tuncay "understood the relevance of his foreign accounts to his U.S. tax returns" is immaterial. The United States need only prove that Tuncay understood the disclosure obligations associated with his foreign accounts. A learned professor like Tuncay cannot contend that he did not understand the ZKB letters telling him that he may have "disclosure obligations" and the Schedule Bs indicating he may have to file an FBAR if he had foreign accounts. Thus, no dispute of fact bars this Court from holding that Tuncay acted knowingly.

Whether reckless, willfully blind, or knowing, Tuncay willfully did not file timely FBARs for 2013 to 2017. No reasonable jury could find otherwise.

### V. This Court Should Enter Judgment Against Tuncay in the Amount of $534,947.09, as of June 6, 2024.

Tuncay does not dispute the IRS's calculation of the willful FBAR penalties nor the United States' calculation of the current amount due on those willful FBAR penalties. Dkt. 36. Thus, if this Court holds that Tuncay is liable for the willful FBAR penalties assessed against him for 2013 through 2017, this Court should enter judgment against Tuncay Saydam in the amount of $534,947.09 as of June 6, 2024, as outlined in the United States' summary judgment motion. Dkt. 34 at 27.

### CONCLUSION

Tuncay seeks to put himself in a sympathetic light by describing himself as in over his head with many foreign accounts and no idea of the potential downsides to not reporting them. But he cannot explain away his lies, both on the Questionnaire and on his Schedule Bs. And his arguments provide only further evidence that his conduct in failing to file timely FBARs was reckless or willfully blind. Thus, this Court should enter judgment in the United States' favor holding Tuncay liable for willful FBAR penalties for 2013 through 2017.

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664

Dated: June 27, 2024

Respectfully submitted,

DAVID A. HUBBERT
Deputy Assistant Attorney General

*/s/ Lolita De Palma*
AMY MATCHISON
LOLITA DE PALMA
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683, Ben Franklin Station
Washington, D.C. 20044-0683

*Counsel for United States of America*

Reply in Support of US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

16

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664

# CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2024, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will provide electronic notice to counsel for all parties that have appeared in this action.

/s/ Lolita De Palma
LOLITA DE PALMA
Trial Attorney, Tax Division
United States Department of Justice

Reply in Support of US Motion for Summary Judgment
(Case No. 4:22-cv-07371-DMR)

17

**U.S. DEPARTMENT OF JUSTICE**
Tax Division, Western Region
P.O. Box 683
Washington, D.C. 20044
Telephone: 202-305-3664